1     A    Correct.

2     Q    All right. Now, if you look above it, it

3 looks like it was sent to a dean714@yandex.com. Did I

4 read that correctly?

5     A    Yes, you did.

6     Q    Okay. Who is Dean? And it's signed Dean

7 Anderson. Who is Dean Anderson, if you know?

8     A    I can't answer that question.

9     Q    And why can't you?

10     A    Well, there is a order from the federal court

11 in the SLAPP lawsuit that Van Dyke filed against me for

12 $100 million. There is a stay in that case ordered by

13 the federal judge for any kind of discovery with

14 regards to that.

15     Q    Okay. I want to stop you right there. We are

16 not in the federal court case and there is no stay in

17 this case, and I am asking you the question of who Dean

18 Anderson is. Are you going to refuse to answer that

19 question even though we are not in a federal court?

20     A    Yes. And I have several reasons why I --

21 first off, that is --

22     Q    Give me a reason other than federal court.

23     A    Attorney-client privilege if myself and my

24 attorney know who this person is based on our work

25 product.

1     Q    Is your attorney Mr. Anderson's attorney?

2     A    I don't know.

3     Q    Are you his attorney?

4     A    I'm not anybody's attorney.

5     Q    Okay. So then you understand the attorney-client privilege wouldn't apply to you and Mr. Anderson?

8     A    Well, if Mr. Dorrell and I have information on this and my information is based on that work product, I can't answer that.

11     Q    I'm going to tell you that's not correct --

12     A    Okay.

13     Q    -- and not in accordance with the law regarding attorney-client privilege. So again, are you refusing to answer my question in regards to who Dean Anderson is?

17     A    Well, when it comes to taking an advice from an attorney, I take the advice from the attorney that I'm paying for.

20     Q    So are you telling me it's Mr. Dorrell's advice for you to refuse to answer the question of who Dean Anderson is?

23     A    ==I'm not answering that question because of the stay ordered by the federal court and based on the fact that attorney work product privilege.== In addition, I'm

1   also going to claim a Fifth Amendment protection as
2   well, because Van Dyke has accused me of being Dean
3   Anderson, and he has accused me of committing crimes
4   and saying that Dean Anderson and I are one in the same
5   committing crimes against him.  He is trying to
6   conflate two separate individuals.
7        Q    Let's move on.  In P-3, did you receive that
8   threat on March 28th, 2018?  Did you receive that from
9   Mr. Anderson?
10       A    I don't see my e-mail header on this.
11       Q    Correct.  I received this e-mail from you on
12  either Monday or Tuesday this week.
13       A    Okay, then if you did, then yes.
14       Q    Let's just move on to P-4.
15       A    Okay.
16       Q    Are you there?
17       A    Yes, ma'am.
18       Q    Okay.  So let's start off at the -- it looks
19  like it's from Dean to -- is that your e-mail,
20  retzlaff@texas.net?
21       A    Yes, it is.
22       Q    And the subject is, "Fwd: Die"?
23       A    Yes.
24       Q    And the date at the top is Tuesday,
25  March 27th, 2018.  Is that correct?

1  A   All right.  I think I found it.
2  Q   Okay.  The highlighted portion begins with the
3  word "Earlier."  So just so we're on the correct
4  document; is that correct?
5  A   No, that's not what it says on 5 Charlie.
6  Q   What does the highlighted portion begin with,
7  sir?
8  A   This stuff there.  That's what I see under 5c.
9  Q   No, sir.  That was 5 bravo.  I'm asking you
10 about 5 Charlie.  Can you --
11 A   Oh, okay. All right. Go ahead. Yeah, just
12 the way these tabs are stuck in there, it's got me --
13 all right.  Go ahead.  What's your question?
14 Q   It says here that you found out that I got a
15 job as an assistant district attorney in Victoria
16 County; is that accurate?
17 A   Yes.
18 Q   Where did you learn that information?
19 A   I can't say that.
20 Q   Why not?
21 A   Because there is a discovery stay in the
22 federal lawsuit, and I can't answer that question.
23 Q   You understand that we're not here in the
24 federal lawsuit today.  This is a Bar disciplinary
25 proceeding?

1    A    Not my problem. The federal judge is very
2    specific. And in fact, I remember you crying like a
3    bitch this morning about wanting to get a discovery
4    conference call with the judge. How did that work out
5    for you, Van Dyke?
6         MR. VAN DYKE: Objection, non --
7         THE WITNESS: Well, you -- you tried to call
8    up the federal judge to ask him to give you a ruling on
9    this thing. What happened when you called him?
10        MR. VAN DYKE: Objection, nonresponsive.
11        THE WITNESS: Yeah, yeah, because this is
12   pretty fucking funny, right? Ha-ha. Giggle there, fat
13   boy. You're the one who said this morning you were
14   calling up the federal judge to get an opinion on
15   whether or not we can talk about these things because
16   of the court-ordered stay, the discovery stay. All
17   right? You're fishing for stuff that you know you are
18   not allowed to get. And what happened when you called
19   the federal court this morning to ask? What did they
20   tell you?
21   Q    BY MR. VAN DYKE: Are you done?
22   A    I'm waiting for your response.
23        MR. VAN DYKE: Object to the nonresponsive
24   parts of Mr. Retzlaff's answer.
25        THE WITNESS: Well, I'm not going to violate a

1 federal court order.
2    Q   BY MR. VAN DYKE: How about you answer the
3 question, and then you can file a motion for sanctions
4 against me for violating the federal court's order?
5 How about that, Mr. Retzlaff?
6    A   Except I would be the one violating the court
7 order, so no, I can't help you with that.
8    Q   I will agree to your motion for sanctions.
9    A   It doesn't matter, okay? It doesn't matter
10 what you want to agree or disagree to. Okay? The
11 federal judge was very clear in black and white, and
12 the statute is very clear in black and white. You
13 don't get to do discovery.
14    Q   Are you refusing to answer my question about
15 where you learned the information that you referenced
16 in your grievance?
17    A   Yes. And also, it's not relevant. It doesn't
18 matter where I heard it from.
19    Q   It says in this grievance you contacted Steve
20 Tyler. When did you contact him?
21    A   I don't recall exactly. I've had many, many
22 communications with Steve. I don't recall.
23    Q   How do you know Mr. Tyler?
24    A   He was in the Army -- knock it off.
25       He was in Germany about the same time I was.

THOMAS C. RETZLAFF - October 25, 2018

1 personal life I'm not gonna give it to you.  Violent
2 Nazi motherfuckers who send death threats forfeit their
3 right by wrongdoing to get my personal information or
4 personal information about my family.
5     Q    Is that your legal opinion?
6     A    That's my personal opinion.  I'll tell you
7 what Jeff Dorrell had to say, but don't worry about it.
8     Q    Would you agree with me that San Antonio is
9 not located in Victoria County?  Can we at least agree
10 on that?
11     A    Yes.
12     Q    Okay.  Would it be accurate to say that
13 Victoria County is an approximately two-hour drive from
14 San Antonio?
15     A    No.
16     Q    Do you know how long of a drive it is?
17     A    Oh, I get there much quicker than that.
18     Q    How long does it take you to get there,
19 Mr. Retzlaff?
20     A    It depends upon from where I am traveling
21 from, but it depends.  Anyways, what difference does it
22 make?
23     Q    Well, you don't really know Mr. Tyler
24 personally, do you?
25     A    ==I can't answer that question.  That's -- you==

1  know, you are going into matters that -- that the
2  federal court has put on hold.
3      Q    Well, Mr. Retzlaff, you said that you know
4  Mr. Tyler in your complaint against me.  I'm just
5  trying to inquire as to whether what you said in your
6  complaint is true or not.  So is that true or not true?
7  Do you know Mr. Tyler personally?
8      A    Well, that's two different questions, because
9  the complaint doesn't say that.  The State Bar
10 complaint doesn't say that.
11     Q    Okay.  So you said, "So I contacted Steve
12 Tyler, the District Attorney (who I know because I live
13 in San Antonio)."
14     A    Right.
15     Q    And said, "Do not hire this dude - he is a
16 fucking lunatic."
17     A    And -- and -- and I stand by that answer.  It
18 says what it says.
19     Q    So would you also stand by when you said
20 that -- when you state in your grievance that you told
21 him that I was a drug addict?
22     A    That's not what I said.
23     Q    Okay.  So you didn't tell him I was a drug
24 addict?
25     A    That's not what it says.  That's not what the

1  A   I don't know.
2  Q   Did you give this letter to anybody?
3  A   Oh, yeah. Shit, I shared it with everybody.
4  Q   Who all did you share this letter with?
5  A   Oh, Jesus, 20, 30 people at least. I'm not
6  sure. News media. I gave one to Ken White. I gave
7  him a copy, I remember that. A lot of people. A lot
8  of people got this letter.
9  Q   Isn't it true you published it to a Web site?
10 A   ==I'm sorry, I can't help you with that.==
11 Q   I'm just asking you if it's true or not. Did
12 you post it to a Web site or not?
13 A   ==And again, I'm sorry, I can't help you with==
14 ==that question. We're stepping into areas where the==
15 ==federal court said we can't talk about.==
16     MR. VAN DYKE: That's -- objection,
17 nonresponsive.
18 Q   BY MR. VAN DYKE: You are not going to tell me
19 whether you published this on a Web site?
20 A   You know, I think I might have put it on
21 Facebook, but I'm not sure.
22 Q   Oh, so you have a Facebook account?
23 A   No, I didn't say that. I said I think it
24 might have gone on Facebook, but I'm not sure.
25 Q   Do you have a Facebook account?

```
 1    A    I think it might have been on the -- the
 2  Popehat blog.  But, you know, we're getting into areas
 3  that -- that -- that are involving the federal lawsuit.
 4  One of the things you said in the federal lawsuit, you
 5  accused me of -- of running some kind of blog or
 6  something like that, and I'm not going to answer any
 7  questions about that.
 8    Q    Let's -- let's get -- make it clear.  Do you
 9  operate a blog commonly known as BV Files?
10    A    And again, I'm not gonna answer that question.
11  We have a federal court order that stays discovery on
12  these matters.  In addition, you and other people have
13  accused me of crimes with regards to that blog, so I'm
14  not going to answer that question.
15    Q    What is the legal basis for your refusal to
16  answer other than the federal court's order?
17    A    I find your -- your question to be harassing
18  and in violation of my Fifth Amendment rights.  You --
19  you want to sit here and -- and make claims that I've
20  done these criminal things with regards to blogging, so
21  any kind of question about blogging I'm not going to
22  talk about.
23    Q    Go to -- why don't you go then to Exhibit 9.
24    A    All right.
25    Q    Do you know what this is?
```

1  Q    Would it be accurate to say that this page
2  references John Morgan?
3  A    I don't -- I don't think so.
4  Q    What's at the top of the page 6 that you are
5  looking at, Mr. Retzlaff?
6  A    You know, I am sorry.  I'm gonna have to shut
7  you down here.  I'm really starting to feel harassed by
8  these questions about John Morgan and -- and about
9  Philip Klein.  I'm being harassed by that.  I'm not
10 going to answer any more questions about those guys.
11 Q    What about you?  How about you go to page 7.
12 A    Sorry, again, I'm -- I'm -- when it comes to
13 this blog, I'm not answering any questions about it for
14 the reasons I've already stated.
15 Q    You're on page 7?
16 A    Say again.
17 Q    So that's not a picture of you on page 7 in
18 the Court of Appeals for the Second District of Texas?
19 Is that you?
20 A    Oh.  Yes, that's a photograph of me.
21 Q    Okay.  And then on page 9, do you know who
22 those -- those people who are photographed at the top
23 of page 9, do you know who they are?
24 A    ==Again, I -- I can't help you with that.==
25 ==You're starting to harass me with these questions.==

1   This is completely irrelevant stuff, and it's
2   harassing, you know, and -- and we're talking about
3   stuff that the federal judge has ordered stayed.  And,
4   you know, you're the one who -- you and McGibney and
5   Klein and Morgan have accused me of various crimes
6   involving this blog, and I'm not going to answer any
7   questions on that, you know, for, you know, Fifth
8   Amendment reasons, and as well as it's harassing and
9   annoying.
10      Q    All right.  What about page number 10?
11      A    It doesn't matter what page you go to, the
12  response is the same.
13      Q    Oh, I don't want to hear your response,
14  Mr. Retzlaff.
15      A    I've already given my response, and now I'm
16  starting to feel harassed.
17      Q    So you are not gonna answer any questions
18  about this exhibit; is that correct?
19      A    Correct.  Anything to do with blogs I'm not
20  going to answer any questions to for the reasons I've
21  already stated.
22      Q    And that -- and is the legal basis for your
23  objection your Fifth Amendment privilege against
24  self-incrimination?
25      A    I'm sorry, dude, I've got nothing more for

1  you.  ==You're trying to violate a federal court order==
2  ==that says we can't talk about these things, and -- and==
3  ==that's all it is.==  And, you know, your question's
4  harassing.  And your -- and it also delves into Fifth
5  Amendment stuff, too.  So, you know, you're the one
6  who --
7       Q    But --
8       A    You're the one -- listen, dude.  You're the
9  one who accused me of committing a crime with this
10 blog.  So when it comes to stuff like that, I'm not
11 answering any questions.
12      Q    All right.  Well, fine.  Why don't you go to
13 Exhibit 10, then.
14      A    We're gonna have to hurry up here because I'm
15 going to have to go here in a little bit.
16      Q    Well, you've been subpoenaed to be here today,
17 Mr. Retzlaff.
18      A    It doesn't matter.
19      Q    Let's look at what's been marked as Exhibit
20 10.
21      A    Yeah, what about it?
22      Q    Well, you state in that e-mail that you
23 accessed State Bar records.
24      A    I don't say that this is an e-mail.  I don't
25 know what this is.

1 person? Because somebody uses the word D or A or
2 simply that there's some kind of grand conspiracy, they
3 are connected? What does that have to do with you
4 going on Twitter calling people niggers and saying
5 you're going to lynch them?
6     MR. VAN DYKE: Objection to the nonresponsive
7 parts of the answer.
8     THE WITNESS: No, I'm objecting. That's my
9 objection, okay. Your question is -- is harassing and
10 it's irrelevant. All right?
11     I'm skipping ahead here, you know, to some of
12 these e-mails. I'm not going to talk about No. 17.
13 That's some stuff with that guy I guess you claimed you
14 worked with. I don't know. That's not my e-mail. I
15 can't authenticate that.
16   Q  BY MR. VAN DYKE: All right. What about
17 No. 18, Mr. Retzlaff? Are you going to talk about that
18 one?
19   A  No. No, I'm not.
20   Q  What about No. 19?
21   A  Again, no.
22   Q  Well --
23   A  This is all stuff from your federal lawsuit
24 against me, dude. I'm not talking about it. There's
25 a -- there's a reason the federal judge said you are

1  not allowed to do discovery on this thing.  You know,
2  once the appeal gets out of the way, then -- then maybe
3  we can talk.  Except the only person getting grilled is
4  going to be you.
5      Q    Mr. Retzlaff, how often have you contacted my
6  clients since this -- since this proceeding has been
7  going on?
8      A    I -- I'm not going to answer that question
9  because I find that to be harassing and irrelevant.
10     Q    Did you contact Gavin McInnes?
11     A    Again, you know, we've got a federal stay on
12 that, so, you know, what Mr. Dorrell has done or hasn't
13 done, I can't talk about that.  That's attorney-client
14 privilege.  You know, what his strategy is and what
15 he's planning on doing and who he's going to do it to,
16 that's work product and strategy, dude.
17     Q    Are you going to answer any of my other
18 questions today or are we just wasting our time?
19     A    You're wasting everybody's time with -- you
20 know you shouldn't be asking these questions, okay?
21 This isn't a fishing expedition, okay, on stuff that
22 you can't talk about.
23     Q    Because I think what we're gonna -- we're
24 gonna get to the bottom of is that you and Dean
25 Anderson are one and the same person, is what we're

```
 1  going to get to today here, Mr. Retzlaff.  So why don't
 2  you just come out --
 3       A    And how is --
 4       Q    -- and say you're the same person.
 5       A    Let's pretend for a moment that your bizarre
 6  conspiracy is true.  How is that gonna help you with
 7  the State Bar?  How is that gonna help you?
 8       Q    The fact that you've lied to them.
 9       A    Lied to them?  You're the one who called me
10  up, Jeff Dorrell up and said that you're gonna murder
11  me.  Okay?  You sent e-mails.  You filed a SLAPP
12  lawsuit against me for $100 million.  Dude, your bar
13  career is over with no matter what happens.  Okay?
14  You're never going to be a lawyer again, and nobody is
15  ever going to hire you because of shit you did.  And
16  you're trying to blame me for it.  You're the one who
17  goes on Twitter calling people niggers and threatening
18  to lynch them.  Do you think you are going to get
19  clients doing that crap?
20           You know, if I was the guy that owned Texas
21  Title -- you know, just like Roseanne Barr got fired
22  for shit she said on Twitter.  What makes you so
23  special, buddy?  You think you get to keep your job and
24  be an assistant DA but you get to be in a white
25  supremacist group?  No, you do not, and that's your
```

```
 1  fault.  Okay?
 2           Just like you breaking into your truck and
 3  staging a crime, committing a felony, dude, all right,
 4  you are going to jail.  You know, I'm sitting here
 5  looking on my phone waiting on the e-mail for when they
 6  come busting in the door there and dragging your ass
 7  off.
 8       Q   I've got all day.  I'm happy to --
 9       A   Well, I ain't got all day, because right now
10  you're harassing me, and this is getting completely
11  annoying and irrelevant, and you are fishing for stuff,
12  you know, with regards to this federal lawsuit and this
13  nonsense with the McGibney lawsuit, and -- and we're
14  not going there.  You stick to what's relevant, you
15  know, unless you're going to say, geez, I never did
16  call up Jeff Dorrell and threaten Tom Retzlaff, or if
17  you're going to say, geez, I never did send those
18  e-mails to Tom Retzlaff threatening him, then that's
19  fine.  What's your defense going to be, Jason, when
20  you're before the grievance committee for the trial?
21           When -- when Kristin asked you, Mr. Van Dyke,
22  did you call up Jeffrey Dorrell and say, yeah, yeah,
23  yada, what are you going to say?  You know, you can't
24  beat the rap, dude.  You know, you sent the e-mails,
25  you sent the threats.
```

1       And what about the crap you did to Ken White?
2 You're gonna deny that, too?  You know, you're gonna
3 sit there -- when you're questioned under oath, what
4 are you going to say, dude?  You've got no defense.
5 All right.  You're looking for ticky-tacky shit to try
6 to deflect, and -- and we're too smart for that, dude.
7       You know, Dean Anderson or the time zone that
8 an e-mail was sent in or whether somebody uses a common
9 English phrase or not or whether somebody posted a
10 picture of Philip Klein on a blog, that's not gonna
11 save you from what the State Bar is going to do.  You
12 know, the only thing that could have saved you would be
13 apologizing, begging for forgiveness and promising
14 never to do it again.  But it's too late, dude.  You
15 had your chance.
16   Q   That's not going to happen.
17   A   No, of course not. Don't apologize.  Don't
18 apologize and walk in there with a defiant attitude
19 that you always have.  That's really winning.  And I'll
20 tell you something else, dumb-ass.  I have never read
21 The Turner Diaries or The Protocols for the Elders of
22 Zion.  But the Michigan police, when they busted into
23 your dorm room and found guns and shit in there, they
24 found the same book that Timothy McVeigh had and other
25 antigovernment nuts.  You know, you're a lunatic.

```
 1     Q    You're not going to give me truthful answers
 2  to any of the rest of my questions today, are you?
 3     A    I haven't said anything that's not truthful,
 4  but there's going to be a lot of shit that I'm not
 5  going to be able to talk about, and you know it.  You
 6  know that you're going into forbidden territory.
 7  That's why you were crying to the federal judge this
 8  morning to try to get him to -- to give you
 9  instructions.  And what did the federal judge said when
10  you called his office?  What did he say?
11     Q    I'm the one asking you the questions.
12     A    Come on, big guy, share it.  What happened
13  when you called the federal judge today?  What
14  happened?  Come on, Jason, tell us what happened.  Did
15  the federal judge said it was okay for you to ask these
16  questions, or did he tell you to go to fuck away?  What
17  did he say?
18     Q    You know what, Mr. Retzlaff, I'm going to pass
19  you, and you know why, because I think I -- I think I
20  want to get your behavior in front of a whole committee
21  when this goes to trial, and it's going to trial.
22          MR. VAN DYKE:  Pass the witness.
23          MS. BRADY:  Hold on.  Okay.  This is Kristin
24  Brady again.
25          THE WITNESS:  Hey.
```