THOMAS C. RETZLAFF - October 25, 2018

BEFORE THE DISTRICT 14 GRIEVANCE COMMITTEE

EVIDENTIARY PANEL 14-2

STATE BAR OF TEXAS

COMMISSION FOR LAWYER DISCIPLINE,)   Case No. 201707583
                                  )
      Petitioner,         )
                                    )
 v.                          )
                                    )
JASON LEE VAN DYKE,       )
                                    )
      Respondent.        )
_____)

VIDEOCONFERENCE DEPOSITION OF THOMAS C. RETZLAFF

October 25, 2018
10:59 a.m.
Phoenix, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona CR No. 50623

Exhibit 1

THOMAS C. RETZLAFF - October 25, 2018

```
 1                        I N D E X

 2   WITNESS                                    PAGE

 3   THOMAS C. RETZLAFF

 4        Examination by Ms. Brady               9
          Examination by Mr. Van Dyke           57
 5

 6

 7

 8                  INDEX TO EXHIBITS

 9   Petitioner's        Description           Page

10   Exhibit 1     Witness subpoena for deposition    15

11   Exhibit 2     Acceptance of service of           15
                   subpoena
12
     Exhibit 3     E-mail chain from Jason Van        17
13                 Dyke to Dean 3/28/18
                   "Subject: Re: Die"
14
     Exhibit 4     E-mail chain from Dean to          20
15                 Thomas Retzlaff 3/27/18
                   "Subject: Fwd: Die"
16                 CFLD-030

17   Exhibit 5     E-mail chain from Dean to          22
                   Thomas Retzlaff 3/27/18
18                 "Subject: Fwd: Die"
                   CFLD-039
19
     Exhibit 6     E-mail chain from Dean to          24
20                 Thomas Retzlaff 3/27/18
                   "Subject: Fwd: Die"
21                 CFLD-035

22   Exhibit 7     E-mail chain from Dean to          25
                   Thomas Retzlaff 3/27/18
23                 "Subject: Fwd: Die"
                   CFLD-040
24

25
```

THOMAS C. RETZLAFF - October 25, 2018

INDEX TO EXHIBITS, CONT'D

| Petitioner's | Description | Page |
|---|---|---|
| Exhibit 8 | E-mail chain from Dean to Thomas Retzlaff 3/28/18 "Subject: Fwd: Die" CFLD-034 | 27 |
| Exhibit 9 | E-mail chain from Dean to Thomas Retzlaff 3/28/18 "Subject: Fwd: Die" CFLD-018 | 28 |
| Exhibit 10 | E-mail from Jason Van Dyke to Dean 4/3/18 "Subject: Pedophile?" CFLD-1420 (Confidential - Attorney Eyes Only) | 29 |
| Exhibit 11 | E-mail chain from Tom Retzlaff to Kristin Brady 4/6/18 "Subject: more Van Dyke threats" | 30 |
| Exhibit 12 | E-mail from Jason Van Dyke to Dean 4/7/18 "Subject: Re:" CFLD-1429 (Confidential, AEO) | 31 |
| Exhibit 13 | E-mail chain from Jason Van Dyke to Dean 4/7/18 "Subject: Re:" CFLD-1432 (Confidential, AEO) | 32 |
| Exhibit 14 | E-mail chain from Jason Van Dyke to Dean 4/8/18 "Subject: Re:" CFLD-1433 (Confidential, AEO) | 32 |
| Exhibit 15 | E-mail from Jason Van Dyke to Dean 4/8/18 "Subject: Re: Pedophile?" CFLD-1434 (Confidential, AEO) | 33 |

THOMAS C. RETZLAFF - October 25, 2018

INDEX TO EXHIBITS, CONT'D

| Petitioner's | Description | Page |
|---|---|---|
| Exhibit 16 | E-mail chain from Kristin Brady to Maria Lopez 5/22/18 "Subject: FW: Van Dyke murder threats" CFLD - 748 to 749 | 33 |
| Exhibit 17 | E-mail chain from Tom Retzlaff to Jeffrey Dorrell 5/29/18 "Subject: ur original email" CFLD-930 to 931 | 35 |
| Exhibit 18 | Twitter post by @realJLVD | 41 |
| Exhibit 19 | Instagram post by proudboywaterfowler August 23rd CFLD-1555 | 41 |
| Exhibit 20 | Instagram post by proudboywaterfowler July 8 CFLD-1556 | 43 |
| Exhibit 21 | Post by J.L. Van Dyke April 20 CFLD-1596 | 44 |
| Exhibit 22 | Post by @MeanTXLawyer 9/12/14 CFLD-1597 | 45 |
| Exhibit 23 | Post by @RealJLVD 7/10/17 CFLD-1598 | 45 |
| Exhibit 24 | Post by @MeanTXLawyer CFLD-1599 | 46 |
| Exhibit 25 | Posts by Jason L. Van Dyke April 21, 2017 CFLD-1605 to 1612 | 9 |
| Exhibit 26 | Post by J.L. Van Dyke April 20 D-1781 | 47 |
| Exhibit 27 | Posts by Jason Lee Van Dyke CFLD-1657 to 1668 | |

THOMAS C. RETZLAFF - October 25, 2018

```
 1              INDEX TO EXHIBITS, CONT'D

 2      Petitioner's        Description            Page

 3    Exhibit 28    Posts by J.L. Van Dyke July 9,     48
                    2017
 4                  CFLD-1788 to 1798

 5    Exhibit 29    Post by J.L. Van Dyke 7/10/17      48

 6    Exhibit 30    Post by J.L. Van Dyke 7/10/17      48

 7    Exhibit 31    Post by J.L. Van Dyke              49
                    CFLD-1772
 8
      Exhibit 32    Posts by J.L. Van Dyke             49
 9                  CFLD-1773

10    Exhibit 33    Post by J.L. Van Dyke              50
                    CFLD-1774
11
      Exhibit 34    Posts by J.L. Van Dyke             50
12                  CFLD-1775

13    Exhibit 35    Posts by J.L. Van Dyke             51
                    CFLD-1782
14
      Exhibit 36    Post by J.L. Van Dyke              51
15                  CFLD-1783

16    Exhibit 37    Post by Jason Van Dyke             51
                    FLD-1784
17
      Exhibit 38    Post by Jason L. Van Dyke          52
18                  December 2014

19    Exhibit 39    Post by Jason L. Van Dyke          52
                    12/29/2014
20
      Exhibit 40    Post by Jason L. Van Dyke          52
21                  @dividedly

22    Exhibit 41    Post by J.L. Van Dyke 11/18/2017   52

23    Exhibit 42    Proud Boys/ Southern Poverty       53
                    Law Center article
24                  CFLD-347

25
```

THOMAS C. RETZLAFF - October 25, 2018

```
 1                      INDEX TO EXHIBITS

 2      Respondent's        Description              Page

 3      Exhibit 1      Criminal history conviction     57
                       search
 4
        Exhibit 2      Office of Court Administration   60
 5                     List of Vexatious Litigants

 6      Exhibit 3      Order granting Defendants motion 62
                       to strike all pleadings filed
 7                     by Thomas Retzlaff

 8      Exhibit 4      E-mail from Tom Retzlaff to      67
                       Kristin Brady 7/9/18
 9                     "Subject: Jason Van Dyke case"
                       CFLD-954
10
        Exhibit 5      Office of Chief Disciplinary     68
11                     Counsel Grievance Form
                       12/20/2017
12
        Exhibit 5a     Attorney-client privilege waiver 71
13
        Exhibit 5b     Questions 8 and 9               72
14
        Exhibit 5c     Grievance                       78
15
        Exhibit 5d     Grievance                       88
16
        Exhibit 5e     Grievance                       90
17
        Exhibit 5f     Grievance                       91
18
        Exhibit 6      Office of Chief Disciplinary     92
19                     Counsel Grievance Form 8/30/18

20      Exhibit 7      (Not used)                      94

21      Exhibit 8      Letter to Thomas Rezlaff from    95
                       Gayle Vickers 3/8/18
22
        Exhibit 9      BV Files posts                  98
23
        Exhibit 10     E-mail from Tom Retzlaff to     103
24                     rd4ou@yahoo.com
                       "Subject: Jason Van Dyke"
25                     CFLD-011
```

THOMAS C. RETZLAFF - October 25, 2018

```
 1                    INDEX TO EXHIBITS, CONT'D

 2      Respondent's          Description              Page

 3      Exhibit 11      E-mail chain from Tom Retzlaff      104
                        to Kristin Brady 3/29/18
 4                      "Subject: RE: Jason Lee Van Dyke"
                        CFLD-184 to 185
 5
        Exhibit 12      E-mail chain from Tom Retzlaff      106
 6                      to Kristin Brady 4/4/18
                        "Subject: RE: Murder threats"
 7                      CFLD-222

 8      Exhibit 13      E-mail chain from Kristin Brady     110
                        to Tom Retzlaff 4/18/18
 9                      "Subject: RE:  Murder threats"
                        CFLD-385 to 386
10
        Exhibit 14      Declaration of Brittany Retzlaff    112
11
        Exhibit 15      Declaration of Collin Retzlaff      112
12
        Exhibit 16      E-mail chain from Dean to           114
13                      Jason Van Dyke 3/23/18
                        "Subject: Re: Stop Posting"
14
        Exhibit 17      E-mail chain from Bob Karlseng      115
15                      to Jason Van Dyke 3/25/18
                        "Subject: Re: Who is Dean Anderson?"
16
        Exhibit 18      E-mail chain from Dean to Jason     115
17                      Van Dyke 3/26/18
                        "Subject: Re: Service of Process"
18
        Exhibit 19      E-mail chain from Dean to           115
19                      Jason Van Dyke 3/27/18
                        "Subject: Re: Stop Posting"
20

21

22

23

24

25
```

```
 1              VIDEOCONFERENCE DEPOSITION OF THOMAS C.

 2   RETZLAFF was taken on October 25, 2018 at the offices

 3   of Phoenix Deposition Services, Copper Point Tower,

 4   3030 North Third Street, Suite 200, Phoenix, Arizona,

 5   commencing at the hour of 10:59 a.m. before Marcella

 6   Daughtry, a Registered Professional Reporter and

 7   Arizona Certified Reporter, in and for the State of

 8   Arizona.

 9

10   APPEARANCES:

11

12       Appearing via videoconference for the Petitioner:

13           State Bar of Texas
             MS. KRISTIN V. BRADY
14           Assistant Disciplinary Counsel
             The Princeton, 14651 Dallas Parkway, Suite 925
15           Dallas, Texas 75254
             972.383.2900
16           kristin.brady@texasbar.com

17

18       Appearing via videoconference for the Respondent:

19           The Van Dyke Law Firm
             MR. JASON LEE VAN DYKE
20           108 Durango Drive
             Crossroads, Texas 76277
21           jason@vandykelawfirm.com
             469.964.5346
22

23

24

25
```

THOMAS C. RETZLAFF - October 25, 2018

1          (Petitioner Deposition Exhibits 1 through 42
2     were marked for identification.)

3

4                    THOMAS C. RETZLAFF,
5     called as a witness herein, having been first duly
6     sworn by the Certified Reporter to speak the whole
7     truth and nothing but the truth, was examined and
8     testified as follows:

9

10                   EXAMINATION
11    BY MS. BRADY:
12        Q    Good afternoon, Mr. Retzlaff.  My name is
13    Kristin Brady.
14        A    Good morning.  Good morning.
15        Q    I work for the Chief Disciplinary Counsel's
16    office.
17             We've spoken before on the phone this week,
18    correct?
19        A    Yes, we have.
20        Q    Okay.  And have you ever had your deposition
21    taken before?
22        A    Yes.
23        Q    All right.  And you understand then that you
24    are under oath?
25        A    Yes.

THOMAS C. RETZLAFF - October 25, 2018

1    Q    And you are going to tell the truth today?

2    A    Yes.

3    Q    Okay.  I just want some general background of

4    you, Mr. Retzlaff.  Where do you -- you don't have to

5    give a specific address, but where do you live?

6    A    Phoenix.

7    Q    And how long have you been in Phoenix?

8    A    On and off for the past several years.

9    Q    And what do you do in Phoenix?

10   A    I play golf.  I like to scuba dive.  I go

11   skydiving.  I like to read books.

12   Q    How about for employment, Mr. Retzlaff?

13   A    Oh, none.  Absolutely nothing.

14   Q    Are you retired?

15   A    Yeah.

16   Q    And what are you retired from?

17   A    Nothing.

18   Q    Have you ever had a job, Mr. Retzlaff?

19   A    Oh, I was in the military for about eight

20   years.

21   Q    Okay.  What branch?

22   A    Army.

23   Q    Okay.  And do you know Jason Van Dyke?

24   A    Not personally.

25   Q    Okay.  So you've never met him face-to-face?

THOMAS C. RETZLAFF - October 25, 2018

1     A     No.

2     Q     Do you know of Jason Van Dyke, the respondent

3 in this case?

4     A     Yes.

5     Q     Okay.  And how do you know of him?

6     A     He's threatened to murder me and my family.

7 He has told my attorney Jeffrey Dorrell in Houston that

8 he knows where I live, that he's going to murder me.

9 Van Dyke is a member of a government designated threat

10 group, white supremacist group called the Proud Boys.

11         I know that Van Dyke is currently under

12 indictment -- I mean investigation at this point by the

13 Denton County District Attorney's Office.  He's also

14 been arrested for the misdemeanor offense of filing a

15 false police report a couple of weeks ago.  He is suing

16 me for $100 million in federal court.  He tried

17 to -- well, not necessarily sue me, but sue Steve

18 Tyler, the DA in Victoria County, trying to find out

19 some information about who may or may not have cost Van

20 Dyke his job.

21     Q     Okay.  I'm going to stop you right there.

22     A     Okay.

23     Q     Approximately when did you first learn of

24 Jason Van Dyke?

25     A     A couple of years ago.  I can't say for sure.

THOMAS C. RETZLAFF - October 25, 2018

1    Q    And then how?

2    A    I think the first time I heard of him was

3 because he and his Nazi buddy, a guy named Kyle

4 Bristow, who is an attorney in -- temporarily,

5 anyways -- in Michigan, they concocted a scheme to file

6 a lawsuit against a Web site called Pink Meth and

7 Google.  And --

8    Q    How did you become aware of that?

9    A    There was news reports about it because it was

10 quite entertaining that somebody wanted to sue the Tor,

11 T-o-r, Tor Browser company, which is a Web browser like

12 Internet Explorer or Firefox or Chrome.  And Van Dyke

13 served Kyle claiming that Kyle ran some sort of Web

14 site and got a default judgment.  Only later it turned

15 out that Kyle was working for and with Van Dyke, and

16 the whole scheme fell apart, and the Internet had a

17 great amount of laughter.

18   Q    Okay.  Now, since that's a couple years ago,

19 after you became aware of that Pink Meth case and of

20 Jason Van Dyke, did you continue to follow him either

21 on social media or the Internet?

22   A    No, I don't think -- I don't think at the --

23   Q    Did you hear of any other things about Mr. Van

24 Dyke after that?

25   A    Well, I found out that he got a job at the

1  Victoria County District Attorney's Office as an

2  assistant DA.

3      Q     And approximately when was that, if you know?

4      A     About a year and a half ago, I think, maybe.

5      Q     Okay.

6      A     Anyways, of course, you can't have Nazis and

7  white supremacists being assistant district attorneys,

8  especially in the state of Texas which has the highest

9  death penalty rate per capita.  You know, in my opinion

10 he is absolutely unqualified for that job or in fact

11 any other job for that matter, unless it involves the

12 food service industry at a drive-thru window.

13     Q     Okay.  Mr. Retzlaff, once you found out about

14 the job offer in Victoria County, the DA's office,

15 when's the next time you had -- at this point, had you

16 had any personal contact with Mr. Van Dyke via either

17 social media, e-mail, anything?

18     A     No.

19     Q     Okay.  After the Victoria County position was

20 offered to Mr. Van Dyke, did you hear again of him

21 after that?

22     A     Did I hear of him or from him?

23     Q     Let's start with from him.

24     A     Not directly, no.

25     Q     Okay.

1   A   But indirectly he did post on social media

2   threatening to murder the people that were behind him

3   losing that job.

4   Q   Okay.  And after that, how about of him?  Did

5   you hear any other stories?

6   A   Yeah.  Steve told me that a lawsuit had been

7   filed against him for Van Dyke trying to uncover who

8   the people were that snitched on Van Dyke, because he

9   was crying like a bitch because he didn't get the job

10   as DA, even though he goes on Twitter calling people

11   niggers and faggots and talking about lynching black

12   people.  And so Van Dyke was upset and shocked that he

13   didn't get the job, and so he wanted to uncover, quote,

14   the people who ran their mouths, I believe was the

15   exact quote that Van Dyke used.

16       And I suggested to Steve that he file an

17   anti-SLAPP motion, because that's what you do when

18   vexatious idiots file baseless litigation against you

19   pertaining to First Amendment rights.

20   Q   Okay, I'm going to backtrack real quick and

21   then get in to some of the e-mails you have sent me in

22   this case.  But first, you are in Arizona right now; is

23   that right?

24   A   Right at this moment, yes.

25   Q   Okay.  And if you look at -- do you have the

1   exhibits in front of you?

2       A    I have absolutely nothing in front of me, but

3   this nice young lady is fixing to hand me some good

4   stuff.

5            All right.  I've got a massive stack of stuff

6   here.  Which would you like me to look at first?

7       Q    The first one, P-1, do you have that in front

8   of you?

9       A    Yes, I do.

10      Q    And is this the subpoena that you received in

11  regards to this deposition?

12      A    Yes, it is.

13      Q    Okay.  And if you look at P-2, is this the

14  acceptance of service that you signed in regards to

15  that subpoena as reflected in P-1?

16      A    Yes, it is.

17      Q    Okay.  Now, is this the address as reflected

18  in P-1 that you are at right now?

19      A    I'm not sure.

20      Q    Okay.  Did you call me on Monday to see if we

21  could switch the address at the last minute?

22      A    Absolutely.

23      Q    And can you tell me why you did that?

24      A    Because Jason Van Dyke has threatened to

25  murder me, as well as my family members.  He has said

1  this directly and indirectly.  He is a member of an

2  organization called the Proud Boys, which is a white

3  supremacist organization with about 10,000 members that

4  is a designated security threat group by the

5  government.

6          Right now Van Dyke is under investigation by

7  the Denton County District Attorney's Office.  In

8  addition, as -- I heard that this morning that his

9  buddy -- his boss, Gavin McInnes, is now on the run.

10  The NYPD is looking for him.  They've opened up a

11  terrorism investigation involving the Proud Boys.  The

12  Proud Boys --

13      Q    I'm going to stop you right there.

14      A    Okay.

15      Q    Tell me why you personally wanted to move it,

16  this depo.  But what, if any, concern did you have?

17      A    That violence would take place.

18      Q    Okay.  Violence on you?

19      A    Yes, among other things of course.

20      Q    From Mr. Van Dyke personally?

21      A    Say again.

22      Q    From Mr. Van Dyke personally?

23      A    Or by one or more of his members of his group.

24  On May 22nd of --

25      Q    Hold you.  And you mentioned his group.  The

1  Proud Boys, is that who you are speaking of?

2      A    Yes, ma'am.

3      Q    And is it your belief that they are a violent

4  group?

5      A    Yes, and not just my belief either.

6      Q    You believe that they are present throughout

7  the nation?

8      A    Yes, they are.

9      Q    Okay.  So we're going to start going through

10  the e-mails.

11      A    Okay.

12      Q    If you could start with P-3.

13      A    All right.  I'm looking at that right now.

14      Q    Okay.  And look at the bottom of this one.

15      A    Okay.

16      Q    Start with that first day of March 28, 2018.

17  Do you see that?

18      A    Yes.

19      Q    Okay.  And in this -- in this at the bottom it

20  states from jason@vandykelawfirm.com.  "If you do not

21  stop calling my clients, I will make you suffer.

22  Better watch your back Tom."

23           Did I read that correctly?

24      A    Yes, that's what it says.

25      Q    And your name is Tom, correct?

1    A    Correct.

2    Q    All right.  Now, if you look above it, it

3  looks like it was sent to a dean714@yandex.com.  Did I

4  read that correctly?

5    A    Yes, you did.

6    Q    Okay.  Who is Dean?  And it's signed Dean

7  Anderson.  Who is Dean Anderson, if you know?

8    A    I can't answer that question.

9    Q    And why can't you?

10    A    Well, there is a order from the federal court

11  in the SLAPP lawsuit that Van Dyke filed against me for

12  $100 million.  There is a stay in that case ordered by

13  the federal judge for any kind of discovery with

14  regards to that.

15    Q    Okay.  I want to stop you right there.  We are

16  not in the federal court case and there is no stay in

17  this case, and I am asking you the question of who Dean

18  Anderson is.  Are you going to refuse to answer that

19  question even though we are not in a federal court?

20    A    Yes.  And I have several reasons why I --

21  first off, that is --

22    Q    Give me a reason other than federal court.

23    A    Attorney-client privilege if myself and my

24  attorney know who this person is based on our work

25  product.

1    Q    Is your attorney Mr. Anderson's attorney?

2    A    I don't know.

3    Q    Are you his attorney?

4    A    I'm not anybody's attorney.

5    Q    Okay.  So then you understand the

6  attorney-client privilege wouldn't apply to you and

7  Mr. Anderson?

8    A    Well, if Mr. Dorrell and I have information on

9  this and my information is based on that work product,

10  I can't answer that.

11    Q    I'm going to tell you that's not correct --

12    A    Okay.

13    Q    -- and not in accordance with the law

14  regarding attorney-client privilege.  So again, are you

15  refusing to answer my question in regards to who Dean

16  Anderson is?

17    A    Well, when it comes to taking an advice from

18  an attorney, I take the advice from the attorney that

19  I'm paying for.

20    Q    So are you telling me it's Mr. Dorrell's

21  advice for you to refuse to answer the question of who

22  Dean Anderson is?

23    A    I'm not answering that question because of the

24  stay ordered by the federal court and based on the fact

25  that attorney work product privilege.  In addition, I'm

THOMAS C. RETZLAFF - October 25, 2018

1  also going to claim a Fifth Amendment protection as

2  well, because Van Dyke has accused me of being Dean

3  Anderson, and he has accused me of committing crimes

4  and saying that Dean Anderson and I are one in the same

5  committing crimes against him.  He is trying to

6  conflate two separate individuals.

7      Q    Let's move on.  In P-3, did you receive that

8  threat on March 28th, 2018?  Did you receive that from

9  Mr. Anderson?

10     A    I don't see my e-mail header on this.

11     Q    Correct.  I received this e-mail from you on

12 either Monday or Tuesday this week.

13     A    Okay, then if you did, then yes.

14     Q    Let's just move on to P-4.

15     A    Okay.

16     Q    Are you there?

17     A    Yes, ma'am.

18     Q    Okay.  So let's start off at the -- it looks

19 like it's from Dean to -- is that your e-mail,

20 retzlaff@texas.net?

21     A    Yes, it is.

22     Q    And the subject is, "Fwd: Die"?

23     A    Yes.

24     Q    And the date at the top is Tuesday,

25 March 27th, 2018.  Is that correct?

THOMAS C. RETZLAFF - October 25, 2018

1     A     Yes, it is.

2     Q     Okay.  Is this a true and correct e-mail that

3  you received from Dean Anderson --

4     A     Yes, it is.

5     Q     -- an e-mail forwarded from Dean Anderson?

6     A     Yes.  That was the e-mail that was forwarded

7  to me.

8     Q     Okay.  And you see it's forwarded from Jason

9  Van Dyke?

10    A     Yes, it is.

11    Q     All right.  And it reads, "You better have

12  your will made out Thomas.  I'm coming for YOU!"

13          Did I read that correctly?

14    A     Yes.

15    Q     What effect did this e-mail -- you reading

16  this e-mail have on you, if any?

17    A     Oh, it made me very angry, very angry and very

18  concerned and worried.  Anytime that you have a crazy

19  person who likes to post pictures of himself on the

20  Internet holding guns and talking about killing people

21  and stuff who is a member of a terrorist organization,

22  it makes you very concerned, especially in this day and

23  age.  There's a lot of crazy people in this world who

24  do a lot of crazy things.  In fact, yesterday we seen

25  eight -- eight or ten bombs mailed off to random

1  people, okay.

2      Q    Okay.  So --

3      A    And of course --

4      Q    Did you take this as a physical threat?

5      A    Say again.

6      Q    Did you take this as a physical threat?

7      A    Yes.

8      Q    Okay.  And at this point, were you aware of

9  the respondent's affiliation with the Proud Boys

10  organization?

11      A    Yes, I was.

12      Q    And did that cause any more concern for your

13  safety?

14      A    Absolutely.  Absolutely.  Especially with

15  myself and my children, my daughter especially.  She's

16  very, very upset and concerned.

17      Q    Okay.  And did you have a belief at that time

18  that either Mr. Van Dyke or someone from the Proud Boys

19  organization could carry out this threat?

20      A    Yes, because they've done it before --

21      Q    Okay.

22      A    -- with other people.

23      Q    All right.  P-5, are you there?

24      A    Yes.  I'm looking right at it.

25      Q    Okay.  Great.  And Exhibit P-5 is another

1  e-mail that was forwarded to you from Dean; is that

2  correct?

3      A    Yes.

4      Q    From Mr. Van Dyke, the respondent?

5      A    Yes.

6      Q    And it states, "No more lawsuit.  See you this

7  weekend with my rifle."  Did I read that correctly?

8      A    Yes.

9      Q    And did this e-mail cause you the same concern

10  as we just described from receiving P-4?

11      A    Absolutely, especially because -- well, this

12  e-mail cost me -- you know, this was within one minute

13  of the --

14      Q    What does that mean to you, that it's

15  happening so frequently together?

16      A    Well, the threat is escalating.  You know,

17  he's -- he's getting more specific, and, you know, he's

18  talking about a specific place or a specific time, a

19  specific method.  You know, see you this weekend with

20  the rifle, people have gotten up -- gotten locked up

21  for less than that for things they posted on social

22  media.  You know, and especially in this day and age,

23  this is --

24      Q    Okay.

25      A    And one thing that made me concerned, too, is

1  this is very similar to the same threat he made against

2  you in the State Bar involving a .50 caliber rifle.

3      Q    Okay.  Let's move on to P-6.  Do you have it

4  in front of you, Mr. Retzlaff?

5      A    Yes, I do.

6      Q    Okay.  Is this a true and correct copy of

7  another e-mail that was forwarded to you by Dean

8  Anderson originating from Mr. Van Dyke, the respondent?

9      A    Yes.

10     Q    Okay.  And in this, did Mr. Van Dyke say, "You

11 are a dead man"?

12     A    Yes.

13     Q    Okay.  And did you feel this threat was

14 towards you?

15     A    Yes.

16     Q    Why?

17     A    Well, he -- he has conflated me and Dean

18 Anderson.  In his mind -- you know, it really doesn't

19 matter whether I am Dean Anderson or I am not Dean

20 Anderson.  In his mind we are one in the same.  You

21 know, whether that's true or not is not relevant,

22 but in his mind, we're one in the same.

23          And, you know, this is the -- the third

24 message now.  I'm looking at the date/time stamp on

25 there, within -- you know, within a one- or two-minute

THOMAS C. RETZLAFF - October 25, 2018

1  period of time.

2      Q    Okay.  So does that mean it's escalating to

3  you again?

4      A    Yes.  You know, one e-mail you could kind

5  of -- you know, the guy is mad, and then maybe he's

6  cooled off or something like that.  But Van Dyke

7  doesn't cool off.  His on switch is permanently stuck.

8  You know, there's something wrong with him mentally.

9      Q    Okay.  Let's move on to P-7.

10     A    Okay.

11     Q    Is this another true and correct copy of an

12 e-mail that was forwarded to you from Dean Anderson on

13 Tuesday, the 27th, originating from Mr. Van Dyke, the

14 respondent?

15     A    Yes.

16     Q    Okay.  And it states from Mr. Van Dyke, "What

17 do you want on your polished rock, Tom?  I'm coming for

18 you.  Sure as God's vengeance I'm coming.  Nobody will

19 ever be harassed by you again.  You're taking a dirt

20 nap."

21         Did I read that correctly?

22     A    Yes, you did.

23     Q    And what effect did this have on you, if any?

24     A    Well, this was the fourth now message within

25 the same period of time.  You know, again, there's --

1  there's something mentally wrong with Van Dyke, very,

2  very wrong with Van Dyke.  And he has -- he has a

3  complete lack of self-control, and it -- it made me

4  scared.

5      Q    Were you in fear, Mr. Retzlaff?

6      A    Say again.

7      Q    Were you in fear?

8      A    Yes, it made me scared.  It made me angry.

9  You know, here's some random guy, you know, sending

10 these kinds of messages.

11     Q    Did you take any extra safety precautions?

12     A    Yes, I did.

13     Q    And what were those?

14     A    Without going into too much detail regarding

15 sources and methods, you know, being more aware of my

16 surroundings.  My son is a police officer here, and

17 he's also in the military.  I made him aware of the

18 situation.  One time I took my daughter to the gun

19 range, and she got pretty good with a .357 and a

20 shotgun.  You know, I've shown Van Dyke's picture to my

21 two dogs so they will recognize him on sight.

22         The condominium high-rise that my father,

23 maybe his trust owned a unit in, I believe the door

24 staff and security staff were shown photographs.  My

25 father's newspaper, his security staff were made aware,

THOMAS C. RETZLAFF - October 25, 2018

1  I believe, as well.

2       Q    Okay.

3       A    You know, again, in this day and age there's

4  nutjobs of all sorts either on the left or on the

5  right.  And, you know, I did contact law enforcement as

6  well.  I'm not sure if I did it on that date or not.  I

7  don't recall.

8       Q    Okay.  Let's move to P-8.  Is this a true and

9  correct copy of an e-mail you received from a Dean

10  Anderson on Wednesday, March 28th, 2018 originating

11  from the respondent Jason Van Dyke?

12       A    Yes.  This e-mail is about 45 minutes after

13  the other three or four e-mails we just spoke about.

14       Q    Okay.  So is that a repeated nature?

15       A    Well, it's not a repeated e-mail, but it is a

16  subsequent e-mail, repetitive -- well, yeah, it's a

17  repetitive e-mail, but the statement on it is

18  different.

19       Q    Right.  And this one on P-8 states, "I don't

20  use Twitter.  I can't wait to see your fat ass on the

21  other end of my scope.  Did you know that a" -- I don't

22  even know if I'm going to say it right -- "a 190 grain

23  300 Winchester Magnum round travels at approximately

24  2,800 feet per second?"

25            Did I read that correctly?

THOMAS C. RETZLAFF - October 25, 2018

1    A    Yes, yes.  190 grain relates to the weight of

2  the bullet.  300 is reference to a .300 caliber

3  Winchester rifle.  A Magnum is a type of round that has

4  a little bit more powder in it and that he's

5  describing --

6    Q    Do you consider this a threat?

7    A    Oh, absolutely.

8    Q    Did you perceive it as a threat to your life?

9    A    Yes, in conjunction with these other e-mails,

10  and especially him saying, "I can't wait to see your

11  fat ass on the other end of my scope."  Rifles have

12  scopes.  A .300 caliber Winchester rifle is -- is

13  actually a very effective sniper weapon.  It's used for

14  long-range shooting.  And, you know, him saying earlier

15  in -- what was it, P-5, see you this weekend with my

16  rifle, you know, and then he goes on to describe the

17  rifle along with telling me that I'm a dead man,

18  absolutely.  That was very, very upsetting.

19    Q    Okay.  And throughout these e-mails it was

20  your understanding and your belief that these threats

21  could be carried out imminently?

22    A    Absolutely, because I didn't know where he was

23  at the time when he sent these e-mails.

24    Q    All right.  Move to P-9, please.

25    A    Okay.

1    Q    Is this a true and correct copy of an e-mail

2  you received from Dean Anderson on Wednesday,

3  March 28th, 2018 originally from Jason Van Dyke that

4  states, "Lol.  You are a dead man.  Enjoy it while it

5  lasts"?

6    A    Yes.

7    Q    And again, did you perceive this as a threat

8  to your life?

9    A    Yes, this e-mail the same day just a couple

10  hours later.  21:40 hours is about 9:40, and the other

11  ones were sent at 5 and 4 o'clock.  So, you know, this

12  was, you know, a half a day later, and he's -- and

13  he's --

14    Q    If you go to P-10 --

15    A    -- sending this garbage.

16    Q    -- and do you see that this is an original

17  e-mail from Jason Van Dyke to Dean Anderson on Tuesday,

18  April 3, 2018?

19    A    Yes, that's what it looks like.

20    Q    If you could review the e-mail briefly and let

21  me know if you have ever seen this threat before.

22    A    "Calling me a pedophile now, Tom?  That's

23  cute."

24         I think I might have.  I've sent you so many

25  e-mails, I'm not sure.

THOMAS C. RETZLAFF - October 25, 2018

1      Q     I understand.

2      A     And some of the e-mails I sent you were

3  duplicates and stuff, so this might have been a part of

4  a chain of e-mails.  I can't recall.

5      Q     That's okay.  And again, though, in this

6  e-mail, is Mr. Van Dyke e-mailing a Dean Anderson but

7  saying Tom?

8      A     Yes, he is.

9      Q     Okay.  And you believe that he is directing

10 this at you; is that correct?

11     A     Absolutely.  It would be just like if I were

12 to call Van Dyke's mother up and say, hey, I'm going to

13 murder Jason this weekend with my rifle.  You know,

14 that would -- it's saying --

15     Q     It didn't make the threat any less concerning

16 to you?

17     A     Absolutely.

18     Q     Okay.  Go ahead and move on to P-11.

19     A     Okay.

20     Q     As you can see, that you had forwarded me this

21 e-mail.

22     A     Yes.

23     Q     Do you see that?

24     A     Yes.

25     Q     Okay.  And that it was originally a forward of

1　an e-mail from Dean Anderson to you that originated

2　from Jason Van Dyke?

3　　　A　　Yes.

4　　　Q　　Okay.  And the e-mail from Jason Van Dyke

5　dated June 4, 2018 reads, "Kill yourself, Tom"?

6　　　A　　Yes.

7　　　Q　　Okay.  Did this concern you?

8　　　A　　No, correction.  Not June 4th, April 6th.

9　　　Q　　Oh, April 6th.  I appreciate that.

10　　　A　　Yeah.

11　　　Q　　Does this e-mail concern you?

12　　　A　　Yes.  You know, not as much as the one about,

13　you know, the rifle and I'm going to come and see you

14　this weekend.  You know, this e-mail was, you know,

15　three days after the -- after P-10 and, let's see, P-9

16　and the earlier ones.  It was just about a week after

17　those.

18　　　Q　　Okay.

19　　　A　　You know, it was upsetting.  I found it

20　harassing.

21　　　Q　　Do you find these e-mails and threats

22　harassing?

23　　　A　　Yes, I found these e-mails harassing,

24　annoying, and quite alarming.

25　　　Q　　Okay.  P-12, please, Mr. Retzlaff.  And this

THOMAS C. RETZLAFF - October 25, 2018

1  is another one from Jason Van Dyke to Dean on Saturday,

2  April 7th, that reads, "You should kill yourself."  Did

3  I read that correctly?

4      A    Yes, you did.  I thought that was a duplicate

5  of P-11, but no, that's a different e-mail.

6      Q    Okay.  So this is another e-mail where Mr. Van

7  Dyke is telling you to kill yourself?

8      A    Well, that's what -- it certainly appears

9  that.  I don't know if this is one of the e-mails that

10 I sent you or not.

11     Q    It originated from -- from Mr. Van Dyke?

12     A    Okay.

13     Q    Go ahead and move to P-13.

14     A    All right.  All right.

15     Q    This is another e-mail originating from

16 Mr. Van Dyke to Dean Anderson, and do I read it

17 correctly to say, "Go kill yourself"?

18     A    Yes.

19     Q    Okay.

20     A    And this one looks like it was just about a

21 day -- sent a day after P-12.

22     Q    Correct.  So from P-11, P-12, and P-13, those

23 are three different instances where Mr. Van Dyke is

24 telling you to kill yourself; is that correct?

25     A    That's the way that I take it.

THOMAS C. RETZLAFF - October 25, 2018

1    Q    Okay.  P-14, are you there?

2    A    Yes, I am.

3    Q    Okay.  And this is another e-mail from Jason

4  Van Dyke dated Sunday, April 8th, 2018 to Dean

5  Anderson.  And I'm just gonna read -- the last line of

6  that first e-mail reads, "Oh, and you should kill

7  yourself.  Save me the trouble."

8         Did I read that correctly?

9    A    Yeah, I see that on there.

10    Q    Okay.  Is this then the fourth instance of

11  Mr. Van Dyke telling you to kill yourself?

12    A    Well, he's saying that to Dean Anderson, which

13  I take it that he's referring to me.

14    Q    Okay.  And go ahead to P-15.  Do you agree

15  this is another e-mail from Jason Van Dyke dated

16  Sunday, April 8th, 2018 to Dean Anderson and states,

17  "Keep digging your own grave.  And while you are at it:

18  kill yourself"?

19         Did I read that correctly?

20    A    Yes, that's what it says.

21    Q    Okay.  Go ahead and go to P-16.  Do you

22  recognize this e-mail?

23    A    Yes, I do.

24    Q    Okay.  Is this a true and correct e-mail that

25  you had sent your attorney Jeffrey Dorrell and copied

1  myself on?

2      A    Yes, amongst several other individuals.

3      Q    Yes.  What is the basis of this e-mail?

4      A    Oh, Van Dyke called up Jeff Dorrell and said

5  he was going to murder me.  You know, it says it right

6  there in the body of the letter, that Mr. Van Dyke

7  e-mailed that if he could not get satisfaction from

8  Retzlaff in court, that he would deal with Mr. Retzlaff

9  in another way.  "'The motherfucking state bar can have

10  my license.  If this doesn't stop TODAY,' Mr. Retzlaff

11  will have 'a hell of a lot more to worry about than

12  just my lawsuit,'" you know, which refers back to the

13  threats about the guns and the murdering me and all

14  that good shit.

15          And then Van Dyke told Mr. Dorrell that he

16  found my physical address and intended to go to Arizona

17  and beat me to within an inch of my life.  He further

18  stated, "If you consider that a threat, then do

19  whatever you have to do," which is really bizarre.

20          MR. VAN DYKE:  Objection to hearsay portions

21  of the answer.

22      Q    BY MS. BRADY:  Is this something then that

23  your attorney Mr. Dorrell told you after he spoke to

24  Mr. Van Dyke?  Is that my understanding?

25      A    Yes, after Van Dyke called him, I believe on a

1  recorded line, too.

2      Q    Okay.  And what effect did it have on you when

3  Mr. Dorrell told you this information?

4      A    Very angry; very, very angry.

5      Q    Were you concerned for your safety?

6      A    Absolutely.  I'm concerned for my safety.  I'm

7  concerned for Mr. Dorrell's safety and the safety of

8  his staff members at his law firm with whom I have paid

9  a great deal of money to, and I would hate to see

10 anything unfortunate happen to them.  But, you know,

11 lawyers get killed by vexatious crazy people all the

12 time, unfortunately.

13     Q    Okay.  I'm going to have you move to P-17,

14 Mr. Retzlaff.

15     A    Okay.

16     Q    And I'm going to refer you to the bottom of

17 the e-mail that's from Mr. Van Dyke to Jeffrey Dorrell

18 and Alan Taggart.

19     A    Yes.  Where is Alan, by the way?

20     Q    Jeffrey Dorrell is your attorney.  Do you know

21 who Alan Taggart is?

22     A    I know of him, and I'm surprised that he's not

23 here today.

24     Q    And why does that surprise you?

25     A    Well, Alan Taggart was supposed to be

1   representing Jason Van Dyke in these Bar complaints,

2   from what I understand.

3       Q     Okay.  Now, in P-17 -- have you seen this

4   e-mail before?

5       A     Yes, I have.

6       Q     It looks like it was forwarded to you from

7   your attorney to Mr. Dorrell?

8       A     Yes.  Every time he does that, too, it costs

9   me money.

10      Q     (Inaudible.)

11      A     Say again.

12      Q     What effect, if any, did this e-mail have on

13  you personally?

14      A     Well, it made me angry, because every time Van

15  Dyke sends one of these stupid e-mails, it costs me

16  money, because then my attorney has to press a button

17  on his computer to forward the e-mail, which is a

18  billable hour, which means it shows up in an invoice at

19  some point.  So that kind of sucks.

20            But yeah, when he says, "The motherfucking

21  state bar can have my license for all I care," you

22  know, this obviously shows his contempt for the State

23  Bar of Texas, for his position as a public official.

24  You know, when you get a Bar card from the State, you

25  are supposed to hold yourself out to a higher standard.

1   And this was during the time when Van Dyke is suing me

2   for $100 million, and he uses these kinds of threats

3   and intimidation to try to browbeat his opponents into

4   submission.  You know, unfortunately --

5       Q    And it says -- other than -- where he mentions

6   the state bar above that, it reads, "This is going to

7   stop, and it is going to stop TODAY.  If it doesn't,

8   Mr. Retzlaff and his cronies are going to have a hell

9   of a lot more to worry about than just my lawsuit."

10  What did you take that to mean?

11      A    Well, Van Dyke has been working with a revenge

12  pornographer by the name of James McGibney from

13  California.  McGibney runs a revenge porn Web site.  He

14  filed a series of SLAPP lawsuits against me and lost

15  spectacularly, but he's also a member of the illegal

16  hacking group Anonymous.  And, in fact, there was a

17  write-up about him in Al Jazeera magazine.

18          And so I suspect that when Van Dyke is

19  referring to cronies, he is conflating the Internet

20  trolls that are harassing Van Dyke, allegedly, with

21  myself.

22          Van Dyke, when he filed his lawsuit against

23  Pink Meth and Google and the -- the Tor Internet

24  browser several years ago, apparently it got a lot of

25  people angry about that, and Van Dyke was exposed to

1  the world.  And, you know, he claims that these people

2  were harassing him.  I don't know if it's true or not.

3  Frankly, I do not care.  But apparently he is

4  conflating me with -- in claiming that I've got

5  cronies.

6    Q    And in the second part, that -- keep reading

7  on that sentence in that paragraph.  "I am not going to

8  tolerate this anymore, and if you construe this as a

9  threat, then by all means go and do what you need to

10 do."

11        Did you construe this as a threat?

12   A    Yes, because you have to look at this in

13 context.  You know, this wasn't just a one-off e-mail.

14 If it was, you know, it could be somebody angry

15 about -- because he's losing this lawsuit.  He's -- he

16 lost at the moment he -- he filed it.  But, you know,

17 you could construe this, if it was just by itself, as

18 just, you know, an angry litigant and that's it.

19        But you've got to remember, there's this

20 history, this pattern that goes back several years.

21 Van Dyke, you know, goes on social media.  He's

22 threatened Ken White, who is a former United States

23 attorney and a lawyer in Los Angeles, a good guy.  I

24 like him a lot.  He's threatened Ken White, sent a

25 glitter bomb to his place of work, threatened his wife

1  and children.  He's done this with other people that

2  he's filed lawsuits against.  You know, the State Bar

3  file on Van Dyke is just ridiculous, and you guys

4  should have done something a long time ago.  But, yeah,

5  you know, when you --

6     Q   Okay.  We're gonna move on.

7     A   All right.

8     Q   Prior to receiving the threats that we went

9  over in those e-mails this year, had you then received

10  any other social media posts or threats from Mr. Van

11  Dyke to other individuals?

12     A   Yes, I have.

13     Q   Okay.  And as I believe you stated earlier,

14  and that also increased your concern for your own

15  safety when you started receiving threats?

16     A   Yes.  There was an article -- when Van Dyke

17  filed the lawsuit against the Victoria County DA's

18  office, there was an article written up in Texas Lawyer

19  magazine by a good friend of mine.  And Van Dyke was --

20  was very angry about that.

21     And at the time they had a comment section on

22  that Web site, and several people had posted comments

23  on there, and Van Dyke posted threatening responses

24  saying that he could identify these people that were

25  posting the comments and that he knew -- I believe it's

THOMAS C. RETZLAFF - October 25, 2018

1   been, you know, a while now, but I believe the gist of

2   it was is he knew who the people were that were -- you

3   know, cost him his job.  And -- let's see.  He posted a

4   picture of himself on Facebook wearing some kind of

5   half-ass ghillie suit, which is a set of camouflage

6   clothes that snipers wear, but this was some

7   nigger-rigged shit.

8       Q    Okay.  We are going to get to some of these,

9   but let's just move on.

10      A    Well, he posted a photo of himself with a

11  semi-automatic rifle saying something about, you know,

12  in the daytime I wear a business suit, but if you mess

13  with my job, my daytime job, I'll show up at your

14  doorstep wearing this suit, showing himself in this

15  military gear with a semi-automatic rifle and his

16  ammunition.

17      Q    And did that cause a concern for you?

18      A    Yes, it did.  Absolutely.

19      Q    And why is that?

20      A    Well, you know, when somebody posts

21  threatening messages on social media like that, you

22  have to take it seriously.  You know, schools get

23  locked down, businesses get evacuated for -- for things

24  like that.  And again, in this day and age, you know,

25  you really don't know who you are dealing with other

1   than that Van Dyke's as crazy as a bedbug and isn't

2   afraid to tell people about it.  You know, he regularly

3   posts photographs of himself with these guns.

4          And, you know, another person that he

5   threatened to file a lawsuit against, Talib Kweli, a

6   rapper in New York City, he posted a statement saying

7   that I'm going to skin you alive and put your skin on

8   my living room floor.  And then short --

9      Q    We are going to get to some of those.  So

10  let's just move on.

11         Can you go to P-18 for me, please,

12  Mr. Retzlaff.

13     A    All right.

14     Q    Are you there?  Have you seen this before?

15     A    Yes, I have.

16     Q    Okay.  And is this the -- I believe is it the

17  Twitter account of Mr. Van Dyke?

18     A    Yes, and until he got banned.

19     Q    Okay.  If you go to P-20 -- or P-19.  I

20  apologize.

21     A    Yes, P-19.  I'm looking at it right now.

22     Q    All right.  Have you seen this before?

23     A    Yes, I have.

24     Q    Okay.  I believe you sent this to me; is that

25  right?

THOMAS C. RETZLAFF - October 25, 2018

1      A    Yes, I did.

2      Q    Okay.  And can you tell me what this is?

3      A    It's an Instagram account for a user by the

4  name proudboywaterfowler, f-o-w-l-e-r.

5      Q    Do you know who that could be?

6      A    Well, it has the photograph of Jason Van Dyke

7  on there, and the Instagram account regularly posts

8  photographs of Jason Van Dyke.

9      Q    Okay.  And what is this post?

10     A    Well, this post here was a -- a screenshot of

11  an order that was signed by the US Fifth Circuit Court

12  of Appeals, because myself and the Hanszen Laporte law

13  firm, we are ready to rock and roll on this.  We wanted

14  to get expedited consideration of our appeal once we

15  filed a brief.  But the Court of Appeals denied the

16  motion to expedite, and then the user

17  proudboywaterfowler states, "I wonder how much of this

18  stalkers ass I am going to have to kick in Court before

19  he realizes that he has 'come up against a man who

20  simply cannot be intimidated.'"

21     Q    And if you see a little below that, under

22  where it says 15 likes, it states it was August 23rd.

23  Is that right?

24     A    That's the date that this was posted, was on

25  August 23rd.

1    Q    Okay.

2    A    I don't recall what date it was that I made

3  the screenshot on.

4    Q    While this case here with the State Bar was

5  pending; is that right?

6    A    Yes.

7    Q    Go ahead and go to P-20, please.

8    A    Okay.

9    Q    And is this a true and correct copy of another

10  post that you saw posted by Mr. Van Dyke?

11    A    This is a true and correct copy of a

12  screenshot I made of an Instagram post from the user of

13  proudboywaterfowler.

14    Q    And this post names you individually?

15    A    Yes, it certainly does.

16    Q    And what effect, if any, did that have on you?

17    A    Well, I was upset because he refers me in the

18  same sentence with a political group called Antifa,

19  A-n-t-i-f-a, which is a group of a bunch of liberals.

20         And let's see.  He says, the user

21  proudboywaterfowler states, "I reject this notion that

22  we can't talk to people we disagree with.  There are

23  some people (the Antifa and Tom Retzlaffs of this

24  world) that just need to be kicked off the planet.  The

25  MSD kids a meet in person were not unreasonable and did

1 not fit that criteria."

2       This is referring to Van Dyke met with some

3 children, I believe, that were involved in a school

4 shooting in Florida, and I forgot what -- the kid's

5 name is Hogie or something.  I don't know.  He's a

6 professional crybaby, is what he is, an antigun nut.

7 And Van Dyke apparently met with this guy, I don't

8 know.  But anyways, this was posted on July 8th.

9     Q   Okay.  I'm gonna go through some social media

10 posts, and I'm gonna try and go through them fairly

11 quickly, and then I'm going to ask you questions about

12 them as a whole in the end so that we can get through

13 these.

14       So on P-21, are you there?

15     A   Yes.

16     Q   Is this a true and correct copy of a post you

17 personally saw that was posted by Mr. Van Dyke?

18     A   It was posted by the account J.L. Van Dyke.

19     Q   Okay.

20     A   And this is a true and correct screenshot of a

21 post.  Yes, I made this and sent that to you.

22     Q   Okay.

23     A   And that's the one that I was referring to --

24     Q   (Inaudible) --

25     A   -- earlier where --

THOMAS C. RETZLAFF - October 25, 2018

1    Q    "If you mess with my career"; is that correct?

2    A    Yes.  That's the -- that's the post -- social

3  media post that I referenced earlier about Van Dyke

4  dressed up in some hillbilly version of a ghillie suit.

5    Q    Okay.  Go to P-22, please.  Is this a true and

6  correct copy of another social media post that you read

7  that Mr. Van Dyke made?

8    A    This is made by the Twitter user MeanTXLawyer

9  using the name Jason L. Van Dyke with a photograph of

10  Jason L. Van Dyke.

11    Q    Okay.  And in this one it states, "I WILL kill

12  both you and your family"?

13    A    Yes.  This is in reference to his lawsuit

14  against the Pink Meth people.

15    Q    Okay.  Move on to P-23.

16    A    Yes, I see it.

17    Q    Is this a true and correct copy of a post that

18  you personally read that Mr. Van Dyke posted?

19    A    Well, this was posted by the Twitter user J.L.

20  Van Dyke, the user @RealJLVD.  It looks like it has a

21  photograph of Jason Van Dyke.  You know, I can't, you

22  know, say who is the person behind the keyboard.  I can

23  just identify, you know, that the screenshot is true

24  and accurate of what I saw in my computer at the time

25  and that the copy is a true and correct copy.

1    Q    And at the time, you did believe this to be

2  Mr. Van Dyke?

3    A    Yes.

4    Q    Okay.  And is --

5    A    Taken -- taken in context with other posts by

6  this --

7    Q    (Inaudible) --

8    A    -- Twitter user.

9    Q    (Inaudible) get his jaw broken; is that

10 correct?

11        THE COURT REPORTER:  You are going to have to

12 say your question again.  I'm sorry.

13        MS. BRADY:  That's okay.

14    Q    BY MS. BRADY:  And in P-23, it states,

15 "Asher's choice is for us to leave each other alone or

16 get his jaw broken."  Did I read that correctly?

17    A    Yes.

18    Q    Okay.  P-24, is this a copy of another post

19 that you sent that states Jason L. Van Dyke

20 @MeanTXLawyer with a picture of Mr. Van Dyke that you

21 understood to be Mr. Van Dyke posting?

22    A    Yes.

23    Q    Okay.  And in it, does it make more death

24 threats?

25    A    Yes.  He's referencing Kyle, which is his

1　co-lawyer there, Kyle Bristow, his Nazi buddy

2　from -- from Michigan.  And this is in regards to the

3　lawsuit several years ago that they concocted against

4　the -- a Web site called Pink Meth and a Internet

5　browser called Tor, and I believe they sued Google as

6　well --

7　　　Q　　Okay.

8　　　A　　-- just to give you some context.  But it was

9　another reference.

10　　　Q　　Okay.  And it looks like these are comments or

11　posts Mr. Van Dyke made that you sent to me.  Does this

12　look accurate?

13　　　A　　Yes.  These were the comments I referenced to

14　earlier that were in -- underneath the article in Texas

15　Lawyer.

16　　　Q　　Okay.  And these look like a true and correct

17　copy of the comments that you sent to me?

18　　　A　　Yes.

19　　　Q　　Move to P-26.  It looks like this is just a

20　duplicate of the other one, correct?

21　　　A　　Yes.

22　　　Q　　Okay.  Go ahead and move on to P-27.  Are you

23　there, Mr. Retzlaff?

24　　　A　　Yes, I am, 27.

25　　　Q　　Okay.  Is this a true and correct copy of

1   another document with comments that you sent to me?

2       A    Yes, it is.

3       Q    And this is a Jason Lee Van Dyke.  Is that who

4   you believe to be the respondent posting these

5   comments?

6       A    Yes.  It has a picture of him with a bunch of

7   stupid looking ducks.

8       Q    Okay.  P-28 --

9       A    All right.

10      Q    -- is this a true and correct copy of posts

11  that you have seen from J.L. Van Dyke @RealJLVD with a

12  picture of the respondent?

13      A    Yes.

14      Q    Okay.  And have you seen these prior to

15  yourself receiving death threats from Mr. Van Dyke?

16      A    These were -- let's see.  Did I see them

17  before or after the death threats from Van Dyke?  I

18  cannot recall for sure.

19      Q    Okay.  P-29, I believe this is another

20  duplicate.  Go ahead and go to P-30.

21      A    Okay.

22      Q    And this states from J.L. Van Dyke @RealJLVD

23  with a photograph of the respondent, Mr. Van Dyke.  "I

24  wonder what a flight to Omaha, then to LAX, and then

25  back to Dallas would cost?"  Did I read that correctly?

1   A    Yes.

2   Q    And this is a true and correct copy of a post

3  that you had seen and believed Mr. Van Dyke to have

4  posted?

5   A    Yes.

6   Q    Go ahead and go to P-32.

7   A    To 32 or do you want to go to 31?

8   Q    31 would be better first.  Thank you.

9   A    Okay.

10   Q    Is this a true and correct copy of a post you

11  saw made by J.L. Van Dyke that you believe to be the

12  respondent?

13   A    Yes.

14   Q    Okay.  And what is this a picture of?

15   A    It is a picture of a hollow-point bullet.  It

16  looks like a .38 caliber round, maybe a .44.  I can't

17  tell for sure from the photograph.

18   Q    And on it, it says, "So there is this new

19  implant that can actually fix stupid."

20       Did I read that correctly?

21   A    Yes, you did.

22   Q    Go ahead and go to P-32 now.

23   A    Okay.

24   Q    Is this a true and correct copy of other

25  comments that you have seen from J.L. Van Dyke

THOMAS C. RETZLAFF - October 25, 2018

1  @RealJLVD with a picture of respondent that you believe

2  to be respondent posting?

3      A    Yes, Twitter user @RealJLVD, correct.

4      Q    Go ahead and go to P-33.  Again, is this a

5  true and correct copy of a post by J.L. Van Dyke with a

6  picture of the respondent, Mr. Van Dyke, that you

7  believe to be Mr. Van Dyke posting?

8      A    Yes.  This was a -- I believe this was posted

9  on, I think it was Facebook or Yelp, some social media

10  Web site.  I can't recall offhand.  But yeah, and at

11  the time, this was when Van Dyke and Ken White were

12  going through a very public dispute with one another.

13  Ken White is a -- in addition to being a lawyer in Los

14  Angeles and a former United States attorney, he blogs

15  on a Web site called Popehat.  And Mr. Van Dyke has

16  been the frequent subject of that blog, and this is a

17  blog that's read all over the world, I think.

18      Q    Okay.

19      A    Which sucks for Van Dyke.

20      Q    Let's go to P-34.

21      A    It sucks for Jason.

22          Okay.

23      Q    Is this another true and correct copy of a

24  post by J.L. Van Dyke @RealJLVD with a picture of the

25  respondent that you believe to be posted by the

1   respondent?

2       A    Yes.

3       Q    Go ahead and go to P-35.

4       A    Okay.

5       Q    Okay.  Is this a true and correct copy of

6   posts by J.L. Van Dyke @RealJLVD with a picture of the

7   respondent that you believe to be posted by the

8   respondent?

9       A    Yes.

10      Q    Go to P-36.

11      A    All right.

12      Q    And is this a true and correct copy of a post

13  by J.L. Van Dyke @RealJLVD with a picture of the

14  respondent that you saw and believed to be the

15  respondent?

16      A    Yes.

17      Q    Okay.  P-37.

18      A    Yes.

19      Q    Have you seen this document before?

20      A    Yes, I have.

21      Q    And how have you seen this document?

22      A    This was a document that was from Ken White.

23      Q    And how did you see it?

24      A    Posted on Mr. White's Web site.

25      Q    And this is a true and correct copy of the

1  document that you saw on Mr. Pope's (sic) Web site?

2      A     On Mr. White's Web site, yes.

3      Q     Okay.  Go to P-38.

4      A     All right.

5      Q     Is this a true and correct copy of a post by

6  Jason L. Van Dyke @MeanTXLawyer with a picture of the

7  respondent that you saw and believed to be the

8  respondent?

9      A     Yes.

10     Q     P-40 -- or 39.  I apologize.

11     A     Sorry.

12     Q     Is this a true and correct copy of a post by

13  Jason L. Van Dyke @MeanTXLawyer with a picture of the

14  respondent that you viewed and believed to be the

15  respondent?

16     A     Yes.

17     Q     Okay.  P-40.

18     A     Okay.

19     Q     Is this a true and correct copy of a post by

20  Jason L. Van Dyke, I believe it's MeanTXLawyer -- I

21  can't read that one -- with a picture of the respondent

22  that you viewed and believed to be the respondent?

23     A     Yes.

24     Q     P-41, again, is this a true and correct copy

25  of a post by J.L. Van Dyke with a picture of the

THOMAS C. RETZLAFF - October 25, 2018

1  respondent that you viewed and believed to be the

2  respondent?

3      A    Yes.  This is in reference to Talib, the New

4  York rapper, where he says he's going to skin him and

5  have his hide put on display in his living room.

6      Q    Okay.  And that's what you had testified to

7  earlier?

8      A    Yes.

9      Q    Okay.  P-42.

10     A    And at the time when this was posted was when

11 Mr. Van Dyke was either suing or threatening to sue

12 Talib for defamation.

13     Q    Okay.  Are you on P-42?

14     A    Yes.

15     Q    All right.  Do you know what this is?

16     A    Yes, I do.

17     Q    And what is it?

18     A    This is a report from the Southern Poverty Law

19 Center regarding the Proud Boys, the white supremacist

20 group that I mentioned.  And this is a true and correct

21 copy of the document that I had sent you.

22     Q    Okay.  In the exhibits that we just went over,

23 all of the social media posts involving different

24 individuals, when you either saw them beforehand,

25 before the threats made to you by Mr. Van Dyke or

THOMAS C. RETZLAFF - October 25, 2018

1  afterwards, did these give you any increasing concerns

2  for your own physical safety?

3      A    Yes, it did, because it shows me that this

4  wasn't just a one-off thing, that this is a part of

5  his -- a pattern and practice, specific behavior,

6  specific intent to terrorize people, to threaten people

7  that he files lawsuits against, to threaten people with

8  physical violence as a way of gaining an unfair

9  advantage in his litigation.  This is -- this is a part

10  of his courtroom strategy, is my belief.

11     Q    And in regard to the Proud Boys organization

12  in which you previously testified that you believe them

13  to be a violent group, why do you believe that?

14     A    Well, I believe it because I have seen

15  photographs and video of Jason Van Dyke on the streets

16  of Austin just a few months ago carrying a Bowie knife

17  running around chasing people getting into fights on

18  the street and trying to stab them with a group of

19  similarly, if not identically, dressed individuals.

20          Just last weekend in New York City, the same

21  exact organization wearing the same exact uniforms were

22  involved in a street fight there which resulted in

23  warrants for at least nine people being arrested.  The

24  New York Police Department has opened up a -- an

25  investigation into -- see, I've -- I've had

1    communications with John Miller.  He's the

2    counterterrorism guy at NYPD, and they've opened up an

3    investigation into this organization with regards to

4    terrorism, domestic terrorism.

5         The same group, the Proud Boys, and Gavin

6    McInnes himself was sued in federal court for his

7    involvement in the Charlottesville riot last year which

8    resulted in a woman being murdered and a bunch of other

9    people being killed as well.

10        Just a couple of weeks ago in Southern

11   California, some more Proud Boys, hang-arounds or

12   groupies, were rounded up on federal charges for

13   interstate travel for rioting.

14        Again, with this Charlottesville nonsense or

15   Charlottesburg nonsense, Van Dyke was arrested for

16   fighting -- or wasn't arrested.  He was detained for

17   bar fighting there in Denton about a year or two ago

18   because of a political statement.  Some guy didn't like

19   Van Dyke's hat or something like that and made a smart

20   comment to him and got into a fight.  And when the

21   police searched him, a knife was found.

22        You know, just reading over the different Bar

23   complaints on Van Dyke, you know, he threatens people

24   with violence regularly.  You know, this is a guy with

25   a screw loose, you know.  And then he, you know, sent

1    me some letter, you know, wanting to settle the lawsuit

2    in exchange for me dropping the State Bar complaint

3    against him.  My response was extremely profane.

4          And I don't want to burden you with -- with my

5    profanities, but, you know, this guy -- this guy is a

6    lunatic.  And I've been dealing with lunatics like this

7    for several years in these SLAPP lawsuits.

8          Van Dyke is hooked up with this revenge

9    pornographer and his idiot attorney Evan Stone who

10   lives in Denton, and for some reason he's trying to get

11   my daughter involved in this, which is really stupid,

12   because she doesn't know who he is.  You know --

13        Q    It's your daughter?

14        A    It's my daughter Brittany.  She helped me when

15   I was being sued by this McGibney guy.  We sabotaged

16   his lawsuits by sending -- McGibney was sent a bunch of

17   disinformation by her and stuff, and he would go into

18   court, and it just turned out to be stupidity.  It's

19   stupidity.  You know, don't put my name on court

20   papers, you know.  That should have been the lesson

21   learned, but Van Dyke didn't learn that, I guess.

22          And in fact this morning --

23        MS. BRADY:  Okay, we're gonna -- I'm done with

24   my questioning, and Mr. Van Dyke now has an opportunity

25   to question you, but we're going to take five, ten

THOMAS C. RETZLAFF - October 25, 2018

1   minutes so we can set up.

2        THE WITNESS:  Well, we better hurry up,

3   because like I said, I heard there's a warrant out for

4   his arrest, and I don't know how much longer this guy

5   has got.

6        MS. BRADY:  Okay, well, we will -- I'm gonna

7   mute for now, and then when we are back, I will say so.

8   Okay?

9        THE WITNESS:  All right.  Not too long,

10  please, because I'm planning on --

11       MS. BRADY:  Just five, ten minutes.

12       THE WITNESS:  -- playing golf with my

13  daughter.

14       (The deposition was at recess from 12:03 p.m.

15  to 12:09 p.m.)

16       MR. VAN DYKE:  Let's go back on the record.

17       Madam Court Reporter, does Mr. Retzlaff have

18  the exhibits in front of him that were printed out and

19  mailed to you?

20       THE COURT REPORTER:  Yes, let me give them to

21  him.

22

23                    EXAMINATION

24  BY MR. VAN DYKE:

25    Q    Mr. Retzlaff, would you please look at Exhibit

THOMAS C. RETZLAFF - October 25, 2018

1 from the exhibits in front of you, please.

A    I see it.

Q    Is that a true and correct copy of your
criminal history in the state of Texas?

A    I cannot authenticate that document.

Q    All right.  Mr. Retzlaff, were you charged
with harassment on or around August 15th, 1995?

A    My response is, I have no criminal convictions
which would be admissible for impeachment purposes
under Texas Rule of Evidence 609.

MR. VAN DYKE:  Objection, nonresponsive.

Q    BY MR. VAN DYKE:  Mr. Retzlaff, were you first
charged with harassment on or around August 15, 1995?

A    I'm refusing to answer on the ground that the
question is merely for purposes of harassment.

Q    So you are refusing to answer that question?

A    Yes.

Q    Are you going to refuse to answer all my
questions with respect to your criminal history today?

A    Yes.  I have none which would be admissible
for impeachment purposes under Rule 609.

Q    When were you released from the Institutional
Division of the Texas Department of Criminal Justice?

A    I can't help you with that.  I find that
question to be given for purposes of harassment.

THOMAS C. RETZLAFF - October 25, 2018

1    Q    Okay.  Since your release from the Texas

2    Department of Criminal Justice Institutional

3    Division --

4    A    Objection.

5    Q    -- have you been charged with any crimes?

6    A    I am objecting because it's assuming facts not

7    in evidence.

8         MR. VAN DYKE:  Objection, nonresponsive.

9         THE WITNESS:  I can make objections.

10   Q    BY MR. VAN DYKE:  Since your release from

11   prison, Mr. Retzlaff, have you been charged with any

12   crimes?

13   A    I can make objections.

14        MR. VAN DYKE:  Objection, nonresponsive.

15        THE WITNESS:  I find your question --

16   Q    BY MR. VAN DYKE:  Since being released from

17   prison, have you been charged with any offense?

18   A    I find your question merely for purposes of

19   harassment, and I'm not going to respond to it.

20   Q    Fine.  Have you been convicted of any offense

21   since your release from the -- from prison?

22   A    I have no convictions which would be

23   admissible for impeachment purposes under Rule 609.

24   Q    When was the last time you were convicted of a

25   criminal offense?

THOMAS C. RETZLAFF - October 25, 2018

1    A    I'm not going to answer that question because

2    it's for purposes of harassment.

3    Q    Mr. Retzlaff, I'm entitled to inquire as to

4    your criminal history and determine whether any

5    offenses you've been convicted of are admissible under

6    609.  Are you refusing to answer my question with

7    respect to any criminal offenses?

8    A    Is that your legal opinion that you are

9    entitled to this?

10   MR. VAN DYKE:  Objection, nonresponsive.

11   Q    BY MR. VAN DYKE:  Mr. Retzlaff, are you going

12   to answer my questions?

13   A    I'm not going to answer that question.

14   Q    Mr. Retzlaff, do you understand that I can get

15   an order from the district courts in Arizona to compel

16   you to answer my questions today?

17   A    Is that your legal opinion?

18   MR. VAN DYKE:  Objection, withdrawn.

19   Q    BY MR. VAN DYKE:  Mr. Retzlaff, do you know

20   what a vexatious litigant is?

21   A    No.

22   Q    Mr. Retzlaff, have you ever been declared a

23   vexatious litigant by any court?

24   A    Yes.

25   Q    Mr. Retzlaff, will you please have a look at

THOMAS C. RETZLAFF - October 25, 2018

1   Exhibit 2.

2        A     Okay.

3        Q     Can you tell me whose name is outlined with a

4   red square on that document?

5        A     I cannot authenticate that document.

6        Q     I'm not asking you to authenticate it.  I'm

7   asking you to tell me whose name is outlined in a red

8   square on that document.

9        A     I see that the name Retzlaff, Tom, is outlined

10  in red.

11       Q     Would it be accurate to say that you were

12  declared a vexatious litigant on or around

13  October 15th, 2008 by the Bexar County Court of Law

14  No. 3?

15       A     Yes.

16       Q     Okay.  Are you familiar with a person by the

17  name of Philip Klein?

18       A     I can't help you with that.

19             MR. VAN DYKE:  Objection, nonresponsive.

20       Q     BY MR. VAN DYKE:  Mr. Retzlaff, are you

21  familiar with an individual by the name of Philip

22  Klein?

23       A     Oh, I've heard of Philip Klein.

24       Q     Have you ever litigated against Philip Klein?

25       A     He's filed lawsuits against me.

1    Q    Have you intervened in any litigation

2    involving Philip Klein?

3    A    Not voluntarily, no.  In fact, no, I haven't.

4    I was dragged into some litigation involving Philip

5    Klein and his bizarre conspiracy theories involving

6    myself, the Beaumont Court of Appeals, the district

7    attorney, the sheriff and some Texas state judges that

8    he claims that myself and all of us are in the Aryan

9    Brotherhood and we're in a conspiracy against him.

10   Q    Okay.  Will you please look at Exhibit 3.

11   A    I see it.

12   Q    Do you recognize that document?

13   A    I'm sorry, I cannot authenticate this.

14   Q    What does it appear to be Mr. Retzlaff?

15   A    It appears to be a piece of paper with some

16   words on it.  I can't authenticate this.

17   Q    Do you see your name anywhere on that

18   document, Mr. Retzlaff?

19   A    Yes.  Somebody did write my name on that

20   document.

21   Q    I'm looking at the second paragraph where it

22   says, "Ordered that Defendants' Motion to Strike all

23   Pleadings Filed by Thomas Retzlaff, a Vexatious

24   Litigant, is hereby GRANTED."

25        Is that what it says?

THOMAS C. RETZLAFF - October 25, 2018

1    A    Those are the words that are on that document.

2    Q    So I'll ask you again.  Did you file any

3 pleadings in the case, Cause Nos. 2014-CI-17145?

4    A    You never asked me that question before.

5    Q    I asked you if you had ever -- I'll rephrase,

6 Mr. Retzlaff.

7         Did you file any pleadings in Cause No.

8 2014-CI-17145?

9    A    Yes, I did.

10   Q    And were those pleadings stricken by the order

11 of that court?

12   A    No, they are still there.

13   Q    So you are telling me that this order -- that

14 this order that's in front of you as Exhibit 3 did

15 not -- was not an order striking your pleadings in that

16 case?

17   A    This isn't an order.  I see an unauthenticated

18 document that has words on a piece of paper.  I dispute

19 your contention that this is some kind of an order.

20   Q    Mr. Retzlaff, how many Texas lawsuits have you

21 been involved in since October --

22        THE COURT REPORTER:  I'm sorry, wait, wait.

23        (A discussion was held off the record.)

24   Q    BY MR. VAN DYKE:  How many Texas lawsuits have

25 you been involved in since October 15th, 2008?

1    A    I am not going to answer that question because

2  I find it to be for harassment.

3         MR. VAN DYKE:  Objection, nonresponsive.

4         THE WITNESS:  As a witness, I'm entitled to

5  object based on harassment.  You are not allowed to use

6  a deposition for purposes of embarrassment or

7  harassment or for oppression or to pry into my privacy.

8    Q    BY MR. VAN DYKE:  Okay.  How many grievances

9  have you filed against attorneys since October 15th of

10 2008?

11   A    The same response.  That question is just for

12 harassment purposes.  I'm not going to answer it.

13   Q    Have you ever filed a grievance against Marc

14 Randazza, an attorney in Nevada?

15   A    Yes, I have.

16   Q    What were your allegations against him?

17   A    Conflict of interest, stealing client moneys,

18 lying to the court.  I don't know.  There's probably

19 eight or nine different things I -- I filed a grievance

20 about.

21   Q    Have you ever filed a grievance against Jay

22 Leiderman, an attorney in California?

23   A    Yes.

24   Q    What were your allegations against him?

25   A    Violating a court sealing order with regards

1   to some documents.  Randazza got suspended for one year

2   from the State Bar, and Leiderman got disciplined and

3   ordered to go through continue legal education.

4        Q    Okay.  Did you ever file a grievance against

5   John Morgan, an attorney in Texas?

6        A    Yes, I have.

7        Q    What were your allegations against him?

8        A    That he is a criminal who pled guilty to

9   perjury for filing a series of false police reports

10  against his ex-wife.  A disbarment case was filed

11  against him.  He pled out and got sent to the -- what

12  is it -- the drug and alcohol rehab with psych

13  counseling with the State Bar nurse.  And then another

14  disbarment case is pending against Morgan right now for

15  doing something different.

16       Q    You ever file a grievance against Evan Stone,

17  an attorney in Texas?

18       A    Not yet, but after I get done with you,

19  I'm -- I'm sure he will be next.

20       Q    Have you ever filed a grievance against Alan

21  Taggart, an attorney in Texas?

22       A    Yes, based upon the e-mail that was sent by

23  you guys demanding that I dismiss my $100 million

24  lawsuit in exchange for dropping the State Bar

25  complaint.

THOMAS C. RETZLAFF - October 25, 2018

1   Q   Okay.  Were you ever represented by any
2   attorney that you filed a grievance against?
3   A   No.  I love my lawyers.
4   Q   So all these attorneys you filed a grievance
5   against represented someone other than you?
6   A   Yes.
7   Q   And in most cases they were representing a
8   party that was opposed to you in civil litigation; is
9   that correct?
10   A   Yes.  People make a mistake of putting my name
11   on their court papers, and then their attorneys act in
12   devious, unethical ways, they are going to get spanked.
13   Q   Isn't it true you filed a grievance against
14   Marc Randazza because he represented James McGibney in
15   a lawsuit against you?
16   A   I can't answer that question.
17   Q   Why not?
18   A   It calls for speculation.
19   Q   I'm asking you -- I'm asking you if you did
20   it.  I don't see how that's speculating, Mr. Retzlaff.
21   A   You are speculating as to my motives and
22   reasoning, and I don't really recall.  It's been a
23   couple years ago when it was filed.
24   Q   What were your motives?
25   A   I don't recall.  Probably mad because he's a

THOMAS C. RETZLAFF - October 25, 2018

1  thief.

2      Q    Is it true you filed a grievance against John

3  Morgan because he represented Philip Klein in a lawsuit

4  against you?

5      A    I filed -- the grievance speaks for itself.

6  And, in fact, I'm not gonna respond to any more of

7  these questions.  I'm finding them to be really

8  harassing, and I'm starting to get a headache.

9      Q    What about judges?  Have you ever filed a

10  complaint against any judge with the Judicial Conduct

11  Commission?

12      A    I can't help you with that.

13      Q    Why not?

14      A    Because that question is completely harassing

15  and irrelevant.

16      Q    All right.

17      A    Trying to point the finger at other people's

18  misconduct isn't going to get you out of this mess, Van

19  Dyke.  You better rethink your strategy.

20      Q    Very well.  I'd like you to have a look at

21  Exhibit 4.  Do you recognize that?

22      A    No, I do not.

23      Q    Are you telling me that Exhibit 4 is -- aside

24  from the highlighting, is not a true and correct copy

25  of the e-mail you sent to Kristin Brady, Tonya Harlan,

1   and Brittany Paynton on July 9th, 2018?

2       A     Just a second.  I was looking at a different

3   exhibit.  You've got so much crap here, it's hard to

4   keep track of.

5            All right.  Okay.  Yeah, I'm looking at it.

6       Q     Okay.  Mr. Retzlaff, except for the

7   highlighting, is that a true and correct copy of the

8   e-mail that you sent to Kristin Brady, Tonya Harlan,

9   and Brittany Paynton on July 9th, 2018?

10      A     I don't know.  I'd have to go back to my

11  original e-mails and see.  I don't know if this has

12  been altered or not.  You're -- you're a shady

13  character who engages in criminal conduct, so I

14  wouldn't put it past you to alter these documents, so I

15  don't know.

16      Q     Okay.  How about this, Mr. Retzlaff.  The last

17  highlighted portion, it says, "Now don't blow me off."

18  It begins with that.  Did you write that?

19      A     Again, I -- I -- I don't recall.  I -- I don't

20  know.  That's been several months ago, and I've

21  exchanged many different e-mails with Kristin.  I don't

22  recall them all.

23      Q     All right.  Can you turn to Exhibit 5, please.

24      A     All right.

25      Q     Except for the handwritten note on the front,

THOMAS C. RETZLAFF - October 25, 2018

1    do you recognize this document?

2       A    Just a second.  I'm trying to organize this

3    crap.  No, I don't.  It looks like just some stuff that

4    got printed up.  I don't know what it is.

5       Q    I'd like you to look through all of Exhibit 5,

6    Mr. Retzlaff, and see if you recognize that as the

7    grievance that you filed against me with the State Bar

8    of Texas that we're taking your deposition about here

9    today.

10      A    I didn't file it on a piece of paper.  I

11   didn't file my grievance on a piece of paper.

12      Q    Mr. Retzlaff, is the piece of paper an

13   accurate representation of the grievance you filed

14   electronically against me with the State Bar of Texas?

15      A    I don't know.  I cannot authenticate that

16   document.  You'd have to ask the State Bar if this is

17   something that's true and correct.  It's not my

18   document.  I didn't create this.

19      Q    Okay.  I'd like you to turn to the -- let's

20   see here, to the last page of Exhibit 5, please.

21      A    All right.

22      Q    Now, on the last page of Exhibit 5, it says,

23   "Attorney-Client Privilege Waiver," correct?

24      A    That's what it says.

25      Q    All right.  And now I'd like you to go back

1    one more page.

2        A    All right.

3        Q    The first word on that page is

4    "Investigation"; is that correct?

5        A    That's what it says.

6        Q    Now, do you see that where this narrative

7    begins, where it begins with, "Van Dyke is a crazy

8    person"?

9        A    Yes.

10       Q    Can you read that and tell me if this is the

11   grievance that you sent to the State Bar against me

12   on -- on or around December 20th, 2017?

13       A    Again, I can't authenticate this document.

14       Q    Do you want to read it to see if you recall

15   saying any of that?

16       A    Well, you are a crazy person, so that part is

17   true.

18            MR. VAN DYKE:  Objection, nonresponsive.

19            THE WITNESS:  Yeah, I'm pretty sure you are a

20   drug addict, so yeah.

21            MR. VAN DYKE:  Objection, nonresponsive.

22            THE WITNESS:  The mental illness part seems

23   spot on.

24            MR. VAN DYKE:  Objection, nonresponsive.

25            THE WITNESS:  And you have threatened to

1    murder people on the Internet.

2            MR. VAN DYKE:  Objection, nonresponsive.

3            THE WITNESS:  And you did file a Rule 202

4    lawsuit in Victoria County.

5            MR. VAN DYKE:  Objection, nonresponsive.

6            THE WITNESS:  And I do think you are a

7    disgrace and embarrassment to the State Bar, so yeah,

8    that does look like something I complained about.

9        Q    BY MR. VAN DYKE:  Very well.  Did you write

10   this yourself or did someone else write it for you?

11       A    No, I wrote that.

12       Q    Okay.  Did you read it completely before

13   electronically signing and filing it?

14       A    No, obviously not.

15       Q    Okay.  I'd like you to look at Exhibit 5a, if

16   you would.

17       A    All right.

18       Q    Would you agree with me that except for the

19   highlighted portion, that page is an exact copy of the

20   last page of the grievance I showed you in Exhibit 5?

21       A    I'm sorry, but I'm in no position to make any

22   kind of agreements with you.

23       Q    Okay.  Will you read the highlighted portion,

24   please.

25       A    I have.

1    Q    Will you please read it.

2    A    I have read it.

3    Q    The highlighted portion says, "I hereby swear

4  and affirm that I am the person named in Section II,

5  Question 1 of this form (the Complainant) and that the

6  information provided in this complaint is true and

7  correct to the best of my knowledge."

8         Is that what it says?

9    A    That's what it says.

10   Q    And in Exhibit 5 did you electronically sign a

11 document with the same language and send it to the

12 State Bar of Texas?

13   A    Yes, I did.

14   Q    Okay.  I'd like you to look at Exhibit 5b,

15 please.

16   A    All right.

17   Q    I'd like you to look at question 8, the

18 highlighted portion.  It says, "Yes.  He is a violent

19 person suffering from very profound mental illness that

20 self-medicates with illegal drugs."

21         Did you write that in the grievance you filed

22 against me with the State Bar of Texas?

23   A    Yes.

24   Q    I'd also like you to read your response to

25 number 9, which says, "He said he was going to murder

1  both me and my family, as well as murder anyone else

2  who 'interferes' with his law practice."

3          Did you write this in your grievance against

4  me with the State Bar of Texas?

5     A    You mean you didn't say that to me?

6          MR. VAN DYKE:  Objection, nonresponsive.

7          THE WITNESS:  Yes.

8     Q    BY MR. VAN DYKE:  This grievance was filed on

9  or around December 20, 2017, correct?

10    A    I don't know.

11    Q    Now, if you will go back to Exhibit 5a, if you

12  would, please.

13    A    Okay.

14    Q    Anywhere on that document does it indicate a

15  date that it was electronically signed?

16    A    Well, there's a date written on it, but I

17  don't know if that means anything.

18    Q    What -- what date is written on it?

19    A    It says 12/20/2017.

20    Q    Okay.  You have previously testified that

21  we've never met in person; is that correct?

22    A    Yes, I believe so.

23    Q    So I -- so I certainly didn't threaten you in

24  person; is that correct?

25    A    Depends on how you define that term, in

1  person.  I think sending someone directly an e-mail

2  is -- is pretty in person, Jason.  It's going to get

3  you in handcuffs.

4       MR. VAN DYKE:  Objection -- objection to the

5  nonresponsive parts of the answer.

6     Q    BY MR. VAN DYKE:  Have we spoken on the

7  telephone before today, Mr. Retzlaff?

8     A    No.

9     Q    Is this the first time we've in fact spoken

10 face-to-face?

11    A    I think so, but I'm not exactly sure.

12    Q    Okay.

13    A    And the reason why I mention that is, isn't

14 some of your family members either from or lived in

15 Rochester, Minnesota?

16      MR. VAN DYKE:  Objection, nonresponsive.

17    Q    BY MR. VAN DYKE:  Mr. Retzlaff, can you

18 explain on what occasion prior to December 20th, 2017 I

19 threatened to murder you?

20    A    On the Internet.

21    Q    Okay.  Perhaps you could point to what of the

22 Plaintiff's exhibits where I threatened to murder you

23 prior to December 20th of 2017.

24    A    Let's see, when you posted a photograph of

25 yourself in a half-assed version of a ghillie suit with

1  an automatic weapon saying that if people who mess with

2  your job, that you're gonna show up at their house and

3  kill them or something like that.

4      Q    Do you believe that that post was directed

5  specifically to you?

6      A    I believe so just because it happened right

7  around the time when you lost your job from Victoria

8  County, and the -- the comments on the -- on the Texas

9  Lawyer magazine.

10     Q    Let's talk about those comments, Mr. Retzlaff.

11 Did any of those comments on the Texas Lawyer magazine

12 specifically reference your name?

13     A    It specifically referenced that you were going

14 to go after the person who cost you your job, which if

15 you were going to be honest about things, you should

16 really have looked in the mirror in order to discover

17 the person who cost you your job instead of looking at

18 me.

19          MR. VAN DYKE:  Objection to the nonresponsive

20 parts of the question.

21     Q    BY MR. VAN DYKE:  Mr. Retzlaff, on what

22 occasion prior to December 20th, 2017 did I threaten to

23 murder your family?

24     A    When you went on your Twitter social media

25 posts.  Where you go on social media and you threaten

1   people that do things that you don't like.  I took that

2   as a -- as a threat to myself because it made me afraid

3   to criticize you or to speak out against you or to --

4   to petition my government to make complaints about you.

5   And so when you go on there and you say that -- that

6   every person who has ever filed a Bar complaint against

7   me I've sued them, I take that as -- as something

8   personal directed to me.  And -- and when you go on

9   social media with guns and stuff and, you know, saying

10  you're -- you're gonna go after the person who

11  complains about you, I take that personally.

12      Q    Would it be accurate to say that none of these

13  social media posts specifically referenced your name?

14      A    I'm sorry, I can't help you with that, Jason.

15  You've dug yourself in this hole.  You know, when you

16  go out and broadcast that crap on the Internet, all

17  kinds of people are going to see it and all kinds of

18  people are going to have different feelings about it.

19  Some people get scared about that shit.  Some people

20  just blow it off.  Some people take it as a personal

21  threat against them.

22          MR. VAN DYKE:  Object to the nonresponsive

23  parts of the answer.

24      Q    BY MR. VAN DYKE:  But based on your testimony,

25  Mr. Retzlaff, would it be fair to say that you believe

THOMAS C. RETZLAFF - October 25, 2018

1  anything threatening or I may or may not have posted on

2  social media you believe is directed towards you?

3      A    I don't understand that question.

4      Q    Well, you've testified that you can't -- that

5  you looked at this picture, I believe a half-assed

6  ghillie suit was the term you used, and it doesn't

7  mention your name, but you still perceive that as a

8  threat against you.  Is that correct?

9      A    Yes, because you say that -- I took it to mean

10 that any person who criticizes you in your professional

11 capacity can look forward to having you show up on

12 their doorstep with a gun.  Yeah, and that's something

13 that only a crazy motherfucker would do.  Yeah, you

14 think this is a joke, funny guy.  Does it seem funny

15 now?  You're at the wrong end of a $100 million SLAPP

16 lawsuit.

17          MR. VAN DYKE:  Object to the nonresponsive

18 parts.

19     Q    BY MR. VAN DYKE:  Mr. Retzlaff, have you ever

20 had a Twitter account?

21     A    Yeah, I think I might have.

22     Q    Have you ever used the Twitter account known

23 as @OneTrueDoxbin?

24     A    No.

25     Q    Okay.  Does -- as seen from the Bar's exhibits

THOMAS C. RETZLAFF - October 25, 2018

1   that that's the only threat contained in any of the

2   exhibits today, the threat references anyone's family.

3   So would it be accurate to say that you and

4   OneTrueDoxbin are not one and the same person?

5       A    So that makes it okay for you to post that

6   kind of crap on social media against opposing

7   litigants?

8           MR. VAN DYKE:  Objection, nonresponsive.

9       Q    BY MR. VAN DYKE:  Mr. Retzlaff, would it be

10  accurate to say that you and OneTrueDoxbin are not the

11  same person?

12      A    Correct.

13      Q    Have you ever used a Twitter account known as

14  Dividedly?  I'm going to spell that, D-i-v-i-d-e-d-l-y,

15  underscore.  Have you ever used that Twitter account?

16      A    No.  That's the one where you've made the post

17  about you wanted to lynch niggers.

18          MR. VAN DYKE:  Objection, nonresponsive.

19          THE WITNESS:  And you posted a noose, I think.

20          MR. VAN DYKE:  Objection, nonresponsive.

21          THE WITNESS:  What, are you going to tell me

22  you didn't?

23          MR. VAN DYKE:  Objection, nonresponsive.

24      Q    BY MR. VAN DYKE:  Mr. Retzlaff, would you

25  please turn to Exhibit 5c.

THOMAS C. RETZLAFF - October 25, 2018

1     A    All right.  I think I found it.

2     Q    Okay.  The highlighted portion begins with the

3  word "Earlier."  So just so we're on the correct

4  document; is that correct?

5     A    No, that's not what it says on 5 Charlie.

6     Q    What does the highlighted portion begin with,

7  sir?

8     A    This stuff there.  That's what I see under 5c.

9     Q    No, sir.  That was 5 bravo.  I'm asking you

10  about 5 Charlie.  Can you --

11    A    Oh, okay.  All right.  Go ahead.  Yeah, just

12  the way these tabs are stuck in there, it's got me --

13  all right.  Go ahead.  What's your question?

14    Q    It says here that you found out that I got a

15  job as an assistant district attorney in Victoria

16  County; is that accurate?

17    A    Yes.

18    Q    Where did you learn that information?

19    A    I can't say that.

20    Q    Why not?

21    A    Because there is a discovery stay in the

22  federal lawsuit, and I can't answer that question.

23    Q    You understand that we're not here in the

24  federal lawsuit today.  This is a Bar disciplinary

25  proceeding?

THOMAS C. RETZLAFF - October 25, 2018

1    A    Not my problem.  The federal judge is very

2  specific.  And in fact, I remember you crying like a

3  bitch this morning about wanting to get a discovery

4  conference call with the judge.  How did that work out

5  for you, Van Dyke?

6         MR. VAN DYKE:  Objection, non --

7         THE WITNESS:  Well, you -- you tried to call

8  up the federal judge to ask him to give you a ruling on

9  this thing.  What happened when you called him?

10        MR. VAN DYKE:  Objection, nonresponsive.

11        THE WITNESS:  Yeah, yeah, because this is

12  pretty fucking funny, right?  Ha-ha.  Giggle there, fat

13  boy.  You're the one who said this morning you were

14  calling up the federal judge to get an opinion on

15  whether or not we can talk about these things because

16  of the court-ordered stay, the discovery stay.  All

17  right?  You're fishing for stuff that you know you are

18  not allowed to get.  And what happened when you called

19  the federal court this morning to ask?  What did they

20  tell you?

21    Q    BY MR. VAN DYKE:  Are you done?

22    A    I'm waiting for your response.

23        MR. VAN DYKE:  Object to the nonresponsive

24  parts of Mr. Retzlaff's answer.

25        THE WITNESS:  Well, I'm not going to violate a

1  federal court order.

2      Q    BY MR. VAN DYKE:  How about you answer the

3  question, and then you can file a motion for sanctions

4  against me for violating the federal court's order?

5  How about that, Mr. Retzlaff?

6      A    Except I would be the one violating the court

7  order, so no, I can't help you with that.

8      Q    I will agree to your motion for sanctions.

9      A    It doesn't matter, okay?  It doesn't matter

10 what you want to agree or disagree to.  Okay?  The

11 federal judge was very clear in black and white, and

12 the statute is very clear in black and white.  You

13 don't get to do discovery.

14     Q    Are you refusing to answer my question about

15 where you learned the information that you referenced

16 in your grievance?

17     A    Yes.  And also, it's not relevant.  It doesn't

18 matter where I heard it from.

19     Q    It says in this grievance you contacted Steve

20 Tyler.  When did you contact him?

21     A    I don't recall exactly.  I've had many, many

22 communications with Steve.  I don't recall.

23     Q    How do you know Mr. Tyler?

24     A    He was in the Army -- knock it off.

25         He was in Germany about the same time I was.

1  He's a district attorney who is in the county next to

2  the one I live at in San Antonio.  He is a public

3  figure, someone you read about in the newspaper a lot.

4      Q   Okay.  Now, it says here in Exhibit 5c you

5  know him because you live in San Antonio.  But you

6  don't actually live in San Antonio anymore, do you?

7      A   I can't answer that question either.  I'm

8  sorry, that -- I'm not going to give ammunition for a

9  stalker who wants to try to murder me and tell him

10 where all the different places are that I live or don't

11 live or where my family has property at.  That's not

12 going to happen.

13     Q   Mr. Retzlaff, I'm not asking for a

14 specific address.

15     A   Sure you are.  Listen, you're the one -- on

16 May 22nd, you are the one who told Jeffrey Dorrell I

17 know where Mr. Retzlaff is physically located at.  I'm

18 gonna come to Arizona and beat him to death, and then

19 you sent some nonsense to the post office trying to get

20 them to give up where my home address is claiming that

21 you needed the information so you could serve me with

22 the federal lawsuit, except the federal lawsuit had

23 been removed from state court, and there wasn't any

24 need for you to do that.

25         So no, any kind of information about my

1   personal life I'm not gonna give it to you.  Violent

2   Nazi motherfuckers who send death threats forfeit their

3   right by wrongdoing to get my personal information or

4   personal information about my family.

5       Q    Is that your legal opinion?

6       A    That's my personal opinion.  I'll tell you

7   what Jeff Dorrell had to say, but don't worry about it.

8       Q    Would you agree with me that San Antonio is

9   not located in Victoria County?  Can we at least agree

10  on that?

11      A    Yes.

12      Q    Okay.  Would it be accurate to say that

13  Victoria County is an approximately two-hour drive from

14  San Antonio?

15      A    No.

16      Q    Do you know how long of a drive it is?

17      A    Oh, I get there much quicker than that.

18      Q    How long does it take you to get there,

19  Mr. Retzlaff?

20      A    It depends upon from where I am traveling

21  from, but it depends.  Anyways, what difference does it

22  make?

23      Q    Well, you don't really know Mr. Tyler

24  personally, do you?

25      A    I can't answer that question.  That's -- you

1  know, you are going into matters that -- that the

2  federal court has put on hold.

3      Q    Well, Mr. Retzlaff, you said that you know

4  Mr. Tyler in your complaint against me.  I'm just

5  trying to inquire as to whether what you said in your

6  complaint is true or not.  So is that true or not true?

7  Do you know Mr. Tyler personally?

8      A    Well, that's two different questions, because

9  the complaint doesn't say that.  The State Bar

10  complaint doesn't say that.

11      Q    Okay.  So you said, "So I contacted Steve

12  Tyler, the District Attorney (who I know because I live

13  in San Antonio)."

14      A    Right.

15      Q    And said, "Do not hire this dude - he is a

16  fucking lunatic."

17      A    And -- and -- and I stand by that answer.  It

18  says what it says.

19      Q    So would you also stand by when you said

20  that -- when you state in your grievance that you told

21  him that I was a drug addict?

22      A    That's not what I said.

23      Q    Okay.  So you didn't tell him I was a drug

24  addict?

25      A    That's not what it says.  That's not what the

1  document says.  The document says something completely

2  different than what you are claiming it says.

3      Q    So aside from "Do not hire this dude - he is a

4  fucking lunatic," what did you say to Mr. Tyler?

5      A    I don't recall exactly.

6      Q    What do you recall?

7      A    I don't know.  Be specific.  There's lots of

8  things I recall, lots of things I don't recall.  I

9  don't know what I don't know.

10     Q    What do you recall telling to Mr. Tyler about

11 me?

12     A    That you're an idiot and that he shouldn't

13 hire you, and that it would be a mistake.  I can't

14 recall exactly what it is.  And we're going into things

15 that -- that you filed this lawsuit over, and I -- I

16 can't answer anything more on that.

17     Q    Well, I've already got a subpoena issued to

18 Mr. Tyler through the panel.  Is he going to tell the

19 panel something different from what you've testified

20 here today to?

21     A    You are asking me to read another -- is he

22 going to say that he -- he thinks that you're a

23 qualified individual to -- to work in the DA's office?

24 I think he's going to say, no, Jason Van Dyke is a

25 fucking lunatic, and it was a terrible mistake for me

1    to hire him, is what I imagine Steve will say.  And I

2    think Steve will say that I -- I should have done my

3    due diligence, but I didn't, and I made a mistake, and

4    Van Dyke has a profound mental illness.  I think

5    Mr. Tyler will probably say that as well, and that

6    he -- ruse the day that he ever heard of Jason Van Dyke

7    who saw a job posting on the TDCAA Web site and thought

8    it would be a good idea for a violent, racist, Nazi

9    motherfucker to be an assistant district attorney.  You

10   were an idiot to apply for that job, Van Dyke.  You

11   were a complete idiot, and you got no one to blame but

12   yourself.

13       Q    Are you done?

14       A    You don't like it, tough.  You move on with

15   your life.

16       Q    Mr. Retzlaff, I see you are a person that

17   likes to take screenshots of various posts that I've

18   made on the Internet.  Are you aware of a single

19   screenshot of even a single instance where I've used an

20   illegal drug?

21       A    The Internet is a very big place.  I -- I

22   don't know what -- I don't know.

23       Q    So as you sit here today, you have no evidence

24   that I have ever used any illegal drugs?

25       A    Oh, I -- I'm convinced that you do.

1    Q    That's your opinion.  You don't have any

2  evidence?

3    A    That's my opinion based on years of experience

4  knowing people with substance abuse problems and

5  knowing people with mental illnesses, and you clearly

6  have a screw loose, dude, seriously.  Who thought it

7  would be a good idea to -- to stage a burglary of their

8  own car and try to get your roommate to go along with

9  your story?  But you guys didn't get your story

10 together correctly, and you get involved in insurance

11 fraud.  That's really smart, dude.  That's really --

12 you just pissed away any type of career you ever hoped

13 to have.

14      MR. VAN DYKE:  Object to the nonresponsive

15 parts of the answer.

16    Q    BY MR. VAN DYKE:  So in question 8 you stated

17 that I self-medicated with illegal drugs.  You had no

18 idea, did you?  That was just your opinion?

19    A    I don't see where it says that.  Oh, number 8,

20 we've got to go back.  Let's see.

21    Q    Yeah, Exhibit 5b.  So when you said that I

22 self-medicate with illegal drugs, you didn't know that,

23 but you just came up with that yourself?

24    A    I base that upon my observations of you and

25 how you conduct yourself.  Normal people don't act the

THOMAS C. RETZLAFF - October 25, 2018

1  way that you do on social media.  Only people that are

2  crazy people that have mental illness and a substance

3  abuse do that kind of crap, you know.  Nobody goes on

4  Twitter that -- that uses their official law firm

5  account with their picture as a lawyer calling out

6  people niggers and faggots, and I'm going to lynch you,

7  and I'm going to skin you alive.  Normal people don't

8  do that; crazy people do.

9      Q    Okay.  Go ahead and turn to 5d, if you would.

10     A    All right.

11     Q    Now, would it be accurate to say, "Van Dyke

12  has since been posting online that he is going to

13  murder me because I am the one who cost him his job

14  with Victoria County.  He further threatens to murder

15  my family, and many others"?

16          So I ask you again, as of the date that this

17  grievance was filed, when did I threaten to murder you?

18     A    When you posted pictures of yourself on --

19  with guns on the Internet saying that if somebody

20  messes with your job, that you're going to show up at

21  their house in the middle of the night and kill them.

22     Q    And when did I threaten to murder your family?

23     A    You know, when I see those kind of posts that

24  are regarding the situation that I'm involved in, you

25  don't have to mention my name specifically in order for

1　that to concern me.  You know, when you say that I'm

2　gonna go after the person who cost me my job.  You said

3　something about -- you were quoted by The Victoria

4　Advocate newspaper as somebody who ran their mouth, I

5　think that you're going to go looking for them, and

6　then you're the guy who posts pictures of yourself with

7　guns saying that, anybody messes with my job, I'm going

8　to go kill them.

9　　　　　And -- and when you say the shit that you did

10　to Ken White and to Aster, you know, that you're going

11　to go to Omaha and go to his house, and, oh, look,

12　here's a map.  It's only two hours to get to Omaha or

13　some shit, you know, when you post stuff like that,

14　I -- I take that personally that you're going to harm

15　me and my family.  That makes me concerned.  You know,

16　I've got a right to have the -- I've got a right to

17　have the kinds of feelings that I have, and that's just

18　how I felt.

19　　　Q    Let's talk about those feelings, Mr. Retzlaff.

20　Would it be accurate to say that anytime I post

21　something on the Internet or social media, you take it

22　as a threat?

23　　　A    No.

24　　　Q    Would it be accurate to say that anytime I

25　post a picture of myself that has a firearm on social

THOMAS C. RETZLAFF - October 25, 2018

1  media, you take that as a threat?

2      A    Just a firearm with no words?

3      Q    Any firearm.

4      A    With no words?

5      Q    Yeah, with no words.

6      A    Well, you're asking me a hypothetical

7  question.  I -- I'm not sure I could really

8  answer -- in fact, yeah, I probably would take that as

9  a threat.  Because people that have mental illness

10 shouldn't be around firearms.  You know, there is some

11 people that just shouldn't -- shouldn't have guns, and

12 you are one of them.  You are one of them.  So, you

13 know, when you post pictures of yourself with guns, you

14 know, it's going to get a lot of people concerned.

15     Q    Okay.  5 echo, please.

16     A    All right.

17     Q    Do you have that in front of you,

18 Mr. Retzlaff?

19     A    Yeah.

20     Q    Were you in court when my Rule 202 petition

21 was denied?

22     A    No, I was not.

23     Q    So you really have -- you have no clue what

24 happened in court that day, do you?

25     A    That's not true.

THOMAS C. RETZLAFF - October 25, 2018

1    Q    It says, "When the judge ruling against Van

2    Dyke poured him out of court for being an idiot for

3    filing such a thing to begin with," you don't know what

4    was said by that judge in court that day, did you?

5    A    Do I have personal knowledge of what the judge

6    said in that court?

7    Q    Yes.  Do you have personal knowledge of what

8    the judge said in that court?

9    A    No.

10   Q    All right.  Thank you.

11   A    I did read his ruling, though, and I heard

12   about what happened.

13   Q    Okay.  Fair enough.  5 foxtrot, please.

14   A    All right.

15   Q    Mr. Retzlaff, would you read the portion of

16   Exhibit 5 foxtrot that is highlighted in green.

17   A    Okay.

18   Q    Will you read it aloud, please.

19   A    "Unfortunately for Van Dyke, he has come up

20   against a person who simply cannot be intimidated."

21   Q    Thank you.

22       A man who simply cannot be intimidated, would

23   it be fair to say that that's a phrase you use rather

24   often, Mr. Retzlaff?

25   A    No.

1    Q    Okay.  How often would you say you use it?

2    A    I don't know.  I don't keep track.

3    Q    Okay.  And is this a phrase when you do use

4  it, you typically use in reference to yourself as a

5  person who can't be intimidated?

6    A    I cannot say.  I don't think that this is a

7  phrase that I use very often.

8    Q    Okay.

9    A    I've seen it used before lots of times, but as

10  for me using it, I don't know.  I think it's just

11  something I saw on the Internet that looked cool and

12  maybe I just started copying it or something.  I don't

13  know.  I can't recall.

14    Q    Okay.  Why don't you turn to Exhibit No. 6,

15  Mr. Retzlaff.

16    A    All right.

17    Q    And go past the first page -- the first page

18  that says "Received" on the top --

19    A    All right.

20    Q    -- scroll down -- actually, turn to the first

21  page where question number 8 has some highlighted

22  portions.  Can you see that?

23    A    Well, I see question number 8, but it's not

24  highlighted.

25    Q    No, the answer, Mr. Retzlaff.

1    A    Oh, you are talking about a different number

2  8.  I was looking at number 8 under Section II where it

3  asks me if I'm a judge.

4    Q    No, sir.  I'm asking for Exhibit 6, and that's

5  a -- that's another grievance you filed against me and

6  question number 8.

7    A    I see.  Yes, I see that.

8    Q    Now, it says -- I want to specifically

9  reference in your -- first of all, is this -- are these

10  questions, your responses, in a more recent grievance

11  you filed against me with the State Bar?

12    A    Yeah, I think so.

13    Q    Okay.  You mentioned suicidal ideation.  Where

14  did you get this idea?

15    A    I think it was something you posted on -- on

16  your Facebook or something.  Maybe it was Instagram.  I

17  can't recall.

18    Q    Really?  And you didn't forward this to

19  Ms. Brady?

20    A    I don't know.  I forwarded a bunch of stuff to

21  her.  I can't recall everything I sent her.

22    Q    Okay.

23    A    Well, yeah, the kind of person who is willing

24  to commit homicide certainly wouldn't -- I wouldn't put

25  it past him to commit suicide at the same time, you

1   know.  And when you say that the State Bar can have my

2   motherfucking bar card, that seems to be a sign of

3   decompensation and that you are in a downward spiral of

4   depression.  And when people are depressed, they are

5   suicidal, which is another reason why you shouldn't

6   have guns.

7        MR. VAN DYKE:  Okay.  Object to the

8   nonresponsive parts of Mr. Retzlaff's --

9        THE WITNESS:  You know --

10       MR. VAN DYKE:  -- statements --

11       THE WITNESS:  -- a lot of crazy stalkers

12  commit homicide and then they do suicide afterwards,

13  you know, these spree killers.

14       Q    BY MR. VAN DYKE:  I'm going to skip over

15  Exhibit No. 7.  And Mr. Retzlaff, how many grievances

16  have you filed against me this year?

17       A    I don't know.

18       Q    There's so many you can't keep an accurate

19  count?

20       A    No.  It's just I don't keep an accurate count.

21       Q    Okay.  You've got two that are pending before

22  The Board of Disciplinary Appeals right now, don't you?

23       A    I don't know.  I know that you keep doing

24  stupid shit.  I keep filing grievances on it.

25       Q    Okay.  How long do you intend to continue

THOMAS C. RETZLAFF - October 25, 2018

1  filing grievances against me, Mr. Retzlaff?

2      A    As long as you keep doing stupid shit.

3  Violating Bar rules or ethical rules or getting

4  arrested for crimes, there's going to be grievances

5  filed against you.

6      Q    Okay.

7      A    Any -- any -- anytime I -- I perceive that

8  you're violating a State Bar rule or acting

9  unethically, you know, I'm gonna be there.

10      Q    Okay.  Mr. Retzlaff, are you familiar with the

11  charges that are at issue in this case?

12      A    Why don't you refresh my memory.  Read off the

13  petition.

14      Q    The threats that -- the threats that Ms. Brady

15  says that I made against you, are you familiar with

16  those?

17      A    Well, why don't you read the -- the petition

18  to me so I can have a clear recollection of what you're

19  talking about.

20      Q    That's -- that's okay, Mr. Retzlaff.

21      A    Why not?  I'm not going to be able to answer

22  your question if you don't.

23      Q    I'd rather you look at Exhibit 8, please.

24      A    Ah.

25      Q    Do you recognize Exhibit 8?

1    A    This looks like another State Bar complaint.

2    Q    Not Exhibit 7, Mr. Retzlaff.  We are skipping

3  over Exhibit 7.  We are using Exhibit 8.  Do you

4  recognize Exhibit 8?

5    A    It's a piece of paper with words on it.

6    Q    What does the piece of paper with words on it

7  appear to be?

8    A    It appears to be a letter, but I can't

9  authenticate this because it's not my letter.

10    Q    To whom does the letter appear to be

11  addressed?

12    A    It has my name on it.

13    Q    Is the P.O. box address correct?

14    A    Yes, it is.

15    Q    And the zip code and the city and state as

16  well, I presume?

17    A    Yep.

18    Q    Do you recall ever receiving this letter?

19    A    I don't know.  I get a lot of letters in the

20  mail.

21    Q    You have no recollection of ever receiving

22  this letter from The Board of Disciplinary Appeals?

23    A    Just a second.  Let me read it over.  Yeah,

24  okay, what about it?

25    Q    About what date did you receive this letter?

THOMAS C. RETZLAFF - October 25, 2018

1     A     I don't know.

2     Q     Did you give this letter to anybody?

3     A     Oh, yeah.  Shit, I shared it with everybody.

4     Q     Who all did you share this letter with?

5     A     Oh, Jesus, 20, 30 people at least.  I'm not

6  sure.  News media.  I gave one to Ken White.  I gave

7  him a copy, I remember that.  A lot of people.  A lot

8  of people got this letter.

9     Q     Isn't it true you published it to a Web site?

10    A     I'm sorry, I can't help you with that.

11    Q     I'm just asking you if it's true or not.  Did

12 you post it to a Web site or not?

13    A     And again, I'm sorry, I can't help you with

14 that question.  We're stepping into areas where the

15 federal court said we can't talk about.

16          MR. VAN DYKE:  That's -- objection,

17 nonresponsive.

18    Q     BY MR. VAN DYKE:  You are not going to tell me

19 whether you published this on a Web site?

20    A     You know, I think I might have put it on

21 Facebook, but I'm not sure.

22    Q     Oh, so you have a Facebook account?

23    A     No, I didn't say that.  I said I think it

24 might have gone on Facebook, but I'm not sure.

25    Q     Do you have a Facebook account?

THOMAS C. RETZLAFF - October 25, 2018

1    A    I think it might have been on the -- the

2  Popehat blog.  But, you know, we're getting into areas

3  that -- that -- that are involving the federal lawsuit.

4  One of the things you said in the federal lawsuit, you

5  accused me of -- of running some kind of blog or

6  something like that, and I'm not going to answer any

7  questions about that.

8    Q    Let's -- let's get -- make it clear.  Do you

9  operate a blog commonly known as BV Files?

10    A    And again, I'm not gonna answer that question.

11  We have a federal court order that stays discovery on

12  these matters.  In addition, you and other people have

13  accused me of crimes with regards to that blog, so I'm

14  not going to answer that question.

15    Q    What is the legal basis for your refusal to

16  answer other than the federal court's order?

17    A    I find your -- your question to be harassing

18  and in violation of my Fifth Amendment rights.  You --

19  you want to sit here and -- and make claims that I've

20  done these criminal things with regards to blogging, so

21  any kind of question about blogging I'm not going to

22  talk about.

23    Q    Go to -- why don't you go then to Exhibit 9.

24    A    All right.

25    Q    Do you know what this is?

A No, I do not. I didn't make this, so...

Q Have you ever seen it before?

A No, I have not.

Q What does it appear to be to you?

A A piece of paper with words on it and some pictures. I can't authenticate this document, so I can't --

Q I'm not asking you to authenticate it.

A Sure you are.

Q I'm asking you if you know what this is a representation of?

A No, I don't.

Q All right. Well --

A I didn't make this, so I don't know. It's your exhibit. You'd have to talk to the person who made it to...

Q Okay. Well, does it start off talking about James McGibney?

A It starts off by having a date on the top and --

Q Okay. I'd like you to scroll about a third of the way down the page. Does this -- does the first page of this document appear to discuss James McGibney?

A I'm going to say that the document says what it says.

THOMAS C. RETZLAFF - October 25, 2018

```
 1      Q     Okay.

 2      A     And it does --

 3      Q     Why don't you go to the third page of the

 4   document.

 5      A     And it does reference the name McGibney.

 6      Q     Okay.  Turn to the third page of the document,

 7   please.

 8      A     All right.

 9      Q     Now, we've mentioned Mr. Klein before.  Does

10   the third page of this document appear to show a

11   picture of Philip Klein?

12      A     I don't know.  I see a picture on there, but I

13   can't authenticate that.

14      Q     Do you know who is in that picture?

15      A     No, I don't.

16      Q     Okay.

17      A     I didn't -- I can't authenticate that

18   document.

19      Q     All right.  Why don't you go to page 6,

20   Mr. Retzlaff.

21      A     I don't know, what page are we on?  Okay.

22      Q     We are on 3.

23      A     All right.  All right.

24      Q     Go to page 6.

25      A     All right.
```

THOMAS C. RETZLAFF - October 25, 2018

1    Q    Would it be accurate to say that this page

2  references John Morgan?

3    A    I don't -- I don't think so.

4    Q    What's at the top of the page 6 that you are

5  looking at, Mr. Retzlaff?

6    A    You know, I am sorry.  I'm gonna have to shut

7  you down here.  I'm really starting to feel harassed by

8  these questions about John Morgan and -- and about

9  Philip Klein.  I'm being harassed by that.  I'm not

10  going to answer any more questions about those guys.

11    Q    What about you?  How about you go to page 7.

12    A    Sorry, again, I'm -- I'm -- when it comes to

13  this blog, I'm not answering any questions about it for

14  the reasons I've already stated.

15    Q    You're on page 7?

16    A    Say again.

17    Q    So that's not a picture of you on page 7 in

18  the Court of Appeals for the Second District of Texas?

19  Is that you?

20    A    Oh.  Yes, that's a photograph of me.

21    Q    Okay.  And then on page 9, do you know who

22  those -- those people who are photographed at the top

23  of page 9, do you know who they are?

24    A    Again, I -- I can't help you with that.

25  You're starting to harass me with these questions.

THOMAS C. RETZLAFF - October 25, 2018

1 This is completely irrelevant stuff, and it's

2 harassing, you know, and -- and we're talking about

3 stuff that the federal judge has ordered stayed.  And,

4 you know, you're the one who -- you and McGibney and

5 Klein and Morgan have accused me of various crimes

6 involving this blog, and I'm not going to answer any

7 questions on that, you know, for, you know, Fifth

8 Amendment reasons, and as well as it's harassing and

9 annoying.

10     Q     All right.  What about page number 10?

11     A     It doesn't matter what page you go to, the

12 response is the same.

13     Q     Oh, I don't want to hear your response,

14 Mr. Retzlaff.

15     A     I've already given my response, and now I'm

16 starting to feel harassed.

17     Q     So you are not gonna answer any questions

18 about this exhibit; is that correct?

19     A     Correct.  Anything to do with blogs I'm not

20 going to answer any questions to for the reasons I've

21 already stated.

22     Q     And that -- and is the legal basis for your

23 objection your Fifth Amendment privilege against

24 self-incrimination?

25     A     I'm sorry, dude, I've got nothing more for

1  you.  You're trying to violate a federal court order

2  that says we can't talk about these things, and -- and

3  that's all it is.  And, you know, your question's

4  harassing.  And your -- and it also delves into Fifth

5  Amendment stuff, too.  So, you know, you're the one

6  who --

7      Q    But --

8      A    You're the one -- listen, dude.  You're the

9  one who accused me of committing a crime with this

10  blog.  So when it comes to stuff like that, I'm not

11  answering any questions.

12      Q    All right.  Well, fine.  Why don't you go to

13  Exhibit 10, then.

14      A    We're gonna have to hurry up here because I'm

15  going to have to go here in a little bit.

16      Q    Well, you've been subpoenaed to be here today,

17  Mr. Retzlaff.

18      A    It doesn't matter.

19      Q    Let's look at what's been marked as Exhibit

20  10.

21      A    Yeah, what about it?

22      Q    Well, you state in that e-mail that you

23  accessed State Bar records.

24      A    I don't say that this is an e-mail.  I don't

25  know what this is.

THOMAS C. RETZLAFF - October 25, 2018

1     Q    Do you recognize Exhibit 10, Mr. Retzlaff?

2     A    I'm sorry, I can't authenticate this document.

3     Q    Do you remember -- I'd like you to read

4 Exhibit 10 and let me know if that's an e-mail that you

5 sent to Dr. Ryan Daniel.

6     A    I don't recall.

7     Q    Okay.  Fair enough.

8     Mr. Retzlaff, do you know who Dean Anderson

9 is?

10     A    That question has already been asked and

11 answered, and I can't help you with that.

12     Q    Do you have any kind of personal relationship

13 with Dean Anderson?

14     A    I'm not gonna answer that question.  I am

15 objecting on attorney work product privilege.  If

16 myself and Mr. Dorrell were able to figure out who this

17 guy is, I'm not gonna share that with you, but you have

18 accused me of being Dean Anderson, and you have accused

19 me of committing crimes as Dean Anderson, so I'm also

20 going to have to take a Fifth Amendment on that.  In

21 addition, we've got the federal discovery stay, you

22 know.  This is a part of your lawsuit, and the judge

23 said you can't ask questions about this stuff, so I'm

24 not gonna answer it.

25     Q    Go to Exhibit 11, Mr. Retzlaff.  Do you see

THOMAS C. RETZLAFF - October 25, 2018

1  Exhibit 11?

2      A    No, I'm goofed up now.  I don't know which is

3  10 or which is 11.

4      Q    Well, Exhibit 10 was the e-mail to Ryan

5  Daniel.  Exhibit 11 is an e-mail that appears to be

6  sent by you to Kristin Brady on Thursday, March 29th,

7  2018.

8      A    Okay.  I -- I don't know.

9      Q    Well, you're not talking about Anderson.  It

10 says -- does it not say at the top, "I have no idea why

11 Van Dyke is e-mailing this Dean Andersen guy.  I don't

12 know Anderson"?  And at the highlighted portion at the

13 bottom, it says, "Anderson's e-mail is

14 dean714@yandex.com.  I suspect he lives in Europe, but

15 I am not certain."

16     A    So what's your question?

17     Q    Did you send this e-mail?

18     A    I don't recall.

19     Q    Okay.  It says -- it says in this e-mail that

20 you suspect Dean Anderson lives in Europe.  Do you

21 suspect Dean Anderson lives in Europe?

22     A    I'm not going to answer that question for the

23 reasons I've already stated.

24     Q    All right.  Well, let's --

25     A    And I find your questioning to be very

THOMAS C. RETZLAFF - October 25, 2018

```
 1   harassing.
 2       Q    Okay.  Let's look at Exhibit 12, Mr. Retzlaff.
 3   Let's go to the next exhibit there.
 4       A    Yeah, again, I don't -- I don't know.  What is
 5   it?
 6       Q    Well, this appears to be an e-mail string
 7   between you and Ms. Brady about these threatening
 8   e-mails that are the subject of this proceeding being
 9   forwarded to you by Mr. Anderson.  Do you recall this
10   string of e-mails?
11       A    No, I don't.  It looks like this is from six,
12   seven months ago.  I don't remember.
13       Q    Okay.  But you remember the e-mails that
14   Ms. Brady referenced -- you remember sending these
15   e-mails to Ms. Brady, do you not?
16       A    I remember the exhibits she sent me.  I don't
17   remember this e-mail here, that -- your exhibit.
18       Q    Okay.  Let's talk about some of those
19   exhibits, Mr. Retzlaff.
20            I'd like the court reporter to please hand
21   Mr. Retzlaff Petitioner's Exhibit No. 4.
22       A    She can't.  Her hands are busy.  You're
23   talking about Exhibit 4 that Kristin showed me earlier?
24       Q    That's correct, Mr. Retzlaff.
25       A    All right.  Yeah, I got that.
```

THOMAS C. RETZLAFF - October 25, 2018

1    Q    You got that?

2    A    Just a second.  All right.  Yeah, what about

3 it?

4    Q    Well, here's what I'm confused about.  What

5 date does it say on this e-mail that it was sent to

6 you?

7    A    It says March 28th at 4:20 in the morning, it

8 looks like.

9    Q    Okay.  And what about on the top -- and what

10 about the top of the e-mail from Dean to

11 retzlaff@texas.net; what's the date there?

12   A    March 27th at 7:09 p.m.

13   Q    So is it your testimony that Mr. Anderson sent

14 you -- forwarded you this e-mail before I sent it?

15   A    I didn't give that kind of testimony at all.

16   Q    Well, it would appear that the e-mail that

17 says, "You better have your will made out Thomas, I'm

18 coming for YOU," you've just said it was sent on

19 March 28th, 2018 at 4:20, correct?

20   A    That's the date stamp on it, yes.

21   Q    But when Mr. Anderson forwarded it to you, the

22 date stamped is Tuesday, March 27th, 2018 at 7:09 p.m.

23 How can that be, Mr. Retzlaff?

24   A    Geez, I don't know, you fucking dumb-ass.

25 There is such a thing as time zones.  And so when

1    somebody sends you an e-mail in a different time zone,

2    it's going to show the time zone where you received it

3    at and the time zone they send it at.  So maybe you

4    have zero concept of -- of the globe and the

5    circumference of the earth and all that good shit.

6        Q    All right, Mr. Retzlaff.  Do you know what the

7    time difference between Europe and the United States

8    is?

9        A    About seven hours depending.  I don't know.

10       Q    About seven hours into the future, right?

11       A    I don't know.  I guess it depends upon where

12   you're at on -- on the planet, and Europe has two,

13   three different time zones, and it depends upon if it's

14   summertime or winter's daylight time -- or standard

15   time.

16       Q    All right, Mr. Retzlaff.  Well --

17       A    And some -- and some countries in Europe

18   don't --

19       Q    Arizona's --

20       A    -- do the time change.

21       Q    -- on Pacific Time, correct?

22       A    I don't know.  Listen, I'm not going to get

23   into debates with you about what the time zone is, you

24   know, in Germany or Ukraine or in London, England.  I

25   don't know.  Okay?  It says what it says, you know.  So

1   whatever.  You want to think there's some kind of

2   mystery about it, but, you know, it's called we live in

3   a globe, and people live in different time zones, so

4   whatever.

5       Q    All right.

6       A    I don't know what time zone this was sent

7   from.  You know, and also, e-mails don't travel with

8   the speed of light.  Sometimes somebody will send you

9   an e-mail and it will be, you know, 10, 15 minutes

10  before you get it.  Sometimes it shows up a day or two

11  later.  You know, that's the mystery of the Internet.

12      Q    All right.  So --

13      A    So I don't know.

14      Q    Okay.

15      A    But it's not going to get you out of the jam,

16  because you're the one who sent these e-mails, and when

17  it's your turn to be questioned, what are you going to

18  say, dude?

19      Q    I just find it curious, Mr. Retzlaff, how

20  these e-mails were forwarded to you before they were --

21  before they were sent to Mr. Anderson.  I'd like you to

22  try to explain that.

23      A    I -- I don't agree with your premise.

24      Q    Isn't it true that you fabricated -- that you

25  fabricated this forwarded Dean Anderson e-mail?  Isn't

1    that true?

2        A    No, this is the -- the e-mail that you sent,

3    and it got forwarded to me.

4        Q    You didn't fabricate the date stamp on it?

5        A    No.  Oops, what happened?

6        Q    All right.  Something happened with --

7        A    Yeah, something happened with the picture.

8             (A discussion was held off the record.)

9        Q    BY MR. VAN DYKE:  Isn't it true, Mr. Retzlaff,

10   that you had an in-depth e-mail communication with

11   Ms. Brady about how this Mr. Anderson, whoever he is,

12   was going to get these e-mails to her?

13       A    I don't know.  I've had many --

14       Q    I'm going to show you now --

15       A    I've had --

16       Q    -- if you look at Exhibit No. 13.  You

17   don't --

18       A    Listen, I've had --

19       Q    (Inaudible) --

20       A    I've had --

21       Q    -- communications at all between you and

22   Ms. Brady?

23       A    I've had many communications with her.  I

24   don't -- I don't recall them all offhand.

25       Q    All right.  Well, are you on Exhibit 13,

THOMAS C. RETZLAFF - October 25, 2018

1   Mr. Retzlaff?

2      A    Yes, I'm looking at it.

3      Q    Okay.  What I'm wondering -- what I'm

4   wondering about this one, Mr. Retzlaff, is about

5   three-quarters of the way down, highlighted, you write,

6   "I suspect that Russian IP addresses are blocked by

7   your IT Depart on account of risk of hacking."

8           Is that what it says?

9      A    It does say that, yes.

10     Q    How would you know if Mr. Anderson was using a

11  Russian IP address?

12     A    The e-mail provider is a well-known company

13  called Yandex, which is -- they're the European version

14  of Google.  It's a Russian company.  Everybody knows

15  that.  It's a huge company.

16     Q    Okay.

17     A    It's as big as Google or Yahoo.

18     Q    All right.

19     A    It's not a mystery about that.  It's called

20  being informed.

21     Q    Mr. Retzlaff, today is not the first time

22  someone has accused you of being one and the same

23  person as Dean Anderson, is it?

24     A    Oh, I've had people make all kinds of wild

25  accusations against me that worked out to their

THOMAS C. RETZLAFF - October 25, 2018

1  detriment.

2     Q   And, in fact, isn't it true that your -- that

3  your daughter stated that you and Dean Anderson are one

4  and the same person?

5     A   No, she never said that.

6     Q   I'd like you to turn to Exhibit 14,

7  Mr. Retzlaff.

8     A   Ah, this is your famous exhibit that you filed

9  in the SLAPP case that's a forged document.  Yeah, I

10 can't help you with that.

11    Q   Do you want to read what number 18 says?

12    A   No.

13    Q   Line 18 of that affidavit?

14    A   No, I -- this isn't an affidavit, dude.  Okay?

15 It's a forged document with a fake signature.  All

16 right?  It's totally fake, dude.

17    Q   It's your testimony that your daughter never

18 wrote this document?

19    A   No, she never did.  It's fake, dummy.

20    Q   What about Exhibit 15, Mr. Retzlaff?  Did your

21 son write that document?

22    A   I don't know.  I've never -- I can't help you

23 with that.  This is some authenticated nonsense that

24 came from Jay Leiderman.  I -- I have no idea if this

25 document is an accurate document or not.

THOMAS C. RETZLAFF - October 25, 2018

1    Q    Really?

2    A    I'm not going to let you sit here and harass

3  me by -- by showing me bullshit that you found off the

4  Internet and you're trying to present it as evidence of

5  something.  I'm not going to waste my time with this,

6  okay.  Your -- the clock is running out, dude,

7  and -- and I'm finding this to be overly burdensome and

8  harassing.  All right?  What does that have to do with

9  you being a Nazi?

10        MR. VAN DYKE:  Object to the nonresponsive

11  part of the answer.

12        THE WITNESS:  What does that have to do with

13  you calling up Jeff Dorrell saying that you are going

14  to murder me?

15    Q    BY MR. VAN DYKE:  (Inaudible.)

16    A    Say again.

17    Q    Your parental rights --

18    A    I can't help you, dude.

19    Q    -- (inaudible) with respect to your children,

20  have they not?

21    A    My children are adults, okay?  I -- you don't

22  have parental rights to adult children, you know, dude.

23  You're barking up the wrong tree on this, and you're

24  aggravating and harassing me with irrelevant nonsense,

25  and I'm not playing.

1      Q      Okay.  All right.

2      A      You know, I'm planning on going to play some

3  golf this afternoon with my daughter.  I ain't got time

4  for this bullshit.

5      Q      All right.  I would like you to turn to

6  Exhibit 16, Mr. Retzlaff.

7      A      What about it?

8      Q      What does the highlighted portion of Exhibit

9  16 say?

10     A      It says, "Some people simply cannot be

11 intimidated."

12     Q      Isn't that remarkable, we have almost the

13 exact same language in your complaint in Exhibit 5f,

14 don't we?

15     A      It's English, so yeah, it is the exact same

16 language.

17     Q      Don't both of them say -- reference a man who

18 simply cannot be intimidated?

19     A      No.  That's not what it says at all.  It just

20 says some people can't be intimidated -- or simply

21 cannot be intimidated.  That's -- that's what this

22 thing says.

23     Q      Okay.

24     A      Why, are you trying to say that because, you

25 know, people use the same letters that they're the same

1  person?  Because somebody uses the word D or A or

2  simply that there's some kind of grand conspiracy, they

3  are connected?  What does that have to do with you

4  going on Twitter calling people niggers and saying

5  you're going to lynch them?

6          MR. VAN DYKE:  Objection to the nonresponsive

7  parts of the answer.

8          THE WITNESS:  No, I'm objecting.  That's my

9  objection, okay.  Your question is -- is harassing and

10  it's irrelevant.  All right?

11          I'm skipping ahead here, you know, to some of

12  these e-mails.  I'm not going to talk about No. 17.

13  That's some stuff with that guy I guess you claimed you

14  worked with.  I don't know.  That's not my e-mail.  I

15  can't authenticate that.

16      Q   BY MR. VAN DYKE:  All right.  What about

17  No. 18, Mr. Retzlaff?  Are you going to talk about that

18  one?

19      A   No.  No, I'm not.

20      Q   What about No. 19?

21      A   Again, no.

22      Q   Well --

23      A   This is all stuff from your federal lawsuit

24  against me, dude.  I'm not talking about it.  There's

25  a -- there's a reason the federal judge said you are

1  not allowed to do discovery on this thing.  You know,

2  once the appeal gets out of the way, then -- then maybe

3  we can talk.  Except the only person getting grilled is

4  going to be you.

5      Q    Mr. Retzlaff, how often have you contacted my

6  clients since this -- since this proceeding has been

7  going on?

8      A    I -- I'm not going to answer that question

9  because I find that to be harassing and irrelevant.

10     Q    Did you contact Gavin McInnes?

11     A    Again, you know, we've got a federal stay on

12 that, so, you know, what Mr. Dorrell has done or hasn't

13 done, I can't talk about that.  That's attorney-client

14 privilege.  You know, what his strategy is and what

15 he's planning on doing and who he's going to do it to,

16 that's work product and strategy, dude.

17     Q    Are you going to answer any of my other

18 questions today or are we just wasting our time?

19     A    You're wasting everybody's time with -- you

20 know you shouldn't be asking these questions, okay?

21 This isn't a fishing expedition, okay, on stuff that

22 you can't talk about.

23     Q    Because I think what we're gonna -- we're

24 gonna get to the bottom of is that you and Dean

25 Anderson are one and the same person, is what we're

1  going to get to today here, Mr. Retzlaff.  So why don't

2  you just come out --

3        A     And how is --

4        Q     -- and say you're the same person.

5        A     Let's pretend for a moment that your bizarre

6  conspiracy is true.  How is that gonna help you with

7  the State Bar?  How is that gonna help you?

8        Q     The fact that you've lied to them.

9        A     Lied to them?  You're the one who called me

10 up, Jeff Dorrell up and said that you're gonna murder

11 me.  Okay?  You sent e-mails.  You filed a SLAPP

12 lawsuit against me for $100 million.  Dude, your bar

13 career is over with no matter what happens.  Okay?

14 You're never going to be a lawyer again, and nobody is

15 ever going to hire you because of shit you did.  And

16 you're trying to blame me for it.  You're the one who

17 goes on Twitter calling people niggers and threatening

18 to lynch them.  Do you think you are going to get

19 clients doing that crap?

20           You know, if I was the guy that owned Texas

21 Title -- you know, just like Roseanne Barr got fired

22 for shit she said on Twitter.  What makes you so

23 special, buddy?  You think you get to keep your job and

24 be an assistant DA but you get to be in a white

25 supremacist group?  No, you do not, and that's your

1  fault.  Okay?

2        Just like you breaking into your truck and

3  staging a crime, committing a felony, dude, all right,

4  you are going to jail.  You know, I'm sitting here

5  looking on my phone waiting on the e-mail for when they

6  come busting in the door there and dragging your ass

7  off.

8        Q    I've got all day.  I'm happy to --

9        A    Well, I ain't got all day, because right now

10  you're harassing me, and this is getting completely

11  annoying and irrelevant, and you are fishing for stuff,

12  you know, with regards to this federal lawsuit and this

13  nonsense with the McGibney lawsuit, and -- and we're

14  not going there.  You stick to what's relevant, you

15  know, unless you're going to say, geez, I never did

16  call up Jeff Dorrell and threaten Tom Retzlaff, or if

17  you're going to say, geez, I never did send those

18  e-mails to Tom Retzlaff threatening him, then that's

19  fine.  What's your defense going to be, Jason, when

20  you're before the grievance committee for the trial?

21        When -- when Kristin asked you, Mr. Van Dyke,

22  did you call up Jeffrey Dorrell and say, yeah, yeah,

23  yada, what are you going to say?  You know, you can't

24  beat the rap, dude.  You know, you sent the e-mails,

25  you sent the threats.

1    And what about the crap you did to Ken White?

2  You're gonna deny that, too?  You know, you're gonna

3  sit there -- when you're questioned under oath, what

4  are you going to say, dude?  You've got no defense.

5  All right.  You're looking for ticky-tacky shit to try

6  to deflect, and -- and we're too smart for that, dude.

7    You know, Dean Anderson or the time zone that

8  an e-mail was sent in or whether somebody uses a common

9  English phrase or not or whether somebody posted a

10  picture of Philip Klein on a blog, that's not gonna

11  save you from what the State Bar is going to do.  You

12  know, the only thing that could have saved you would be

13  apologizing, begging for forgiveness and promising

14  never to do it again.  But it's too late, dude.  You

15  had your chance.

16    Q    That's not going to happen.

17    A    No, of course not.  Don't apologize.  Don't

18  apologize and walk in there with a defiant attitude

19  that you always have.  That's really winning.  And I'll

20  tell you something else, dumb-ass.  I have never read

21  The Turner Diaries or The Protocols for the Elders of

22  Zion.  But the Michigan police, when they busted into

23  your dorm room and found guns and shit in there, they

24  found the same book that Timothy McVeigh had and other

25  antigovernment nuts.  You know, you're a lunatic.

THOMAS C. RETZLAFF - October 25, 2018

1    Q    You're not going to give me truthful answers

2  to any of the rest of my questions today, are you?

3    A    I haven't said anything that's not truthful,

4  but there's going to be a lot of shit that I'm not

5  going to be able to talk about, and you know it.  You

6  know that you're going into forbidden territory.

7  That's why you were crying to the federal judge this

8  morning to try to get him to -- to give you

9  instructions.  And what did the federal judge said when

10 you called his office?  What did he say?

11   Q    I'm the one asking you the questions.

12   A    Come on, big guy, share it.  What happened

13 when you called the federal judge today?  What

14 happened?  Come on, Jason, tell us what happened.  Did

15 the federal judge said it was okay for you to ask these

16 questions, or did he tell you to go to fuck away?  What

17 did he say?

18   Q    You know what, Mr. Retzlaff, I'm going to pass

19 you, and you know why, because I think I -- I think I

20 want to get your behavior in front of a whole committee

21 when this goes to trial, and it's going to trial.

22        MR. VAN DYKE:  Pass the witness.

23        MS. BRADY:  Hold on.  Okay.  This is Kristin

24 Brady again.

25        THE WITNESS:  Hey.

THOMAS C. RETZLAFF - October 25, 2018

1          MS. BRADY:  And we are all done for the day.

2          THE WITNESS:  Good.

3          MS. BRADY:  I have no further questions.

4          THE WITNESS:  Good deal.  We'll see you later.

5          MS. BRADY:  Thank you, everyone.

6          THE COURT REPORTER:  Kristin, did you want a

7    copy of the transcript?

8          MS. BRADY:  I sure do.

9          MR. VAN DYKE:  I want one, too.

10         (Respondent Deposition Exhibits 1 through 19

11   were marked for identification.)

12         (The deposition concluded at 1:28 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF ARIZONA   )
                         )
 2    COUNTY OF MARICOPA )

 3

 4          I, Marcella L. Daughtry, a Certified Reporter,

 5    Certificate No. 50623, in the State of Arizona, do

 6    hereby certify that the foregoing witness was duly

 7    sworn to tell the whole truth; that the foregoing pages

 8    constitute a full, true, and accurate transcript of all

 9    proceedings had in the foregoing matter, all done to

10    the best of my skill and ability.  Pursuant to request,

11    notification was provided that the deposition is

12    available for review and signature.

13

14          I FURTHER CERTIFY that I am not related to nor

15    employed by any of the parties hereto, and have no

16    interest in the outcome.

17

18          WITNESS my hand this 8th day of November,

19    2018.

20

21

22

23                        _____
                          Marcella L. Daughtry
24                        Arizona Certified
                          Reporter No. 50623
25
```

**THOMAS C. RETZLAFF - October 25, 2018**

```
1                    WITNESS SIGNATURE PAGE

2       PAGE   LINE        CHANGE TO              REASON

3       _____  _____   _____

4       _____  _____   _____

5       _____  _____   _____

6       _____  _____   _____

7       _____  _____   _____

8       _____  _____   _____

9       _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19                 *    *    *    *    *

20           I, THOMAS C. RETZLAFF, a deponent exercising
        my right to read and sign my deposition taken on
21      October 25, 2018, place my signature hereon and make
        the following changes on this _____day of
22      _____, 2018.

23

24

        _____        _____
25      THOMAS C. RETZLAFF                   DATE
```