**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| JASON LEE VAN DYKE | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Case No. 4:18cv247 |
| | § | |
| THOMAS CHRISTOPHER RETZLAFF | § | |
| a/k/a Dean Anderson d/b/a BV Files, Via | § | |
| View Files L.L.C., and ViaView Files | § | |
| Defendant | § | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(b)(6)

## I.  INTRODUCTION

1.1   In this case, Plaintiff seeks to hold Thomas Christopher Retzlaff ("Retzlaff")

accountable for repeatedly defaming him and interfering with his legal career on an

ongoing manner since March 2017. Retzlaff and his counsel artfully claim that the kind

of stalking behavior Retzlaff has engaged in is protected by the First Amendment and is

otherwise not legally actionable. It is not.

## II.  FACTS

2.1   Plaintiff incorporates by reference herein all of the factual allegations contained in his

second amended complaint. ECF 7.

2.2   Defendant states that "Retzlaff's pungent comments were made after being sued, and

were in response to, among other things, Van Dyke's projection of his violent, racist

beliefs . . . " ECF 110, ¶ 6. This is a lie. Retzlaff, by his own admission, first made

these comments to a prospective employer of Plaintiff in March of 2017 (nearly a year

before being sued). A copy of the document where Retzlaff admits to such conduct is

attached hereto as Exhibit "1" and incorporated by reference herein. Retzlaff is not

being sued for those remarks in this lawsuit solely because the statute of limitations had expired as of the date Plaintiff first filed this lawsuit in state Court. Retzlaff is not being sued for the remarks made in Exhibit "1" itself solely because they are privileged.

2.3    Retzlaff also made these comments in an e-mail message directly to Plaintiff's supervisors. A copy of the e-mail string in which Retzlaff made these comments, and Plaintiff was subsequently fired, is attached hereto as Exhibit "2" and incorporated by reference herein. This also demonstrates that Retzlaff's assertion that all of his comments were made *after* being sued is completely false.

2.4    Plaintiff does not deny that he is a member of the Proud Boys, that he joined the organization in May of 2017, or that he represented the group nationwide as its attorney between September of 2017 and November of 2019. However, many of the exhibits offered by Retzlaff relate or pertain to activities Plaintiff was involved in *after* Retzlaff made the comments for which he is being sued (on March 28, 2018).

2.5    Proud Boys of Texas LLC was chartered by Plaintiff approximately four months prior to Retzlaff making the statements for which he had been sued. See ECF 110-1 (dated November 20, 2017). Proud Boys International LLC was chartered on November 26, 2018; approximately eight months *after* Retzlaff was sued. See ECF 110-2. Plaintiff's letter – attached to Defendant's motion as exhibit three - was written and published approximately three months *after* Retzlaff was sued. See ECF 110-3. With respect to all three acts, Plaintiff was acting in his capacity as the attorney for the organization.

2.6    Although Plaintiff was Sergeant-at-Arms of the Dallas/Fort Worth chapter of the Proud Boy from approximately July of 2017 until November of 2018, he had no national leadership role and there were no national leadership positions. Plaintiff's temporary

chairmanship of the Proud Boys was not revealed until the November 21, 2018 press

release - which was written approximately eight months *after* Retzlaff was sued.

2.7    The lawsuit attached as exhibit five to Defendant's motion was not only filed well over

one year *after* Retzlaff was sued, but was served long after Plaintiff stopped acting as

attorney for the Proud Boys (which was, in relevant part, due to Retzlaff's ongoing

criminal behavior against Plaintiff). In any case, the Proud Boys had nothing to do with

the "Unite the Right" rally in Charlottesville, Virginia, and Plaintiff was not in

attendance.

2.8    Finally, Retzlaff's statements to the Victoria County District Attorney did not involve

Plaintiff's status as a public figure because Plaintiff had not even stated his job at the

time they were made, and because Plaintiff had no involvement with the Proud Boys

until *after* that event. Again, Retzlaff is not being sued for those statements. They were

referenced in Plaintiff's complaint for the sole purpose of demonstrating a pattern of

tortious and criminal conduct by Retzlaff.

2.9    Plaintiff is not a public figure or a limited purpose figure. Even if Plaintiff attained

public figure status at some point in time, it does not change the fact that Plaintiff was

not a public figure when Retzlaff made the statements that are the subject of this

lawsuit.

2.10   Despite the fact that Plaintiff is not require to prove actual malice in this case, it is

sufficiently plead in Plaintiff's Second Amended Complaint anyway. Actual malice is

clear to be seen from the e-mail communications between Retzlaff, using the

pseudonym of "Dean Anderson", and Plaintiff.  He writes:

> 'Time to put up or STFU, bitch. The longer you wait the more clients of yours
> we are finding and contacting. One of my co-admins had a very nice

> conversation with Jennifer Jaynes last night. Did you know that your client Chris Roberts was a pedophile? The same with Jon Langbert! I heard that they are both Nazis AND pedophiles – at least according to some brand new websites that links them both to you that somebody told me they saw a couple of days ago."

> "The whole world is going to learn about little Jason Van Dyke and his Nazy, homophobic antics in a very big, BIG, way my friend.  Putting you out of business is just for the lulz, asshole."

> "Dude, your law office is going to be a ghost town filled with nothing but spider webs and Past Due notices from all of your student loan holders on account of you having no clients, which equals NO MONEY, by the time we get done with you"

> "Ken White totally does not like you and, thanks to his help and guidance, you are going to be put out of business."

ECF 7, Ex. C and D. Communications such as this demonstrate that the purpose of Retzlaff's activities was to ignore the truth about Plaintiff and to cause as much damage to his business as possible.

2.11   No longer finding it necessary to mask his identity, these communications mirror those sent by Retzlaff using his personal e-mail to Plaintiff between December 11, 2018 and December 12, 2018.  Specifically:

> "As long as your ability to practice law and earn any kind of income dies, I will be happy.  And, I got to be honest with you, fat boy, I am pretty fucking happy right now."

> "I get paid the same regardless how many names you assholes call me.  Like rain off a duck, bitch.  At least nobody is calling me a Nazi, eh?"

> "Dude – get over it and move on with your life. Learn how to make pizzas or something cuz your lawyering days are over with – 100% VERIFIED"

See ECF 107-3. He was ultimately able to succeed in his stated endeavor by collaborating with halfwit journalists, incompetent police officers, and corrupt state bar and state court prosecutors (hence, Plaintiff's related lawsuit against Michael

Shackleford referenced in ECF 110-7).

2.12    These communications are just a small sampling. Plaintiff is in possession of hundreds

of e-mail communications from Retzlaff demonstrating his malicious intentions. There

is circumstantial evidence establishing that Retzlaff entertained serious doubts about

the truth of the material he published concerning Plaintiff, there are obvious reasons to

doubt the veracity of the information published, and there is strong evidence that

Retzlaff purposefully avoided the truth as part of his ongoing efforts to destroy

Plaintiff's legal career (in addition to the fact that Retzlaff has previously been

convicted of falsifying evidence and tampering with government records in Texas).

ECF 7, Ex. A.

2.13    Statements such as those contained in Retzlaff's email to Plaintiff's supervisor at

Karlseng, LeBlanc & Rich L.L.C. ("KLR") are not opinion, are not rhetorical

hyperbole, and are not constitutionally protected: they are tortious. See Ex. B. While

Retzlaff may attempt to escape accountability for his tortious and criminal behavior by

claiming that it wasn't intended to be taken seriously, his statements were clearly taken

seriously by the law firm that had employed Plaintiff.

2.14    The same can be said of full color photographs of Plaintiff with headlines such as this:



The "court record" referred to by Retzlaff in this headline is his state court filing made

on March 30, 2018 stating "No doubt Van Dyke is also a pedophile, too.  He has that "look" about him."  ECF 7, ¶ 5.18.  On or around the same date Retzlaff also wrote "[w]e will post more later about Denton attorney Jason Van Dyke and our efforts at identifying ALL of his clients, as well as the court records regarding him being a pedophile." ECF 7, ¶ 5.19. He also falsely alleged that Plaintiff has a profile on a white supremacist website known as "Stormfront."  ECF 7, ¶ 5.22.  See also Exhibit 5 and 6.

2.15    Finally, Retzlaff cannot seriously argue that his tortious statements concerning Plaintiff had to do with Plaintiff's association with the Proud Boys. Attached hereto as Exhibit "3" are letters written by Retzlaff to Proud Boys founder Gavin McInnes and website editor Pawl Bazile; where he clearly states that his animosity has nothing to do with the Proud Boys and everything to do with his hatred of Plaintiff.

2.16    Plaintiff is not a public figure today and was not a public figure at the time Retzlaff made the statements which are the subject of this lawsuit to Plaintiff's employer at KLR or on his blog. Retzlaff's statements do not even come close to meeting the definition of opinion or rhetorical hyperbole; they were intended to be tortious and they are, in fact, tortioius.

### III.   PROCEDURAL OBJECTIONS TO RETZLAFF'S MOTION

**A.    Retzlaff's Motion Under Rule 12(b)(6) Is Untimely Under the Scheduling Order**

3.1     Defendant's motion is untimely pursuant to the scheduling order entered in this case on June 11, 2018. ECF 53. That order specifically states that all motions to dismiss must be filed prior to January 28, 2019. Although this case greatly needs a new scheduling order, and Plaintiff has requested the same, a new scheduling conference has not been convened and a new scheduling order has not been entered.

3.2     Defendant has ironically filed an untimely motion to dismiss while simultaneously

arguing against the very mechanism that would make his motion timely. As the parties

remain bound by the deadlines of the scheduling order, Defendant's motion cannot be

considered until a new scheduling order is made. Plaintiff would also show that

Defendant's filing of a 12(b)(6) motion creates even more sufficient cause for this

Court to allow Plaintiff additional leave to amend his complaint.

**B.     Retzlaff's Motion Is Untimely Under Rule 12**

3.3     Furthermore, Plaintiff filed his Second Amended Complaint on April 11, 2018. ECF 8.

Plaintiff's filing was not pursuant to Rule 15, but rather, in obedience to the order of

U.S. Magistrate Judge Christine A. Nowak who, on the same date, ordered both parties

to replead as necessary to comply with the Federal Rules of Civil Procedure and the

local rules.  ECF 6.

3.4     Defendant filed his answer to Plaintiff's Second Amended Complaint on May 21, 2018.

ECF 42.  Accordingly, Defendant's motion to dismiss under Rule 12(b)(6) is not only

untimely under the Court's scheduling order in this case, it is also untimely under Rule

12 itself, which states that all motion under Rule 12(b) must be made before pleading if

a responsive pleading is allowed. Although this Court is permitted to treat Defendant's

untimely motion as a motion for judgment on the pleadings under Rule 12(c), it would

still be untimely under the scheduling order.

3.5     This Court should deny Defendant's motion as untimely filed. The best way to resolve

this motion is as follows: (a) set a new scheduling conference for this case; (b) enter a

new scheduling order in this case; (c) permit Plaintiff a reasonable period of time to

amend his complaint following the entry of a new scheduling order; and (d) deny

Defendant's current 12(b)(6) motion as untimely while permitting Defendant to re-urge this motion after Plaintiff re-pleads (if he is able to do so).

## IV.   ARGUMENT

### A.   Standard for Dismissal Under Rule 12(b)(6)

4.1   If there was ever a case to be made for defamation in a civil case, it exists here. A dismissal of this case would be tantamount to a finding by this Court that defamation no longer exists as a valid cause of action in Texas.

4.2   A motion to dismiss under Rule 12(b)(6) should be granted only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson*, 335 U.S. 41, 48 (1957) (emphasis added); see also Fed. R. Civ. P. 12(b)(6); *Bell Atlantic Corp v. Twombly*, 550 U.S. 540, 570 (2007). A motion under Rule 12(b)(6) merely tests the legal sufficiency of a complaint, requiring a court to construe the complaint liberally, assume all facts as true, and draw all reasonable inferences in favor of the plaintiff. *Twombly*, 550 U.S. at 556-57. A complaint should never be dismissed because the court is doubtful that the plaintiff will be able to prove all the factual allegations contained therein. *Id*.

### B.   The Elements of Defamation and Types of Defendants

4.3   As articulated by the Texas Supreme Court, the elements of a *prima facie* case for defamation are (1) the defendant published a false statement; (2) that defamed Plaintiff; (3) with the requisite degree of fault regarding the truth of the statement; and (4) damages, unless the statement constitutes defamation per se. *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017); *accord. WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).

4.4     In a defamation action, a defendant can be the person who either publishes, re-

        publishes, or expresses agreement with the defamatory statement. *WFAA-TV, Inc*., 978

        S.W.2d at 571 (original publisher); *Jacobs v. McIlvain*, 759 S.W.2d 467, 469 (Tex.

        App. – Houston [14th Dist.] 1998) (republisher), rev'd on other grounds, 794 S.W.2d

        14 (Tex 1990); *Bentley v. Bunton*, 94 S.W.3d 561, 585-86 (Tex. 2002) (liability for

        expressing agreement with a defamatory statement). There is a distinction between

        media and non-media defendants in defamation cases as well. *Gertz,* 418 U.S. at 333;

        *New York Times Co. v. Sullivan*, 376 U.S. 254, 269-71 (1964); *Milkovich v. Lorain*

        *Journal Co*., 497 U.S. 1, 18 (1990). There is no dispute in this case that Retzlaff is a

        non-media defendant.

**C.      Standards for Defining A Defamatory Statement**

4.5     A defamatory statement, under Texas law, is one that injures a person's reputation. See

        *Bedford*, 520 S.W.3d at 905; *Hancock v. Variyam*, 400 S.W.3d 59, 62 (Tex. 2013). See

        also Nunnally & Franklin, 1 Tex. Prac. Guide Torts § 1:33 (Dec. 2018 update)

        (discussing defamation under Texas law). Texas law also provides for liability if the

        "gist" of a collection of statements conveys a false and defamatory impression, even if

        each statement is literally correct. See *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103,

        116-17 (Tex. 2000).

4.6     A statement is defamatory *per se* if, on its face, the statement falls within the statutory

        definition of libel. *Gartman v. Hedgpeth*, 157 S.W.2d 139, 140-41 (Tex. 1941). To fall

        within the statutory definition, a statement must: (a) injure a living person's reputation

        and thus expose the person to public hatred, contempt, or ridicule; (b) impeach a

        person's honesty, integrity, virtue, or reputation; or (c) publish a person's natural

defects and thus expose the person to public hatred, ridicule, or financial injury. Tex. Civ. Prac. & Rem. Code § 73.001.

4.7     A statement is also considered defamatory *per se* in Texas if it falls into one of the following categories: (a) A statement that injures a person in his office, profession, or occupation; *Hancock*, 400 S.W.3d at 64. (b) A statement that falsely charges a person with the commission of a crime; *KTRK TV*, 409 S.W.3d at 690. (c) A statement that imputes that a person presently has a loathsome disease; *Memon v. Shaikh*, 401 S.W.3d 407, 421 (Tex. App. – Houston [14th Dist.] 2013). and (d) A statement that imputes sexual misconduct. *Id*. A statement that is not obviously hurtful on its face and requires extrinsic facts or circumstances to explain its defamatory nature is defamation *per quod. Id*.

4.8     The Texas Supreme Court has adopted the test used by the *Milkovich* court in determining whether a statement is actionable in defamation. *Bentley*, 94 S.W.3d at 579. In his motion to dismiss, Retzlaff argues that the statements on his blog are either pure opinion or rhetorical hyperbole. However, the *Milkovich* court held that the First Amendment does not demand an inquiry into whether a statement is opinion or fact, because existing constitutional doctrine adequately secures freedom of expression without the need to create an artificial dichotomy between the two. *Milkovich*, 497 U.S. at 19. Under the test set out in *Milkovich* and adopted by *Bentley*, an opinion (like any other statement) can be actionable in defamation if it expressly or impliedly asserts facts that can be objectively verified. See e.g. *Milkovich*, 497 U.S. at 18-19; *Bentley*, 94 S.W.3d at 580.

4.9     When Retzlaff states that "In my opinion, Van Dyke is a Nazi", "In my opinion, Van

Dyke is a Nazi drug addict", or "[w]e will post more later about Denton attorney Jason

Van Dyke and our efforts at identifying ALL of his clients, as well as the court records

regarding him being a pedophile", he has implied knowledge of facts which lead to the

conclusion the Plaintiff is, in fact, a Nazi, a drug addict, or a pedophile respectively.

Retzlaff cannot escape this implication by couching his statements in terms of opinion

or rhetorical hyperbole, using ridiculous graphics near where these statements are

published, publishing them in conjunction with taunts, or claiming that the entire blog

is meant to be silly and fun.

**D.      Referring to Plaintiff As a "Nazi" or "White Supremacist" Is Defamatory *Per Se***

4.10   Courts around the country have recognized that whether a statement is "defamatory"

must be measured by current social norms. It was once defamatory to falsely identify a

white person as African-American. In *Flood v. News & Courier Co*., the court held that

"to call a white man a negro affects the social status of the white man so referred to."

50 S.E. 637, 639 (S.C. 1905). While a holding of this nature is outrageous by twenty

first century standards, it was not until forty years ago that courts began rejecting

claims for defamation based upon racial misidentification. The courts held "[p]rivate

biases may be outside the reach of the law, but the law cannot, directly or indirectly,

give them effect." *Thomason v. Times-Journal, Inc.*, 379 S.E.2d 551, 553, *quoting*

*Palmore v. Sidoti*, 466 U.S. 429, 422 (1984). See also: *Albright v. Morton*, 321 F.Supp.

2d 130, 138 (D. Mass. 2004) (discussing defamation law and stating that "statements

falsely linking a plaintiff to racial, ethnic, or religious groups, which plainly would not

qualify as defamation today) *Polygram Records Inc. v. Super. Ct.,* 170 Cal. App. 3d

543, 557 (Cal. 1985) (rejecting claim based on supposed association of Plaintiff's brand

of wine with African-Americans).

4.11    Similarly, courts have increasingly rejected previous rulings that allegations of

homosexuality are defamatory *per se*. In *Amrack Prods. Inc. v. Morton*, the First Circuit

rejected a defamation claim based upon an allegedly false claim of homosexuality. 410

F.3d 69 (1st Cir. 2005). Many other courts have rejected defamation claims based upon

homosexual conduct finding, for example, that "the fact of [prejudice] on the part of

some does not warrant a judicial holding that gays and lesbians, merely because of their

sexual orientation, belong in the same class of criminals." *Hayes v. Smith*, 832 P.2d

1022, 1025 (Colo. App. 1991). See also: *Donovan v. Fiumara*, 442 S.E.2d 572, 580

(N.C. Ct. App. 1994) (finding that allegations of homosexuality are defamation *per

quod* rather than defamation *per se*); *Albright*, 321 F. Supp. 2d at 138 (rejecting

homosexuality as the basis of a claim for defamation per se); *Yonaty v. Mincolla*, 97

A.D.3d 141, 145-46 (N.Y.App. Div. 2012) (rejecting a defamation claim concerning

homosexuality based upon the "prevailing attitudes of the community" and the

"tremendous evolution in social attitudes regarding homosexuality").

4.12    Shortly after World War II and during the Cold War, courts held that misidentifying

someone as a communist was defamatory per se. *Utah State Farm Bureau Fed'n v.

Nat'l Farmers Union Serv. Corp.*, 198 F.2d 20, 23 (10th Cir. 1952) (noting the "temper

of the times" in holding that identifying someone as "communist" or a "communist

sympathizer" is defamatory per se). When considering that openly socialist individuals,

such as Bernie Sanders, are serving in the United States Congress and making credible

runs for the presidency of the United States, it is highly probable that prevailing

attitudes towards communism in the twenty-first century, and evolving social norms

concerning communist ideas, would doom a defamation claim by a person claiming to have been defamed as a "communist" or "communist sympathizer". Referring to someone as a Nazi or a white supremacist, in modern society, is certainly the type of statement that meets the criteria for defamation *per se* under the Texas statute. See *supra* ¶ 4.6 – 4.7. Such claims are certainly as independently verifiable today (if not more so) as claims concerning communism were in 1954.

4.13    Retzlaff references the "Unite the Right" rally in Charlottesville, Virginia. ECF 110, ¶ 7 and Ex. 7. Plaintiff would show this Court that the white supremacist violence in Charlottesville, Virginia in August of 2017 was an event which changed the national conversation on issues of race and white supremacy especially. He also expects this Court to take judicial notice of facts concerning the Proud Boys. That being the case, this Court can also take judicial notice of mainstream news reports of individuals being discharged from the U.S. military, losing civilian jobs, being forced off social media, being harassed in public places, or having their homes or businesses vandalized following allegations – true or untrue - of Nazism or white supremacy by individuals like Retzlaff who are objectively lack any credibility. For example, on December 26, 2019, there was a report of two members of the national guard receiving a general discharge (rather than an honorable discharge) following reports from an Atlanta based "antifascist" group that the two were involved in white supremacist activity. A copy of that article is attached hereto as Exhibit "4" and incorporated by reference herein.

4.14    When a court categorizes statements as defamatory per se, it reinforces general societal disapproval of people described in the manner of the offending speech. See *supra* ¶ 4.10 and 4.11. This was a problem for courts when they are asked to uphold such

implications of societal scorn for homosexuals and people of color. While white

supremacy and anti-Semitism may have been acceptable when *Flood* was decided in

1905, such views have reached a level of scorn in the 21st century similar to that

reserved for murderers and thieves. Just as evolutions in social attitudes have led to the

acceptance of those who used to be scorned, they have resulted in the condemnation of

"Nazis" and other white supremacists as being akin to criminals. The Court should

recognize this societal change and find that wrongful references to an individual as a

"Nazi" or "white supremacist" as legally actionable as defamation *per se*. Doing so

would not buck judicial trends: it would validate societal disapproval of Nazis and other

forms of racism while holding sociopaths like Retzlaff accountable when they make

make such claims falsely, recklessly, and with malicious intent.

4.15    Court have already recognized, at least implicitly, that similar terms can form the basis

for a defamation claim. In *Armstrong v. Shivrell*, a disbarred attorney was sued for

defaming a student activist at the University of Michigan. 596 Fed.Appx. 433 (6th Cir.

2015). Shivrell made the same arguments concerning opinion and rhetorical hyperbole

that Retzlaff makes in his motion. The 6th Circuit found that "the vast majority of

Shirvell's statements were capable of defamatory meaning because they can reasonably

be interpreted as conveying actual facts. The common usage of Shirvell's words does

not suggest that they are commonly understood as loose, figurative, or

hyperbolic. **Courts have held that words like "liar" and "racist" have clear, well**

**understood meanings, which are capable of being defamatory**." *Id*. at 442

(emphasis added, quoting *Milkovich* at 1; *Taylor v. Carmouche*, 214 F.3d 788, 793-94

(7th Cir. 2000); and *Connaughton v. Harte Hanks Commc'ns, Inc*., 842 F.2d 825, 840-

41 (6th Cir. 1988)).

**E.     All of Retzlaff's Other Statements Are Also Defamatory *Per Se***

4.16    Retzlaff is also being sued for repeatedly making factual assertions that Plaintiff is a

drug addict, a pedophile, and that he has a criminal record for abusing women.

4.17    Each and every one of these assertions of fact imputes that Plaintiff has committed a

felony or a crime of moral turpitude (sexual assault of a child, possession of child

pornography, possession of a controlled substance, and assault causing bodily injury are

just a few of the criminal offenses that can be imputed from these statements). The

mere fact that they falsely impute that Plaintiff has committed crimes of this nature

would be sufficient to bring a claim for defamation per se *regardless* of Plaintiff's

occupation.

4.18    These allegations are more serious in light of that fact that, at the time they were made,

Plaintiff was an attorney.  To the extent that each of these statements impute a crime,

they also impute a violation of the rules of professional conduct in each jurisdiction

where Plaintiff was licensed to practice. See e.g. Tex. Discip. R. Prof. Cond. §

8.04(a)(2). Furthermore, although allegations of drug addiction are not always

prosecuted by state bar authorities as *per se* violations of the rules of professional

conduct in the absence of a criminal conviction, they are often used to strip attorneys of

their licenses on the basis that such addictions make them mentally unfit to practice

law.

4.19    To the extent that pedophilia and drug addiction have been treated as "diseases" by

mental health professions in recent years, imputing this type of conduct to Plaintiff also

carries with it the implication that Plaintiff presently has a loathsome disease, which

meets the criteria for defamation per se.

**F.      Defamation - Plaintiff Is Not, And Was Not, A Public Figure**

4.20     Retzlaff argues that Plaintiff is a limited purpose public figure.  A limited purpose

public figure is a public figure only for a limited range of issues surrounding a

particular public controversy. *Gertz*, 418 U.S. at 351. There is a three-part test to

determine whether a person is a limited purpose public figure: (a) the controversy must

be public – that is, people other than the immediate participants in the controversy must

discuss it and must be likely to feel the impact of its resolution; (b) the plaintiff must

have more than a trivial or tangential role in the controversy; and (c) the defamation

must be related to plaintiff's participation in the controversy. *Trotter v. Jack Anderson

Enters.*, 818 F.2d 431, 433-34 (5th Cir. 1987).

4.21     Prior to amending his motion, Retzlaff first argued that Plaintiff's status as a licensed

attorney, and the fact that he had been offered a job by the Victoria County District

Attorney's office in March of 2017, makes him a public figure. ECF 109, ¶ 7 – 8. This

argument that "Plaintiff was a lawyer, all lawyers are public figures, and thus, Plaintiff

is a public figure" appears to have been abandoned in Defendant's amended motion in

favor of the notion that Plaintiff's membership in, legal representation of, and

temporary national leadership role in the Proud Boys makes him a public figure. In

support of his claims, Retzlaff almost entirely references documents produced *after* he

made the false and defamatory statements concerning Plaintiff for which he has been

sued.

4.22     There are plenty of cases where the Supreme Court has found that lawyers are not

public figures despite their role in controversial cases. In *Time, Inc. v, Firestone*, the

U.S. Supreme Court held that a lawyer who was a prominent member of local society did not become a public figure due to his divorce in a Palm Beach, Florida Court. 424 U.S. 448 (1976). Of particular importance, the Court found that the lawyer did not voluntarily choose to make aspects of his life public by electing to dissolve his marriage through judicial proceedings because such proceedings were require for divorce and the divorce itself was not a public controversy which made the lawyer a public figure. *Id*. Similarly, the Court held in *Rosenbloom v. Metromedia, Inc*. that a lawyer who represented a convicted criminal on appeal was not a public figure. 403 U.S. 29 (1971). Finally, in *Gertz,* the Court held that the lawyer for a family involved in controversial civil litigation was not a public figure. 418 U.S. 323 (1974).

4.23    Although Plaintiff represented the Proud Boys generally (mostly for the purpose of sending demand letters to media organizations who defamed the fraternity), filed business formation documents for the group, and registered their trademark, Retzlaff is unable to point to a single instance where Plaintiff represented the group as a whole in any type of civil litigation filed in any court. The nature of Plaintiff's representation of the group is insufficient to place Plaintiff into the "forefront of a very public issue." It is telling that Retzlaff rarely referred to Plaintiff as a "Proud Boy", a "western chauvinist" (Proud Boys declare themselves to be "western chauvinists who refuse to apologize for creating the modern world), or even as an "extremist": he elected to repeatedly refer to Plaintiff as a Nazi and a white supremacist *despite* the fact that the Proud Boys was and remains a multi-racial fraternity that allows welcomes both straight and gay men as brothers.

4.24    Whatever Plaintiff's association with the Proud Boys is or was, it ultimately has

nothing to do with this case. Retzlaff is being sued for procuring the termination of

Plaintiff's employment at KLR and his subsequent interference with Plaintiff's private

law practice. There was absolutely no public controversy over his role as a private

attorney employed as an associate at a private law firm primarily engaged in title

insurance work. Following his termination from that employment due to Retzlaff's

actions, there was also no public controversy concerning his role as a solo practitioner.

To the extent that a public controversy ever arose, it was created entirely by Retzlaff

*after* he was sued by Plaintiff.

**G.    Defamation - Defendant's Speech Did Not Involve A Matter of Public Concern**

4.25    Whether the statement is a matter of public concern is a separate and distinct issue from

the question of whether a plaintiff is a public or private figure. *Philadelphia*

*Newspapers v. Hepps*, 475 U.S. 767, 775 (1986). In this case, none of Retzlaff's speech

involved a matter of public concern; all of the speech that is the subject of Plaintiff's

Second Amended Complaint relates or pertains either to (a) Plaintiff's employment as a

private attorney at KLR; or (b) Plaintiff's ongoing law practice as a solo practitioner

following his termination from that employment.

4.26    A statement is a matter of public concern only if (1) the statement can "fairly be

considered as relating to any matter of political, social, or other concern to the

community" or (2) the statement concerns "a subject of legitimate news interest; that is,

a subject of general interest and of value and concern to the public." *Snyder v. Phelps*,

562 U.S. 443, 453 (2011). To determine whether a statement involves a matter of

public concern, the content, form, and context of the statement must be analyzed. *Id*. In

considering content, form, and context, no factor is independently dispositive; all

circumstances of the speech must be evaluated, including what was said, where it was said, and how it was said. *Id*. at 454.

4.27    There are two types of communications that Defendant is being sued for: the first are his private e-mail communications to Plaintiff's employer, which were not intended to be public, which were not disseminated to the public, and which was clearly intended for not other purpose than to end Plaintiff's employment (rather than provide public comment on some issue of the day). See Exhibit 2. The second types of communications are Defendant's blog postings which, as part of his defense, Retzlaff now appears to suggest are not meant to be taken literally and which could not possibly be construed by a reasonable person as having any factual basis. ECF 110, ¶ 28 – 30 (this is the same argument that conservative commentator Alex Jones recently made – quite unsuccessfully – in defending against a lawsuit by Sandy Hook parents based upon Jones' claims that Sandy Hook was a hoax). If Defendant's blog truly is meant to be silly (rather than an open and notorious platform used by Retzlaff to print libelous material about those persons he has come into conflict with), Retzlaff cannot also argue that he is writing about matters of legitimate public concern.

4.28    As Retzlaff was kind enough to present this Court with portions of his blog, Plaintiff now elects to attach as Exhibits 5 and 6 the appropriate excerpts of the blog postings for which Retzlaff is being sued. Plaintiff is confident that the Court can decide for itself whether, when considered together with Retzlaff's statements to KLR and his e-mail communications to Plaintiff, the statements on his blog are intended to be taken at their literal defamatory meaning and whether they are mere opinion or hyperbole.

### G.      Defamation – The Appropriate Standard of Fault

4.29    In *Dun & Bradstreet Inc. v. Greenmoss Builders, Inc.*, the U.S. Supreme Court held that

the constitutional requirements of *Gertz* did not apply in cases such as this: where

private plaintiffs sue non-media defendants for speech involving private concerns. If

this Court does indeed find, at least for the purpose of this motion, that Plaintiff is a

private person suing a non-media defendant for speech involving private concerns, the

appropriate standard is strict liability. *Snead v. Redland Aggregates Ltd*. 998 F.2d 1325,

1334 (5th Cir. 1993). However, more recent Texas Supreme Court cases have held that

at least some showing of fault is required in cases such as this involving defamation per

se. See e.g. *Hancock*, 400 S.W.3d at 65 n. 7. In this case, Plaintiff can show actual

malice even though he is not required to do so.

4.30    The following evidence has previously been shown to constitute actual malice with

regard to the truth of a statement: (1) circumstantial evidence establishing that the

defendant entertained serious doubts about the truth of the statement; See e.g. *Harte-*

*Hanks Comms. v. Connaughton*, 491 U.S. 657, 688 (1998); (2) obvious reasons to

doubt the veracity of a statement; *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)

(story based wholly on unverified anonymous informant may establish recklessness);

(3) the publisher's purposeful avoidance of the truth. *Bentley*, 94 S.W. 3d at 599

(purposeful avoidance of the truth enough to establish actual malice); and (4) denial of

the allegations by a plaintiff combined with circumstances where the defendant

admitted that he "really couldn't get anything" on a plaintiff. *Id.* at 600-601.

4.31    Retzlaff is correct in his statement that publishing a statement with ill-will, spite, hatred

or wanton desire to injure does not, by itself, establish malice. *Leyendecker & Assoc. v.*

*Wechter*, 683 S.W.2d 369, 375 (Tex. 1984). However, this is not a case regarding a dopey member of the media acting recklessly with his informants: it's a case where the defendant is not a member of the media, has no informants, and who has consciously and intentionally lied about Plaintiff to accomplish a stated goal: the destruction of Plaintiff's law practice and ability to earn an income. The circumstantial evidence in this case shows that Retzlaff has been, and remains, willing to say or do anything to destroy Plaintiff's life. Retzlaff must be held accountable.

4.32    Actual malice is not the appropriate standard in this case. However, even if it was, actual malice is sufficiently plead in Plaintiff's Second Amended Complaint. Retzlaff's motivation to lie is also clearly plead must be considered by the Court even if not entirely dispositive. *Bentley*, 94 S.W.3d at 596; *Belo Corp. v. Publicaciones Paso Del Norte, S.A. de C.V.,* 243 S.W.3d 152, 159 (Tex. App. – El Paso 2007, pet. denied. If this Court finds that actual malice *is* the appropriate standard and also finds that it *is not* properly plead, the appropriate remedy would be to allow Plaintiff leave to amend his complaint rather than dismissal of the complaint.

**H.    Defendant Intruded on Plaintiff's Seclusion**

4.33    The elements of intrusion on seclusion are (a) the defendant intentionally intruded on the plaintiff's solitiude, seclusion, *or private affairs*; (b) the intrusion would be highly offensive to a reasonable person; and (c) the plaintiff suffered an injury as a result of the defendant's intrusion. *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993) (emphasis added). Defendant's motion is quite astute in one respect: Plaintiff *is* suing Retzlaff for contacting his private employer for the purpose of having Plaintiff's employment terminated.

4.34   While intrusion on seclusion certainly includes activities such as harassing telephone

calls or wiretapping, it has also included "following, spying on, and harassing the

plaintiff." *Kramer v. Downey*, 680 S.W.2d 524, 525 (Tex. App. – Dallas 1984, writ

ref'd n.r.e). While this does not specifically include contacting a person's private

employer for the purpose of having them terminated, such conduct would certainly

constitute both harassment and an intrusion onto a person's private affairs. It does not,

as Retzlaff argues, involve a public place or public matters: Plaintiff's private

employment was of no legitimate concern to Retzlaff, or for that matter, anyone other

than Plaintiff, his employers, and his clients.

4.35   The type of injury alleged by Plaintiff in his claim for intrusion on seclusion is not

specifically excluded by any case law that Retzlaff is able to cite. Therefore, Plaintiff

has presented a claim that is plausible on its face and cannot be dismissed under Rule

12.

**I – Tortious Interference With Existing Contract**

4.36   Plaintiff has properly plead that it had a valid contract with KLR for at-will

employment, that Retzlaff willfully and intentionally interfered with the contract, that

Retzlaff's interference proximately caused his injuries, and that he suffered actual

damage or loss.

4.37   Retzlaff's "defense" is that Plaintiff's employment was terminable at will and he

merely induced Robert Karlseng to do what he had a right to do: in this case, to fire

Plaintiff.  He also argues that an at-will employment contract is incapable of being

interfered with. This is incorrect: it is well settled law that a cause of action exists in

Texas for tortious interference with a contract of employment terminable at well.

*Sterner v. Marathon Oil Company*, 767 S.W.2d 686, 688 – 689 (Tex. 1989); *See also Crouch v. Trinque*, 262 S.W.3d 417, 425-26 (Tex.App.-Eastland 2008, no pet.) (cause of action exists " for tortious interference with a contract of employment terminable at will").

4.38   Defendant relies on *ACS Investors, Inc. v. McLaughlin* to argue that "[o]rdinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference." After this quote, the Texas Supreme Court signaled, " but cf. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686 (Tex.1989)." 943 S.W.2d 426, 430 (Tex. 1997). Perhaps, instead of accusing Plaintiff of making formbook recitations of the elements of his claims, defense counsel would benefit from reading the cases he cites in his motion to dismiss. See ECF 110, ¶ 31.

4.39   Retzlaff's reliance on *El Paso Healthcare Sys. v. Murphy* is similarly misplaced because it had nothing to do with tortious interference with an at-will employee. In *El Paso Healthcare*, the Plaintiff was an independent practitioner working under contract with a company which, in turn, had contracted as a service provider for the Defendant. 518 S.W.3d 412, 414 (Tex. 2017). Following a disturbance involving the plaintiff at their facility, the defendant requested that their contractor no longer schedule plaintiff to work at any shifts at their facility. *Id*. That conduct resulted in a claim - not for tortious interference with at-will employment - but rather, for tortious interference in the ongoing business relationship between the plaintiff (the subcontractor) and the contractor. *Id*. at 420. The *El Paso Healthcare* case had no effect on the holding of the Texas Supreme Court in *Sterne*r.

4.40   Finally, Retzlaff argues that plaintiff has failed to plead Retzlaff's knowledge of the

contract between him and his employer. This argument borders on the absurd. Clearly

Retzlaff knew of the employment relationship between Plaintiff and his employer, or he

would not have known to send them an email messages demanding Plaintiff

termination – or to publish false and defamatory information about Plaintiff's

supervisors and co-workers on his blog as a means of procuring Plaintiff's termination.

See Exhibits 2 and 5.

4.41    KLR clearly breached the contract of at-will employment with Plaintiff by terminating

Plaintiff for no cause other than Retzlaff's conduct. Plaintiff clearly suffered damages

from that breach which include, but are not limited to, the loss of that employment and

its benefits as well as damage to his professional reputation. There can be no realistic

dispute that Retzlaff was the sole and proximate cause of Plaintiff's termination at

KLR. See Exhibits 2 and 5. Plaintiff has plead sufficient facts to establish Retzlaff's

liability and the motion to dismiss this claim should be denied.

## V.    CONCLUSION

5.1    Defendant's motion to dismiss is untimely under both the scheduling order in this case

and under Rule 12. Plaintiff's second amended complaint contains more than enough

factual matter, accepted as true, to plausibly allege each element of cause of action for

defamation, intrusion on seclusion, and tortious interference with contract against

Retzlaff. They do more than raise Plaintiff's right to relief above a speculative level;

they raise it to a probable level.

## VI.    PRAYER

6.1    Plaintiff prays that this Court dispose of Defendant's untimely motion in a fair and

equitable way by: (a) setting a new scheduling conference for this case; (b) entering a

new scheduling order in this case; (c) permitting Plaintiff a reasonable period of time to amend his complaint following the entry of a new scheduling order; and (d) denying Defendant's current 12(b)(6) motion as untimely while permitting Defendant to re-urge this motion after Plaintiff re-pleads (if he is able to do so). If this Court is disinclined to permit Plaintiff to replead, Plaintiff prays that Defendant's motion simply be denied.

Respectfully submitted,

/s/ Jason Lee Van Dyke
Jason L. Van Dyke
PO Box 2618
Decatur, TX 76234
P – (940) 305-9242
Email:  jasonleevandyke@protonmail.com

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was electronically filed on the CM/ECF System, which will automatically serve a Notice of Electronic Filing on Jeffrey Dorrell, Attorney for Defendant.

/s/ Jason Lee Van Dyke
JASON LEE VAN DYKE