## IN THE UNITED STATES DISTRICT FOR THE
## EASTERN DISTRICT OF TEXAS,
## SHERMAN DIVISION

| | | |
|---|---|---|
| **JASON LEE VAN DYKE**, | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **THOMAS CHRISTOPHER** | § | **NO. 4:18-CV-247-ALM** |
| **RETZLAFF, a/k/a DEAN** | § | |
| **ANDERSON, d/b/a BV FILES, VIA** | § | |
| **VIEW FILES, L.L.C., and VIAVIEW** | § | |
| **FILES,** | § | |
| *Defendants* | § | |

### RETZLAFF'S MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P 12(b)(6)[1]

> **The Court should dismiss public-figure-plaintiff Van Dyke's libel claim because Van Dyke does not adequately plead "actual malice," Retzlaff's speech is nonactionable opinion, Van Dyke failed to comply with the Defamation Mitigation Act, and other reasons. The Court should dismiss the remaining claims because Van Dyke states too few facts to plausibly allege each element.**

### I. INTRODUCTION

1.      Plaintiff Jason Van Dyke sued defendant Thomas Retzlaff for libel after Retzlaff filed a grievance against him with the State Bar of Texas.[2]

2.      The Court denied Retzlaff's motion to dismiss under the Texas Citizens Participation Act.  Retzlaff unsuccessfully appealed to the Fifth Circuit.

3.      This case is set for trial during the period January 4-29, 2021.

---

[1]      This motion exceeds the 30-page limit for dispositive motions of Local Rule CV-7(a)(1).  Retzlaff's unopposed motion for leave to exceed the page limit for this motion (Doc. 128) is pending.  Retzlaff files his Rule 12(b)(6) motion now so the Court may more readily judge whether the proposed additional briefing would materially aid the Court's resolution of the issues.

[2]      Van Dyke denies the grievance is the basis of his claims. (TAC ¶ 5.33).

## II. FACTS

### A. The Allegations of Van Dyke's Third Amended Complaint

4.      Van Dyke sues Retzlaff for the following seven causes of action:

(i)      libel per se; (Doc. 113, Plaintiff's Third Amended Complaint ("TAC"), ¶¶ 6.2-6.11)

(ii)      business disparagement; (TAC ¶¶ 6.12-6.17)

(iii)      intrusion on seclusion; (TAC ¶¶ 6.18-6.20)

(iv)      tortious interference with an existing contract (plaintiff's at-will employment by the law firm of Karlseng, Leblanc, & Rich, LLC) (TAC ¶¶ 6.21-6.24).

(v)      tortious interference with prospective relations (plaintiff's future relations with the law firm of Karlseng, Leblanc, & Rich, LLC) (TAC ¶¶ 6.25-6.30).

(vi)      malicious criminal prosecution; (TAC ¶¶ 6.31-6.37) and

(vii)      intentional infliction of emotional distress. (TAC ¶¶ 6.38-6.42)

Complaining that Retzlaff filed an allegedly "frivolous" grievance against him with the State Bar of Texas, (TAC ¶ 5.4), Van Dyke bases his claims on statements posted on a "blog"[3] Retzlaff allegedly owns[4] and in e-mails Retzlaff allegedly sent.[5]   Van Dyke alleges Retzlaff made approximately ten false "statements of fact" about Van Dyke, including the following:

---

[3]    The blog is known as "BV Files" and can be found at www.viaviewfiles.net.
[4]    *See* TAC ¶¶ 5.5-5.11, 5.18-5.20 and Exhibit 3, 4, 9 and 10.
[5]    *See* TAC ¶¶ 5.12 and Exhibit 5.

(i)     Van Dyke is a "Nazi;"

(ii)    Van Dyke is a pedophile;[6]

(iii)   Van Dyke is a drug addict;

(iv)    Van Dyke is a white supremacist;

(v)     Van Dyke is involved in revenge pornography;

(vi)    Van Dyke has a criminal record for abusing women;

(vii)   Van Dyke was being treated and was medicated for bipolar disorder;

(viii)  Van Dyke has engaged in unwanted sexual solicitations;

(ix)    Van Dyke suffers from syphilis; and

(x)     Van Dyke has engaged in other sexual misconduct including, but not limited to, a homosexual relationship with one or more witnesses.

TAC, ¶ 6.2.

5.      The pungent comments on the "BV Files" blog use loose, figurative language to express the opinion that Van Dyke was ill-suited to be employed as either an assistant district attorney or an attorney with the firm of Karlseng, Leblanc, & Rich, LLC.  The "BV Files" authors, whoever they are, are entitled to express negative opinions about Van Dyke as a result of Van Dyke's frequent projection of his violent, racist beliefs onto an Internet audience of 7.5 billion people with posts such as this:

---

[6]     The actual statement was that Van Dyke "has *the look of* a pedophile" (whatever that is).



As shown below, no matter how acrid or offensive, the statements Van Dyke attributes to Retzlaff are constitutionally protected expressions of opinion and rhetorical hyperbole about a limited-purpose public figure.

6.      Furthermore, the "BV Files" authors, whoever they may be, have a well-settled First Amendment right to publish their opinions on the Internet anonymously.  ***Reno v. ACLU***, 521 U.S. 844, 853 (1997); *see also **ApolloMedia Corp. v. Reno***, 19 F. Supp. 1081 (N.D. Cal. 1998) (protecting anonymous denizens of www.annoy.com, a website "created and designed to annoy" legislators), *aff'd by **ApolloMedia Corp. v. Reno***, 526 U.S. 1061 (1999).

### B. Van Dyke Is a Limited-Purpose Public Figure

7.    Van Dyke is a limited-purpose public figure[7] plaintiff—a person who "thrust[] [himself] to the forefront of particular public controversies in order to influence the resolution of the issues involved" or because he "voluntarily inject[ed] himself or is drawn into a particular public controversy."  ***Gertz v. Robert Welch, Inc***., 418 U.S. 323, 351 (1974).  Van Dyke has claimed he was not a public figure "when Retzlaff made the statements that are the subject of this lawsuit."[8] (Doc. 111, ¶ 2.9.)  Van Dyke is mistaken.  Here is why.

### 1. Van Dyke's Involvement With The "Proud Boys"—A Violent Hate Group

8.    For years, Van Dyke has been actively involved with—and a leader, spokesman, and attorney for—a group known as the "Proud Boys."[9]  The Proud Boys are internationally notorious[10] for demonstrations so vicious that they have

---

[7]    Public figures fall into two categories: (i) all-purpose public figures and (ii) limited-purpose public figures.  ***WFAA-TV, Inc. v. McLemore***, 978 S.W.2d 568, 571 (Tex. 1998).  General-purpose public figures are those who have achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts.  *Id*.  (citing ***Gertz***, 418 U.S. at 351).  Limited-purpose public figures are public figures for only a limited range of issues surrounding a public controversy.  *Id*.

[8]    March 28, 2018, according to TAC ¶ 2.4.

[9]    *See* **Exhibit 1**, Certificate of Formation of "Proud Boys of Texas, LLC," signed and filed by Van Dyke with the State of Texas on November 20, 2017; **Exhibit 2**, Certificate of Formation of "Proud Boys International, LLC, signed and filed by Van Dyke with the State of Texas on November 26, 2018;" **Exhibit 3**, a public statement signed and published by Van Dyke on June 14, 2018, on behalf of the "Pacific Northwest Proud Boys" denying published reports that the organization intended to interfere with a "Gay Pride" parade in Portland, Oregon; **Exhibit 4**—a Proud Boys press release announcing Van Dyke had been elected "chairman of the Proud Boy Elders" on November 21, 2018, and noting that Van Dyke was at that time a "fourth degree brother" and "current Sergeant-at-Arms of the Dallas/Fort Worth chapter."

[10]    *See* **Exhibit 17**, December 20, 2017, *Huffington Post* article, "Lawyer Suing Anti-Fascist for Calling Him Nazi Sent Death Threats, Racial Slurs on Twitter," reporting that Van Dyke "threatened to kill a 'f**king n***r,'" and described him as "representing a far-right group with connections to white supremacy called the 'Proud Boys;'" **Exhibit 18**, November 14, 2017, *Huffington Post* article; **Exhibit 19**, p.5, April 3, 2018, *Huffington Post* article "Should

been called "terroristic neo-Nazi and white supremacist protestors"[11] and designated a "hate group" by the Southern Poverty Law Center:

> **Although [Proud Boys founder Gavin] McInnes has attempted to distance his organization from the violence of Charlottesville, violence is firmly entrenched in Proud Boy dogma. McInnes was filmed punching a counter-protestor outside of the Deploraball in January 2017, and after a speaking engagement at New York University the next month turned violent, he wryly declared, "I cannot recommend violence enough. It's a really effective way to solve problems." In fact, in early 2017, the Proud Boys added another degree to their membership hierarchy: in order to enter the 4th degree, a member needs to "get involved in a major fight for the cause."**

*See*  https://www.splcenter.org/fighting-hate/extremist-files/group/proud-boys,  last accessed January 3, 2020.  As shown in **Exhibit 4**, Van Dyke was a "fourth-degree brother" in the "Proud Boys" as of November 21, 2018.  ABC News published on August 12, 2018, that Van Dyke had written to ABC News "as an attorney for the Proud Boys." **Exhibit 12**.

9.    An attorney can become a limited purpose public figure by "voluntarily assuming a particularly visible position in the forefront of a very public issue." ***Schwartz v. Worrall Publ'ns, Inc***., 610 A.2d 425, 426 (N.J. Super. Ct. App. Div. 1992).  A lawyer who volunteers to represent a group of white

---

White Supremacists Be Allowed to Practice Law," describing Van Dyke as a member of "a racist, thuggish group called the Proud Boys" and quoting the State Bar of Texas as having condemned Van Dyke's statements as "reprehensible and contrary to the values we hold as Texas lawyers;" **Exhibit 20**, Van Dyke's November 21, 2017, complaint in a defamation suit against Mockingbird Publishing Co. for referring to the Proud Boys as "neo-Nazis;" the complaint appends as "Exhibit B" a September 15, 2017, Mockingbird article labeling Van Dyke as a "Nazi" and a "white nationalist lawyer" an stating, "[T]he Proud Boys are in fact neo-nazis."

[11]       *See* **Exhibit 5**, ¶ 2, the complaint in No. 2:19-CV-02006-EPD; ***Burke v. Fields,*** in the U.S. District Court for the Southern District of Ohio; in which the Proud Boys is a defendant.  The suit arises from organized activities on August 12, 2017, in Charlottesville, Virginia, that led to the death of one woman and injuries to several others.  *Id*.  Service of the summons and complaint was upon the Proud Boys through Van Dyke. **Exhibit 6**.

supremacists is a public figure because, by virtue of his representation, he voluntarily injects himself into public controversies concerning the group. *See Steel v. Spokesman-Review*, 61 P.3d 606, 609 (Idaho 2002). Van Dyke has clearly done so. Retzlaff offers public criticisms of the "Proud Boys" (which Van Dyke denies) not to argue they are true, but to show that Van Dyke's role in the Proud Boys' notoriety makes Van Dyke a public figure. And there is more.

## 2. Van Dyke's Employment as a Felony Prosecutor

10.     Public figures include governmental employees who have substantial responsibility for or control over governmental affairs. *See, e.g.*, *Pardo v. Simons*, 148 S.W.3d 181, 189 (Tex. App.—Waco 2004, no pet.). Van Dyke falls into this category, too. Van Dyke alleges Retzlaff cost him a job as a felony prosecutor in Victoria County, Texas[12]—a governmental office of public trust—by informing the Victoria County District Attorney that Van Dyke was a "lunatic" and "white nationalist" who "regularly gets into 'flame-wars' and disputes with random people on the internet." (Doc. 1-2, ¶¶ 3.3, 4.10-4.13). Although Van Dyke abandons this basis for suing Retzlaff in his third amended complaint, this does not alter the fact that Van Dyke's being hired as a prosecutor—a public official whose power over prosecutorial decisions gives him responsibility for governmental affairs—also makes Van Dyke a public figure.

11.     But that is not all.

---

[12]     **Exhibit 7**, pp. 2-3, Van Dyke's pleading in No. 4:19-CV-00786-SDJ-KPJ, *Van Dyke v. Shackleford*; in the U.S. District Court for the Eastern District of Texas; alleging Retzlaff

### 3. Van Dyke's 20 Years of Press and Racially Charged Public Comments

12.     On April 26, 2007, Todd Heywood, in an online publication called "PrideSource," wrote a story titled "Hate Group's Invited Speaker is Shouted Down."   **Exhibit 9**.   According to Heywood, at an event at Michigan State University emceed by Van Dyke, Civilian Defense Corps leader Chris Simcox was invited to speak by the MSU chapter of the Young Americans for Freedom.   *Id.* The Southern Poverty Law Center lists Simcox's Minutemen as "a Nativist extremist organization."   *Id.*   The event began with a rally for those opposed to Simcox and his message.   *Id.*   About 200 people stood outside Conrad Hall at MSU listening to speakers, holding signs and chanting.   *Id.*   When Simcox was introduced, the protesters jumped to their feet and began chanting and yelling.   *Id.* Simcox could not be heard above the din.   *Id.*   The Heywood article reported:

> **The crowd continued chanting for another 10 or so minutes, when Jason Van Dyke, a Texas attorney who acted as emcee for the event, stepped up to the microphone.  "The first amendment gives y'all the right to use four letter words, well I have two more words for you, soap and work.**

**Exhibit 9**.

13.     This is decidedly not Van Dyke's "seclusion" being intruded upon. Van Dyke is voluntarily addressing—and taunting—a crowd of Hispanic protesters at an event Van Dyke emceed to present a speaker controversial for his racist views.   *Id.*   One who seeks the limelight on controversial subjects and welcomes the resulting publicity has made himself a public figure.

---

"took responsibility for interfering with [Van Dyke's] job offer to become an "assistant felony

14.     Even so, Van Dyke has a 12-year history of unsuccessfully fighting disclosure of the more unsavory aspects of his background—also the *raison d'etre* of the case at bar.  By 2008, Van Dyke was already regarded as a "public figure" in at least one online publication where the following appeared:

> **Now meet Jason Van Dyke, the self-styled "legal adviser" to the MSU [Young Americans for Freedom].  Van Dyke is an attorney in Texas, but he used to attend MSU. Back in 2000, Van Dyke had some legal problems at MSU.  He struck a plea bargain and later had the record expunged. Heywood received the documents about that arrest from the court … and wrote about them.**
>
> **Van Dyke then filed to have those records sealed.  Todd went to court to argue against sealing them, arguing that as a public figure who has inserted himself into a public controversy and as an officer of the court in Texas (where he practices law), the public has a right to know and he as a journalist has a right to report on Van Dyke's history of illegal actions. This week, the judge agreed with Todd and refused to seal the records.**
>
> **…**
>
> **Van Dyke's whole argument to the judge was that this information getting out could hurt his legal career and subject him to ridicule. And he's right, of course. But they *should* hurt his legal career and they *should* subject him to ridicule. And the judge obviously agrees. Now he claims he's going to sue the judge. What he calls "slanderous attacks" are simply the truth and truth is, of course, an absolute defense against defamation charges (which he claims he's going to file against Todd).[13]**

The similarities to the case at bar are glaring.  Van Dyke's reaction to his loss in court was to publish the following grotesque rant about his perceived tormentor, Todd Heywood—the author of the PrideSource article:[14]

---

prosecutor with the Victoria County District Attorney's Office."

[13]     **Exhibit 10**, "Dispatches From the Culture Wars" story dated June 10, 2008, headlined "**Meet Jason Van Dyke**." [Emphasis added.]

[14]     **Exhibit 9**.  Heywood authored another PrideSource article on June 23, 2016, in which he quoted Van Dyke in connection with sponsoring a weapons training event.  Heywood

**AIDS Infected Faggot and his Moonbat Buddy Are Playing With Fire**

**AIDS-ridden highway rest stop bathroom connoisseur Todd Heywood may not like what he gets when he plays with fire. When I first heard that he managed to convince a judge to essentially ignore the law and the clear intent of the Michigan legislature, I thought about just letting this one go. The truth of the matter is that Todd Heywood will die a horrible death due to complications from AIDS and will be screaming and rotting in Hell before I am even halfway into my career. Unfortunately for him, I don't think there are any reststops on the road to the Malebolge – although I am sure he will find himself in the company of an entire legion of faggots.**

**…I am nearly finished compiling the information needed for a lawsuit that I intend to file against these two moonbats. Maybe, after spending a fortune on legal bills only to end up paying a hefty judgment, they will think twice before they tangle with me again.[15]**

This 13-year-old article appears to be the first recorded instance of Van Dyke's threatening a scorched-earth campaign of litigation to silence a critic. It would not be the last. On November 12, 2013—foreshadowing Van Dyke's 2018 retaliation against Retzlaff with his claim for $100 million in the case at bar—Van Dyke made the following threat to someone named Les Holtzman:

**You stated that I filed a harmless and frivolous lawsuit. That is enough for me. I will warn you: I have sued everyone who has ever filed a formal grievance against me with the State Bar. If you file some sort of groundless grievance against me with the State Bar, I will make your life a living hell unlike anything you can imagine.**

**Exhibit 13**.

15.     On a website emblazoned with the banner "The American Freedom Party," a January 27, 2013, article noted that "Jason Van Dyke of the Van Dyke

---

described Van Dyke as "a white nationalist … who co-authored a legal brief to the U.S. Sixth Circuit Court of Appeals against marriage equality and invoking long held 'western cultural beliefs' including execution of gay people." **Exhibit 11**.
[15]     **Exhibit 10**.

Law Firm, PLLC," had "made headlines recently" due to "successful efforts at getting 'revenge pornography' websites shut down."[16]   That article notes Van Dyke is "no stranger[] to the conservative movement" and says this:

> **In 2000, due to his exploits as a conservative activist while he was a student at Michigan State University, LewRockwell.com published an article about Van Dyke entitled "An 'Honorary White Male' in a Vast Right-Wing Conspiracy."[17]  The title says it all, but it is well worth the read.**

*Id*.  Attorney Kyle Bristow, reportedly a "good friend" of Van Dyke, is  shown  in the 2013 American Freedom Party post in a video clip from Fox Toledo saying:

> **Van Dyke and I are on the front lines of the culture war, and we are winning.**

*Id*.  Voluntarily lurching to the "front lines of the culture war" makes Van Dyke a public figure—*at least* for purposes of Retzlaff's criticizing Van Dyke for having done it.

16.     In one of the harshest pieces of publicity about Van Dyke to date (no small accomplishment)—published six months *before* Retzlaff's allegedly "frivolous grievance" filed with the State Bar on December 20, 2017[18]—author and former federal prosecutor Ken White published an article about Van Dyke with the following provocative and unflattering title:

---

[16]     The cited article can be found at http://theamericanfreedomparty.us/revenge-porn-websites/, last accessed February 26, 2020.
[17]     The cited article can be found at https://www.lewrockwell.com/2000/04/wendy-mcelroy/an-honorary-white-male-in-a-vast-right-wing-conspiracy/, McElroy, Wendy, April 13, 2000, last accessed February 26, 2020.
[18]     TAC ¶ 5.4.

### Texas Attorney Jason L. Van Dyke: Fraudulent Buffoon, Violence-Threatening Online-Tough-Guy, Vexatious Litigant, Proud Bigot, And All Around Human Dumpster Fire

**Exhibit 14**.[19] Amid various photographs and social media postings made by Van Dyke *himself* threatening violence, murder, and financial ruination, White writes:

> **Let's talk about an unusually despicable, ridiculous, bigoted, and potentially dangerously unbalanced and violence-threatening lawyer — Jason Lee Van Dyke.**
>
> **Jason L. Van Dyke, Texas attorney (for now), likes threatening violence against people who make fun of him or criticize him or question him online. Recently he's been getting questioned, ridiculed, and criticized a lot, since he filed suit seeking to force Victoria County District Attorney Stephen B. Tyler to explain why he rescinded a job offer to make Van Dyke a deputy prosecutor. (Probable answer: Tyler didn't do any due diligence before making the offer to Van Dyke and belatedly discovered he appears to be a bigoted lunatic.)**

*Id*. A Van Dyke Tweet dated September 12, 2014—*years* before Victoria County District Attorney Stephen Tyler rescinded a job offer to Van Dyke (allegedly because of communications from Retzlaff)—displays Van Dyke's photograph using the Twitter handle "@MeanTXlawyer:"

> **Your kiddies are quite a nuisance.  My advice: run and hide.  If I find you I WILL kill both you and your family.**

*Id*.   White's 2017 Popehat article analyzes Van Dyke's loss of his felony prosecutor job in Victoria County with this:

---

[19]        The cited article can still be found at https://www.popehat.com/2017/07/09/texas-attorney-jason-l-van-dyke-fraudulent-buffoon-violence-threatening-online-tough-guy-vexatious-litigant-proud-bigot-and-all-around-human-dumpster-fire/, last accessed February 26, 2020.

> **Not to mention Van Dyke's frivolous attempt to sue a sitting District Attorney to force him into a deposition explaining why he rescinded Van Dyke's job offer.… [Van Dyke's] theory is ridiculous.  The issue is that Victoria County District Attorney Stephen B. Tyler did an abysmally poor job of vetting Van Dyke before offering him vast power as a prosecutor.  But Van Dyke thinks the issue is that nobody ought to be allowed to say "[H]ey, maybe don't hire a bigoted lunatic to be a prosecutor, huh?" and that anyone who says that (which, by the way, would be classic petitioning the government, protected by the First Amendment) owes him money.**

*Id*.  White's article presciently foretells the very case Van Dyke would file against Retzlaff nine months later—the case at bar.

17.     The rationale of the public figure doctrine is that the public figure has reached such a level of prominence in the affairs of society that he is risking or inviting the spotlight of public attention and comment, or that he is attempting to influence resolution of issues involved in the controversy.  *See **Time, Inc. v. Firestone***, 424 U.S. 448, 453 (1976); ***Gertz***, 418 U.S. at 345.  The significance of Van Dyke's status as a public figure defamation plaintiff is that he must sufficiently allege Retzlaff's actual malice.  ***New York Times Co. v. Sullivan***, 376 U.S. 254, 279-80 (1964); ***Walker v. Beaumont Ind. Sch. Dist***., 938 F.3d 724, 744-45 (5th Cir. 2019) (dismissing defamation claim under FED. R. CIV. P 12(b)(6) for failure to sufficiently plead malice).  Actual malice in this context does not mean bad motive or ill will.  ***Walker***, 938 F.3d at 744.  It means the statement was made with actual knowledge of its falsity or with reckless disregard for the truth.  *Id*.

18.     As shown below, Van Dyke fails to state *any* claim upon which relief can be granted.  Accordingly, the Court should dismiss his claims pursuant to FED. R. CIV. P 12(b)(6).

### III. ARGUMENT & AUTHORITIES

### A. What Can the Court Consider in Deciding Retzlaff's Motion to Dismiss Under Rule 12(b)(6)?

19.     To determine whether Van Dyke's claims survive Retzlaff's Rule 12(b)(6) motion to dismiss, information Court considers includes (i) facts set forth in the complaint; (ii) documents attached to the complaint; and (iii) matters of which judicial notice may be taken under FED. R. EVID. 201.  *See Walker*, 938 F.3d at 735; *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).  The Court may judicially notice facts "determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b)(2).  "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference…."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007).  Of paramount importance here, the Court may judicially notice materials that show things said in the press and not offered for the truth of the matter asserted.  *Staehr v. Harford Fin. Servs. Group, Inc*., 547 F.3d 406, 425 (2d Cir. 2008); *Benak v. Alliance Capital Mgmt., L.P*., 435 F.3d 396, 401 (3d Cir. 2006); *Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991).

20.     Both above and below, Retzlaff has incorporated or appended exhibits reflecting such matters.  Retzlaff does not ask the Court to base its decision on anything but what is properly within the Court's power to consider.

## **B. When Should Claims Be Dismissed Under Rule 12(b)(6)?**

21.     Federal rules authorize the filing of motions to dismiss asserting as a defense a plaintiff's "failure to state a claim upon which relief can be granted." FED. R. CIV. P 12(b)(6); *Walker*, 938 F.3d at 734.  Thus, claims may be dismissed under Rule 12(b)(6) "on the basis of a dispositive issue of law."  *Id*., citing *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).  Dismissal under Rule 12(b)(6) also is warranted if the complaint does not contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Walker*, 938 F.3d at 734, citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

> **Where the well-pleaded facts of a complaint do not permit a court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—"that the pleader is entitled to relief."**

*Walker*, 938 F.3d at 734, citing *Iqbal*, 556 U.S. at 678 (quoting FED. R. CIV. P 8(a)(2)) [emphasis added].  Accordingly, a complaint's allegations "must make relief plausible, not merely conceivable, when taken as true."  *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009).

22.     To survive a motion to dismiss, Van Dyke must set forth factual allegations sufficient to plausibly allege each element of the stated cause of action. *Iqbal*, 556 U.S. at 678.  These factual allegations must "'raise a right to relief above the speculative level.'"  *Twombly*, 550 U.S. at 555-56; *see also Walker*, 938 F.3d at 734-35; *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016). Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation

of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 555, 557); *see also* *Turner v. Wells*, 879 F.3d 1254, 1273

(11th Cir. 2018) (rejecting "conclusory" allegations in defamation case).

23.    "The plausibility standard is not akin to a 'probability requirement,'

but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Twombly*, 550 U.S. at 555.  Factual allegations that are "merely consistent with a

defendant's liability stop short of the line between possibility and plausibility of

entitlement to relief," and thus are inadequate.  *Id.* (internal quotations omitted).

Rigorous application of the plausibility standard takes on particular importance in

cases arising from speech that implicates constitutional rights. In such cases "there

is a powerful interest in ensuring that free speech is not unduly burdened by the

necessity of defending against expensive yet groundless litigation" and because

"[f]orcing publishers to defend inappropriate suits through expensive discovery

proceedings in all cases would constrict th[e] breathing space" that is "needed to

ensure robust reporting on public figures and events."  *Michel*, 816 F.3d at 702.

24.    Such claims are also susceptible to early dismissal for another

reason: "[U]nlike in most litigation, in a libel suit the central event—the

communication about which suit has been brought—is ordinarily before the judge

at the pleading stage.  He or she may assess it upon a motion to dismiss, firsthand

and in context." 2 Robert D. Sack, *Sack on Defamation* § 16.2.1 at 16-3 (5th ed.

2018).  Courts frequently dismiss defamation claims on a motion to dismiss where,

as here, an examination of the challenged statements, in the context in which they

were disseminated, demonstrates that the statements are not actionable as a matter of law.  *Id.*; *see also* ***Turner***, 879 F.3d at 1273 (rejecting "conclusory" allegations in defamation case and affirming dismissal because the challenged statements were non-actionable opinion).   Elements of a plaintiff's claim(s) "must be addressed by allegations in the complaint sufficient to give fair notice to a defendant."  ***Christopher v. Harbury***, 536 U.S. 403, 416 (2002).  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." ***Papasan v. Allain***, 478 U.S. 265, 286 (1986).

25     Below, Retzlaff examines the seven causes of action in the TAC for deficiencies that require dismissal under FED. R. CIV. P 12(b)(6):

(i)     libel per se; ("TAC"), ¶¶ 6.2-6.11)

(ii)     business disparagement; (TAC ¶¶ 6.12-6.17) and

(iii)     intrusion on seclusion; (TAC ¶¶ 6.18-6.20) and

(iv)     tortious interference with an existing contract; (TAC ¶¶ 6.21-6.24).

(v)     tortious interference with prospective relations; (TAC ¶¶ 6.25-6.30).

(vi)     malicious criminal prosecution; (TAC ¶¶ 6.31-6.37) and

(vii)     intentional infliction of emotional distress; (TAC ¶¶ 6.38-6.42)

Discussed separately under "libel per se" are Van Dyke's failure to sufficiently plead actual malice, failure to plausibly allege that the statements sued upon were statements of fact (as opposed to opinion or rhetorical hyperbole), failure to comply with the Defamation Mitigation Act, failure to overcome Retzlaff's immunity, and failure to plead causation (because Van Dyke is "libel-proof").

### C. Bloggers Have the Same First Amendment Protections as Members of Institutional Media

26.     Although bloggers are sometimes disdained by members of the traditional media, for purposes of defamation law there is no legal distinction between the two.  Whether a statement is published in the *New York Times* or on the Internet by an unknown individual writing a blog from his bedroom makes no difference.  Bloggers are entitled to the same protections as traditional media journalists.  ***Obsidian Fin. Group, LLC v. Cox***, 740 F.3d 1284, 1287 (9th Cir. 2014), *cert. denied*, 134 S.Ct. 2680,[20] citing ***Citizens United v. FEC***, 558 U.S 310, 352 (2010) (internal quotations omitted) ("We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers.").

27.     Thus, even if the Court assumes Retzlaff is the author of the statements published on the "BV Files" blog, Van Dyke's complaint and Retzlaff's motion to dismiss are properly evaluated under the same constitutional standards as if Van Dyke had sued the *New York Times*.  As discussed in more detail below, this means the Court should dismiss Van Dyke's libel claim under Rule 12(b)(6) absent a sufficient pleading of actual malice.  *Cf.* ***Obsidian Fin.***, 740 F.3d at 1289; ***New York Times Co. v. Sullivan***, 376 U.S. 254, 280 (1964).

---

[20]     In ***Obsidian Fin. Group***, the Ninth Circuit reversed a trial court who had held that the defamation plaintiffs were not required to prove fault because the defendant blogger had failed to submit "evidence suggestive of her status as a journalist." ***Obsidian Fin. Group***, 740 F.3d at 1288.

### D. Van Dyke Fails to State a Valid Claim for Libel Per Se

28.     To survive Retzlaff's Rule 12(b)(6) motion to dismiss Van Dyke's libel claim, Van Dyke must sufficiently plead the following elements:

(i)     **Retzlaff's published a false statement of fact to a third party**;

(ii)    Retzlaff's statement concerned Van Dyke and was defamatory;

(iii)   **the publication was made with the requisite degree of fault**; and

(iv)    **the publication caused Van Dyke damages**.

*Walker*, 938 F.3d at 743, citing *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015). Van Dyke fails as to at least the three elements shown in **blue**.  Retzlaff discusses below 7 separate legal reasons that compel dismissal of Van Dyke's claim for libel per se for failure to state a claim.

### 1. Van Dyke's Failure to Sufficiently Plead Actual Malice Fails to State a Claim for Libel Per Se

29.     In *Walker*, 938 F.3d at 745, the Fifth Circuit held a defamation plaintiff's complaint failed to sufficiently plead actual malice. The complaint alleged the defendants "acted with actual malice, knowledge, negligence and/or recklessness as to the truth of [the] statements." *Id*., at 744.  The complaint also alleged defendants were "fully aware of the falsity of their statements but continued making them." *Id*., at 745.  This was not enough.

> **Such scant assertions are insufficient to allow the court to infer more than the mere possibility of misconduct.**

*Walker*, 938 F.3d 745.  Van Dyke's complaint is similarly deficient.  Van Dyke merely pleads his conclusion that Retzlaff "knew, and continues to know," that the

statements were false.  (TAC ¶ 6.9).  Van Dyke does not plead *how* Retzlaff supposedly knew that the statements were false.  The omission is fatal.

30.    The Texas Supreme Court, too—in recognizing that the Texas Constitution provides greater rights of free expression than its federal equivalent[21]—has consistently held that proof of actual malice requires sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication.[22]  And while these Texas cases were not decided in the context of a motion to dismiss for failure to state a claim, they nevertheless evince the height of the Texas Constitution's bar for defamation claims—and the subjective state of knowledge of the defendant necessary for a plaintiff to prevail.

31.    The Court should dismiss Van Dyke's libel claim under Rule 12(b)(6) for failure to sufficiently plead malice.

---

[21]      *See, e.g.*, ***Cain v. Hearst Corp.***, 878 S.W.2d 577, 584 (Tex. 1994); ***Davenport v. Garcia***, 834 S.W.2d 4, 8 (Tex. 1992) (noting that the continued inclusion in our state constitution of "an expansive freedom of expression clause and rejection of more narrow protections indicates a desire in Texas to ensure broad liberty of speech); ***O'Quinn v. State Bar of Texas***, 763 S.W.2d 397, 402 (Tex. 1988) (concluding "it is quite obvious that the Texas Constitution's affirmative grant of free speech is more broadly worded than the first amendment.").

[22]      *See, e.g.*, ***Hagler v. Proctor & Gamble Mfg. Co.***, 884 S.W.2d 771, 772 (Tex. 1994) (holding ill will cannot prove malice); ***Channel 4, KGBT v. Briggs***, 759 S.W.2d 939, 941 (Tex. 1988) (holding a mistake was not actionable where broadcaster denied subjective awareness of the error); ***Doubleday & Co., Inc. v. Rogers***, 674 S.W.2d 751, 755-57 (Tex. 1984) (holding proof that a prudent person would not have published or would first have investigated is not actual malice); ***Foster v. Upchurch***, 624 S.W.2d 564, 566 (Tex. 1981) (holding that naming the wrong person as a killer was a "mistake" and not actual malice); ***Dun & Bradstreet, Inc. v. O'Neil***, 456 S.W.2d 896, 900 (Tex. 1970) (holding no evidence of actual malice where publisher admitted, "I didn't look at it, I'm afraid, as carefully as I should," because of "an executive breathing down my neck"); ***El Paso Times, Inc. v. Trexler***, 447 S.W.2d 403, 406 (Tex. 1969) (holding the complete failure to investigate amounted to no evidence of constitutional malice).

## 2. Van Dyke's Complaints About Retzlaff's Opinions and Rhetorical Hyperbole Fail to State a Valid Claim for Libel Per Se

32.    Van Dyke sues for libel per se.  (TAC ¶¶ 6.2-6.11).  "Libel" is "defamation expressed in written or other graphic form that tends to … injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or to impeach any person's honesty, integrity, virtue, or reputation…." TEX. CIV. PRAC. & REM. CODE § 73.001.  Libel is defamatory per se if, on its face, the statement falls into this statutory definition.  *Gartman v. Hedgpeth*, 157 S.W.2d 139, 140-41 (Tex. 1941).  Libel is also defamatory per se if it (i) injures a person in his office, profession, occupation;[23] (ii) imputes a crime;[24] or (iii) imputes a loathsome disease;[25] or (iv) imputes sexual misconduct.[26]  *See Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 623 (Tex. 2018), *cert. denied*, 139 S.Ct. 1216 (2019).[27]

33.    At first blush, some of the statements Van Dyke alleges Retzlaff published appear to come close to the definition of libel per se—that Van Dyke (i) is a "Nazi;" (ii) is a "pedophile;" (iii) is a "drug addict;" (iv) has a criminal record for abusing women; (v) "i[s] involved with revenge pornography;" (vi) has

---

[23]    *Bedford v. Spassoff*, 520 S.W.3d 901, 905 (Tex. 2017).
[24]    *D. Mag. Partners v. Rosenthal*, 529 S.W.3d 429, 439 (Tex. 2017).
[25]    *Memon v. Shaikh*, 401 S.W.3d 407, 421 (Tex. App.—Houston [14th Dist.  2013, no pet.).
[26]    *Memon*, 401 S.W.3d at 421.
[27]    In *Tatum*, the Texas Supreme Court presented a new, comprehensive framework for courts to use when evaluating defamation claims.  Courts historically used the terms "defamation per se" and "defamation per quod" to classify types of defamatory statements by their defamatory nature and the nature and type of proof required to establish damages.  In *Tatum*, the court limited the use of those terms to the damages issue and introduced new terms for courts to use when evaluating a statement's defamatory nature.

engaged in unwanted sexual solicitations; (vii) has been treated for bipolar disorder, and other mental illness; (viii) has syphilis; and (ix) has engaged in "other sexual misconduct including, but not limited to, a homosexual relationship with one or more witnesses."  (TAC, ¶ 6.2.)  Of course, this does not end the Court's inquiry.   The Court must determine whether each statement was reasonably capable of a defamatory meaning.  *Tatum*, 554 S.W.3d at 625.  This is a question of law that uses an objective standard.  *Id*. at 637.  The Court must consider the type of defamation alleged and whether the statement was ambiguous.  *Id*., at 631-32.

34.    A statement incapable of being proved true or false cannot be the basis of a defamation action.  *See, e.g*., *Harvest House Publ'rs v. Local Ch*., 180 S.W.3d 204, 211 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (whether labeling a church as a "cult" is defamatory depends on religious beliefs).  Because the First Amendment allows only provably *false* statements to be potentially actionable as defamation, subjective characterizations and opinions cannot give rise to a valid claim as a matter of law.  *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 19-20 (1990).  And even when a statement *is* verifiable as false, it does not give rise to liability if the 'entire context in which it is made' discloses that it is merely an opinion masquerading as fact."  *Tatum*, 554 S.W.3d at 639. "Even if susceptible to verification, [statements] do not expose the speaker to liability if their entire context discloses that they were not intended to assert a fact."  *Castleman v. Internet Money Ltd.*, 2018 WL 5093857, at *5 (Tex. App.—

Amarillo 2018, pet. denied).  Statements not intended to assert a fact "are 'called
an opinion.'" *Id.*

35.    "However pernicious an opinion may seem, we depend for its
correction not on the conscience of judges and juries but on the competition of
other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974).  As noted
above, the "Texas Supreme Court has repeatedly recognized that the Texas
Constitution provides greater rights of expression than its federal equivalent."
*Dolcefino v. Turner*, 987 S.W.2d 100, 110-111 (Tex. App.—Houston [14th Dist.]
(collecting cases).  The Texas Constitution *expressly* protects opinions:

> **Every person shall be at liberty to speak, write or publish his opinions
> on any subject, being responsible for the abuse of that privilege; and
> no law shall ever be passed curtailing the liberty of speech or of the
> press.**

TEX. CONST. art. I, § 8.

36.    In *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler*, 398
U.S. 6 (1970), a developer, Bresler, was negotiating with the city for a variance on
certain of his land, while also negotiating on other land the city wanted to buy
from him. A newspaper reported that some persons characterized his negotiating
position as "blackmail."  Bresler sued for libel, claiming the articles imputed to
him the crime of blackmail. *Id*. at 8. The Court held: "[A]s a matter of
constitutional law, the word 'blackmail' in these circumstances was not slander
when spoken, and not libel when reported in the Greenbelt News Review." *Id.* at
13. "It is simply impossible to believe that a reader who reached the word

'blackmail' in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized." *Id.* at 14.

> 37.    The ***Bresler*** court further held:

> **No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense.  On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable.**

*Id.*; *see also **Hustler Magazine, Inc. v. Falwell***, 485 U.S. 46, 50 (1988) (First Amendment precluded recovery for ad which "could not reasonably have been interpreted as stating actual facts about the public figure involved"); ***Letter Carriers v. Austin***, 418 U.S. 264 (1974) ("List of Scabs" in newsletter, together with pejorative definition of "scab" using words like "traitor," did not support a defamation action since terms were used "in a loose, figurative sense" and were "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members").  "Rhetorical hyperbole" is "extravagant exaggeration … [used] for rhetorical effect." ***Backes v. Misko***, 486 S.W.3d 7, 26 (Tex. App.—Dallas 2015, pet. denied) (internal quotation omitted).  "For example, the use of 'rewarding,' 'ripping off,' and 'bilking' when reviewed in context have been considered rhetorical hyperbole." *Id.* (citing ***Rehak Creative Services, Inc. v. Witt***, 404 S.W.3d 716, 729 (Tex. App.—Houston [14th Dist. 2013, *disapproved on other grounds, **In re Lipsky***, 460 S.W.3d 579 (Tex. 2015)).

38.     "Context is important." ***Rehak***, 404 S.W.3d at 729. "[P]ublications alleged to be defamatory must be viewed as a whole—including accompanying statements, headlines, pictures, and the general tenor…." *Id.* "This is also true in determining whether a publication is an actionable statement of fact or a constitutionally protected expression of opinion." ***Bentley v. Bunton***, 94 S.W.3d 561, 579 (Tex. 2003). "The statements … must be viewed in their context; they may be false, abusive, unpleasant, or objectionable to the plaintiff and still not be defamatory in light of the surrounding circumstances." ***Ezrailson v. Rohrich***, 65 S.W.3d 373, 376 (Tex. App.—Beaumont 2001, no pet.).

39.     A communication is viewed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it. ***Turner v. KTRK Television, Inc***., 38 S.W.3d 103, 114 (Tex. 2000). Falsity is determined based on "the meaning a reasonable person would attribute to a publication, and not to a technical analysis of each statement." ***New Times, Inc. v. Isaacks***, 146 S.W.3d 144, 154 (Tex. 2004). The irreverent tone and format of the "BV Files" blog Van Dyke accuses Retzlaff of authoring "notifies readers to expect speculation and personal judgment." *See **Milkovich***, 110 S.Ct. at 2712 (Brennan, J., dissenting). It is "pointed, exaggerated, and heavily laden with emotional rhetoric and moral outrage." *Id.* The language is "loose and figurative," not precise and literal, and is "employed as a metaphor or hyperbole, not to convey actual facts." ***Yiamouyiannis v. Thompson***, 764 S.W.2d 338, 339-40 (Tex. App.—San Antonio 1988, writ denied), *cert. denied*, 110 S.Ct. 722

(1990).  The ***Yiamouyiannis*** court held, "[R]eferences to [plaintiff] as a quack, a hoke artist, and a fearmonger are assertions of pure opinion, as are the statements that he was exposed for quackery, lacks solid credentials, and expresses incomprehensible mumbo jumbo."  *Id*. at 341.

> **These terms of derision, considered in context and in light of the fluoridation debate, are vintage hyperbole and … the speaker's shorthand way of opining [plaintiff] is not worthy of belief, his views are confused nonsense, and he is not qualified to instruct the public about fluoridation.**

*Id*.  "While other commentators might have taken a more ratiocinative approach, [defendant] was entitled to use instead these particular terms of invective in this context."  *Id.*  "As to each of these utterances, the absolute constitutional privilege applies…."  *Id*.

40.    The blog statements Retzlaff allegedly published were not "hard news" like that printed on the front page of a newspaper or in a full-length scholarly article or book.  *See **Milkovich***, 497 U.S. at 32 ("Certain formats … signal the reader to anticipate a departure from what is actually known by the author as fact"); *see also **Obsidian Fin.***, 740 F.3d at 1293 ("[T]he general tenor of Cox's blog posts negates the impression that she was asserting objective facts.");  ***Gardner v. Martino***, 563 F.3d 981, 988 (9th Cir. 2009) ("elements that would reduce the audience's expectation of learning an objective fact [include]: drama, hyperbolic language, an opinionated and arrogant host [speaker] and heated controversy").  Such elements are scattered liberally across the "BV Files" blog.  For example, on March 25, 2018, was this:

**So why does Bob Karlseng give money and economic support to Nazis? And what do each and every one of the corporate clients of Maverick Title of Texas LLC dba Texas Title Company think about their monies going into the pocket of a racist ass-hat who likes to post ridiculous stuff on the interwebs?** That, our teeming **MILLIONS** of readers, listeners, and supporters will be the subject of an upcoming article. STAY TUNED!

**We here at the BV Files have a very special message for Denton, TX, attorney Jason Lee Van Dyke:**

**Go Fuck Yourself Jason Van Dyke.  Woof, bitch!**

www.viaviewfiles.net, last accessed February 26, 2020.   The blog shows a red siren saying "Upset Alert" and child-like scrawl stating, "Now, On With the Show!"  Especially relevant to whether the blog makes statements of *fact* is this:

> *ALL CONTENT ON THIS BLOG, BEING A MIXTURE OF PARODY, SATIRE, AND LAME HUMOR, IS FOR ENTERTAINMENT PURPOSES ONLY AND NOT TO BE TAKEN SERIOUSLY. WHEN IT COMES TO PARODY, THE LAW REQUIRES A REASONABLE READER STANDARD, NOT A "MOST GULLIBLE PERSON ON FACEBOOK" STANDARD. THE FIRST AMENDMENT DOES NOT DEPEND ON WHETHER EVERYONE IS IN ON THE JOKE. NEITHER IS IT BOTHERED BY PUBLIC DISAPPROVAL, WHETHER TEPID OR RED-HOT.*[28]

41.    Given this context, Van Dyke fails to state a claim for libel per se upon which the Court may grant relief.   The blog statements are nonactionable statements of opinion or rhetorical hyperbole that no reasonable person of ordinary intelligence would believe were stating facts about Van Dyke.   The Court should dismiss Van Dyke's libel claim under FED. R. CIV. P. 12(b)(6) on this ground alone. But there are more reasons Van Dyke's libel claim fails as a matter of law.

### 3. Van Dyke Fails to State a Claim for Libel Per Se Because He Failed to Comply With the Defamation Mitigation Act

42.     Even assuming Retzlaff is the owner and author of the "BV Files" blog or the author of statements made over the name "Dean Anderson," Van Dyke cannot maintain his libel suit against Retzlaff because Van Dyke failed to make a timely pre-suit demand for retraction, correction, or clarification as required by TEX. CIV. PRAC. & REM. CODE § 73.055(d)(3).   Without having made such a request, Van Dyke may not maintain his suit for libel.[29]   *See* ***Tubbs v. Nicol***, 675 Fed.App'x. 437, 439 (5th Cir. 2017).   Van Dyke does not plead that he complied with the Defamation Mitigation Act.  This is because he cannot.

43.     As noted above, claims may be dismissed under Rule 12(b)(6) "on the basis of a dispositive issue of law."  ***Walker***, 938 F.3d at 734, citing ***Neitzke***, 490 U.S. 319.  Van Dyke's failure to comply with the Defamation Mitigation Act deprives him of the right to "maintain" his libel suit, as the Fifth Circuit held in ***Tubbs***.  This is a dispositive issue of law.  For this reason, too, Van Dyke fails to state a claim for libel per se upon which the Court may grant relief.  The Court should dismiss Van Dyke's libel claim under FED. R. CIV. P. 12(b)(6) on this ground alone.

44.     But there is still more.

---

[28]     **Exhibit 8**, a portion of the "BV Files" website misleadingly omitted from Van Dyke's partial attachments to the TAC.  This language can be viewed by any visitor by clicking the "About" button.  *See* http://www.viaviewfiles.net/about/, last accessed January 3, 2020.

[29]     Van Dyke contends the proper remedy for his failure to comply with the Defamation Mitigation Act is abatement, not dismissal, and that Retzlaff waived this remedy by not moving for it.

### 4. Van Dyke Fails to State a Claim for Libel Per Se Because Retzlaff is Immune for Blog Users' Comments Under § 230 of the Communications Decency Act

45.    Even assuming Retzlaff is the owner and author of the "BV Files" blog, he cannot be liable to Van Dyke for statements made by others on that blog.

> **No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.**

47 U.S.C. § 230.  The statute shields bloggers who act as intermediaries by hosting comments on their blogs.  *See **Green v. America Online (AOL)**, 318 F.3rd 465, 471(3rd Cir. 2003).  Bloggers are not liable for comments left by readers, the work of guest bloggers, or tips sent via email. This legal protection holds even if a blogger is aware of the objectionable content or makes editorial judgments. ***La'Tiejira v. Facebook, Inc.**, 272 F.Supp. 981, 993-94 (S.D.Tex. 2017).

46.    Van Dyke's third amended complaint appears to seek relief against Retzlaff for "comments" hosted by the "BV Files" blog.  (TAC, ¶ 5.28.)  These also figure prominently in Van Dyke's request for injunctive relief.  (Doc. 114, ¶¶ 5, 6, 8, and 9.)   Although Van Dyke denies that he sues Retzlaff for user comments on the blog, his pleadings say otherwise. As to his suit for libel based on user comments on the "BV Files" blog, Van Dyke fails to state a claim upon which the Court may grant relief.

47.    And that is not all, either.

## **5. Van Dyke Fails to State aa Claim for Libel Per Se Because Retzlaff Is Immune From Suit for Filing State Bar Grievances**

48.     The Texas Rules of Disciplinary Procedure establish a broad immunity from suit for those who file grievances against attorneys with the State Bar of Texas:

> **No lawsuit may be instituted against any Complainant or witness predicated upon the filing of a Grievance or participation in the attorney disciplinary and disability system…. The immunity is absolute and unqualified and extends to all actions at law or in equity.**

TEX. R. DISCIPLINARY PROCEDURE 17.09; *see* ***Commission for Lawyer Discipline v. Rosales***, 577 S.W.3d 305, 313 (Tex. App.—Austin 2019, pet. filed 9-25-19).

49.     In one of the opening paragraphs of his complaint, Van Dyke alleges Retzlaff filed a "frivolous grievance" against him with the State Bar.  (TAC ¶ 5.4.) While Van Dyke strains to show he is "**not** suing Retzlaff for filing grievances against him with the State Bar of Texas," Van Dyke's own prior statements[30] belie this claim.  So does Van Dyke's remarkable prayer for the remedy of a permanent injunction *barring Retzlaff from filing grievances*.[31]

50.     Van Dyke fails to state a claim based on Retzlaff's filing of State Bar grievances against Van Dyke upon which this Court may grant relief. Accordingly, the Court should dismiss Van Dyke's suit under Rule 12(b)(6).

51.     And there is still more.

---

[30]     "I will warn you: I have sued everyone who has ever filed a formal grievance against me with the State Bar.  If you file some sort of groundless grievance against me with the State Bar, I will make your life a living hell unlike anything you can imagine."  **Exhibit 13**.

[31]     TAC ¶ 7.2(g)(i) and (ii).

### 6. Van Dyke Fails to State a Claim for Libel Per Se Because the "Criminal Stalking" Statute Is Unconstitutional—*As a Trespass Upon the First Amendment Right of Free Speech*

52.     Throughout his third amended complaint, Van Dyke repeatedly complains about Retzlaff's alleged "criminal stalking" behavior and "criminally harassing" acts.[32]  Although Van Dyke does not appear to attempt a civil cause of action for "stalking," he nevertheless affirmatively pleads these alleged "criminal acts" as the basis for at least two other torts—Van Dyke's claims against Retzlaff for tortious interference and for intentional infliction of emotional distress.[33]  But there is a problem with this predicate that appears to have escaped Van Dyke's notice—it is not a crime to repeatedly send e-mails *even if the e-mails are sent with the intent to harass, annoy, alarm, abuse, torment, or embarrass the recipient*.  Here is why.

53.     Since 2001, there *has been* a statute entitled "Harassment" that criminalizes the act of sending "repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass or offend another."[34]  TEX. PENAL CODE § 42.07(a)(7).  Although Van Dyke never cites this statute, this is almost certainly the statute he is relying on to describe Retzlaff's behavior as "criminally harassing."

---

[32]     *See, e.g.*, TAC ¶ 5.3 (Retzlaff's decision to "criminally stalk" Van Dyke); heading on p. 7, ("Criminal Stalking Behavior"); ¶ 5.21 ("criminal acts"), ¶ 5.23 ("harassing e-mails");  ¶ 5.31 ("criminally harassing acts");   ¶ 6.28 ("criminal harassment"); and ¶ 6.39 ("Retzlaff's ongoing tortious activity and criminal staking (sic)").

[33]     *See, e.g.*, TAC ¶ 6.27 (basis for Van Dyke's tortious interference claim); ¶ 6.39 (basis for Van Dyke's claim for intentional infliction of emotional distress).

54.     On October 3, 2019, a Texas court of appeals held the 2001 version of § 42.07(a)(7) unconstitutionally vague and overbroad on its face.  ***Ex Parte Barton***, 586 S.W.3d 573, 575 (Tex. App.—Fort Worth 2019, pet. granted).

> **A statute is overbroad in violation of the First Amendment guarantee of free speech if in addition to proscribing activity that may be constitutionally forbidden, it sweeps within its coverage a substantial amount of expressive activity that is protected by the First Amendment.**

*Id.* at 580-81.  The ***Ex Parte Barton*** court held that § 42.07(a)(7) did this.  Both the Fifth Circuit and the Texas Court of Criminal Appeals have also held prior versions of § 42.07 unconstitutionally vague because of the words used to describe the offensive behavior—"harass, annoy, alarm, abuse, torment, or embarrass." ***Kramer v. Price***, 723 F.2d 1164, 176 (5th Cir. 1984) (en banc opinion); ***Long v. State***, 931 S.W.2d at 285, 297 (Tex. Crim App. 1996).  And while § 42.07 was amended effective September 1, 2017, there was *no change* to § 42.07(a)(7), which retains the language found unconstitutional by the ***Ex Parte Barton*** court in 2019.

55.     Van Dyke fails to state a claim based on Retzlaff's allegedly "criminal harassment" upon which this Court may grant relief.  Accordingly, to the extent Van Dyke affirmatively bases any claims upon Retzlaff's alleged violation of an unconstitutional statute, the Court should dismiss the claims under Rule 12(b)(6).

56.     And there is yet still even more.

---

[34]     *See* Act of June 15, 2001, 77th Leg., R.S., ch. 1222, 2001 Tex. Gen. Laws 2795

### 7. Van Dyke Fails to State a Claim for Libel Per Se Because He is "Libel-Proof"

57.     As shown in ¶¶ 7-18 above and in the exhibits appended hereto, Van Dyke's history of making aggressively hostile racist or homophobic statements has been widely reported in harshly critical press since long before any statement attributed to Retzlaff in the case at bar.  As noted above, one of these referred to Van Dyke as a "fraudulent buffoon," "violence-threatening online-tough-guy," "vexatious litigant," "proud bigot," and "all around human dumpster fire." **Exhibit 14**.  Another accused Van Dyke and the Proud Boys of being "Nazis." **Exhibit 20**.  These online articles have been on continuous display on the Internet for almost four years[35] and have even been republished by Van Dyke himself.

58.     Van Dyke lost whatever reputation he had after the broad publication of these characterizations.  *See **Swate v. Schiffers***, 975 S.W.2d 70, 74-75 (Tex. App.—San Antonio 1998, pet. denied) (physician whose reputation had already been ruined by derogatory newspaper articles and public censure from medical disciplinary boards was libel-proof and could not hold defendant liable for misstating new criminal charges).  Van Dyke lost his reputation years before the libel alleged in the case at bar. As a result, Van Dyke cannot show that Retzlaff's alleged libel caused Van Dyke's damages.  Van Dyke thus fails to state a claim for libel per se upon which this Court may grant relief.  The Court should dismiss Van Dyke's libel claim under Rule 12(b)(6) for this reason alone.

---

(amended 2013) (current version at TEX. PENAL CODE § 42.07(a)(7).)

## E. Van Dyke Fails to State a Valid Claim for Business Disparagement

59.     To survive Retzlaff's Rule 12(b)(6) motion to dismiss Van Dyke's business disparagement claim, Van Dyke must plead the following elements:

(i)     Retzlaff's publication of disparaging words about Van Dyke;

(ii)    Retzlaff's words were false;

**(iii)   Retzlaff published the words with malice**;

(iv)    Retzlaff published the words without privilege; and

(v)     Retzlaff's published words caused Van Dyke special damages.

*In re Lipsky*, 460 S.W.3d 579, 592 (Tex. 2015).

60.     Van Dyke's formulaic recitation of the elements of business disparagement is inadequate.   For example, Van Dyke mechanically recites that Retzlaff's words "cast doubt on the existence, quality, or ownership of plaintiff's land, chattels, or intangible things."  (TAC ¶ 6.13.)  But Van Dyke pleads no facts showing that any words published by Retzlaff that referred to "the existence, quality, or ownership of plaintiff's land, chattels, or intangible things."  Van Dyke pleads that Retzlaff's statements "concerned a product that Plaintiff was forced to sell, its financial position, or the character of his business."  (TAC ¶ 6.14.)  As noted above, "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).

---

[35]     *See, e.g.*, https://www.popehat.com/2017/07/09/texas-attorney-jason-l-van-dyke-fraudulent-buffoon-violence-threatening-online-tough-guy-vexatious-litigant-proud-bigot-and-all-around-human-dumpster-fire/, last accessed February 26, 2020.

61.     The tort of business disparagement is not properly understood as "an alternative theory of recovery" to a libel claim, as Van Dyke mistakenly appears to believe.[36]  Statements referring to a plaintiff personally—as Van Dyke alleges in his Third Amended Complaint—are governed by defamation law.  *Hurlbut v. Gulf Coast Atl. Life Ins*., 749 S.W.2d 762, 766 (Tex. 1987).  Van Dyke appears not to understand the difference.

62.     In an action for business disparagement by a public figure such as Van Dyke, the *New York Times* standard for "actual malice" applies.[37]  *Forbes, Inc, v. Granada Biosciences, Inc*., 124 S.W.3d 167, 170-71 (Tex. 2003).    As shown above,[38] Van Dyke fails to sufficiently plead actual malice.  Here, too, Van Dyke makes only conclusory allegations.[39]

63.     Accordingly, Van Dyke fails to state a claim for business disparagement upon which the Court may grant relief.  The Court should dismiss Van Dyke's business disparagement claim pursuant to FED. R. CIV. P 12(b)(6).

---

[36]     "Plaintiff contends as an alternative theory of recovery that Retzlaff is liable to him for business disparagement."  (TAC ¶ 6.12.)

[37]     Under the *New York Times* standard, "actual malice" means the statement was made with actual knowledge of its falsity or with reckless disregard for the truth.  *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964.)

[38]     *See* discussion of Van Dyke's libel claim supra, ¶¶ 29-31, under the heading "Van Dyke Fails to Sufficiently Plead Actual Malice."

[39]     "Retzlaff published the statements with malice because he (i) knew the statements in question were false; (2) acted with reckless disregard fir whether the statements were true; (3) acted with ill will; or (4) intended to interfere with Plaintiff's economic interests."  (TAC ¶ 6.15.)

### F. Van Dyke Fails to State a Valid Claim for Intrusion On Seclusion

64.     Van Dyke's formbook recitation of the elements of a claim for intrusion upon seclusion (TAC ¶¶ 6.18-6.20)  provides no facts showing how Retzlaff allegedly committed this tort except to allege that Retzlaff "contacted [Van Dyke's] private employer for the purpose of having [Van Dyke's] employment terminated."   Actionable "intrusion" has been held to include wiretapping,[40] putting a camera in plaintiff's bedroom without permission,[41] making harassing phone calls,[42] entering a home without permission,[43] and searching an employee's personal locker and her purse.[44]   If the intrusion involves a public place or public matters, the defendant is not liable.   *See, e.g.*, ***Floyd v. Park Cities People, Inc.***, 685 S.W.2d 96, 97-98 (Tex. App.—Dallas 1985, no writ). No authority supports an "intrusion upon seclusion" by making written comments about a person's qualifications or fitness to be a Texas lawyer or to be employed in a particular job.

65.     Van Dyke fails to state a claim for intrusion on seclusion upon which the Court can grant relief.  The Court should dismiss this claim pursuant to FED. R. CIV. P 12(b)(6).

---

[40]      ***Billings v. Atkinson***, 489 S.W.2d 858, 860 (Tex. 1973).
[41]      ***Clayton v. Richards***, 47 S.W.3d 149, 156 (Tex. App.—Texarkana 2001, pet. denied).
[42]      ***Household Credit Servs. v. Driscoll***, 989 S.W.2d 72, 84-85 (Tex. App.—El Paso 1998, pet. denied).
[43]      ***Gonzales v. Southwestern Bell Tel. Co.***, 555 S.W.2d 219, 222 (Tex. App.—Corpus Christi 1977, no writ).
[44]      ***K-Mart Corp. v. Trotti***, 677 S.W.2d 632, 637-38 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

### G. Van Dyke Fails to State a Valid Claim for Tortious Interference With Existing Contract

66.     To sufficiently state a claim for tortious interference with an existing contract, Van Dyke must plead:

(i)     **Van Dyke had a valid contract**;

(ii)    Retzlaff willfully and intentionally interfered with the contract;

(iii)   Retzlaff's interference proximately caused Van Dyke's injuries; and

(iv)    Van Dyke incurred actual damage or loss.

*Walker*, 938 F.3d at 749, citing *Butnuru v. Ford Motor Co*., 84 S.W.3d 198, 207 (Tex. 2002).  Van Dyke must plead that "some obligatory provision of a contract has been breached."  *Walker*, 938 F.3d at 749, citing *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 361 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).  Van Dyke fails.

67.     Van Dyke failed to allege that Retzlaff induced or caused another party to breach its contract with Van Dyke.  *John Paul Mitchell Sys. v. Randall's Food Markets, Inc*., 17 S.W.3d 721, 730-31 (Tex. App.—Austin 2000, pet. denied).  Inducing a party to do what it had a right to do does not constitute tortious interference. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1977).  The Texas Supreme Court has strongly implied that an at-will employment contract is incapable of being interfered with.  *See El Paso Healthcare Sys. v. Murphy*, 518 S.W.3d 412, 422 (Tex. 2017) (at-will employee of medical practice did not establish that hospital interfered with her employment

by asking medical practice not to schedule her for any shifts because the medical practice was not required to schedule her for any shifts at all).   There is no indication in Van Dyke's complaint that the contract Retzlaff allegedly interfered with was anything other than at-will employment.

68.   Furthermore, a defendant must have actual knowledge of a contract in order to interfere with it.   ***Frost Nat'l Bank v. Alamo Nat'l Bank***, 421 S.W.2d 153, 156 (Tex. App.—San Antonio 1967, writ ref'd n.r.e.).   Van Dyke does not allege that Retzlaff subjectively knew of any "contract" with Van Dyke's employer, much less induce its breach.   The failure to plead a breach of contract requires dismissal under Rule 12(b)(6).

> **[Plaintiff] does not identify an actual breach of the contract.  Rather, his actual complaint appears to be that his contract was not renewed at the end of its term.**

***Walker***, 938 F.3d at 749.   Van Dyke pleads only that Retzlaff's interference caused the loss of Van Dyke's employment by the law firm of Karlseng, Leblanc, & Rich, LLC.   (TAC ¶ 6.23.)   This is not enough.

69.   Van Dyke fails to state a claim for tortious interference with existing contract upon which the Court can grant relief.   The Court should dismiss this claim pursuant to Fed. R. Civ. P 12(b)(6).

### H. Van Dyke Fails to State a Valid Claim for Tortious Interference With Prospective Relations

70.    To sufficiently state a claim for tortious interference with prospective relations, Van Dyke must plead:

(i)    **There was a reasonable probability that Van Dyke would have entered into a business relationship with a third person**;

(ii)    Retzlaff intentionally interfered with the relationship;

(iii)    Retzlaff's conduct was independently tortious or unlawful;

(iv)    Retzlaff's interference proximately caused Van Dyke's injury; and

(v)    Van Dyke incurred actual damage or loss.

*Coinmatch Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). Van Dyke's complaint is deficient in at least two important ways.

71.    First, the only *prospective* relationship Van Dyke alleges Retzlaff interfered with is the *existing* relationship with Karlseng, Leblanc, & Rich.  (TAC ¶ 6.27.)  Van Dyke cannot transmute the *existing* relationship with KLR into a *prospective* one merely for the purpose of adding a new tort.  If he could, every existing contract would also become the basis of a claim for tortious interference with prospective relationships, and the two torts would cease to be distinct.

72.    Second, the conduct Van Dyke contends was "independently tortious" is the other torts Van Dyke alleges, augmented by the claim that Retzlaff "criminally harassed" Van Dyke.  Retzlaff does not repeat the argument and authorities cited above.  The Court should dismiss Van Dyke's claim pursuant to FED. R. CIV. P 12(b)(6).

## I. Van Dyke Fails to State a Valid Claim for Intentional Infliction of Emotional Distress

73.     To sufficiently state a claim for intentional infliction of emotional distress ("IIED"), Van Dyke must plead:

(i)      Retzlaff acted intentionally or recklessly;

(ii)     Retzlaff's conduct was extreme and outrageous;

(iii)    Retzlaff's actions caused the plaintiff emotional distress; and

**(iv)    the resulting emotional distress was severe.**

***Kroger Tex. Ltd. P'ship v. Suberu***, 216 S.W.3d 788, 796 (Tex. 2006).  The Texas Supreme Court has set a high standard for "extreme and outrageous" conduct, holding that this element is satisfied only if the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Hersh*, 526 S.W.3d at 468 (citing ***Kroger Tex. Ltd. P'ship***). Emotional distress is embarrassment, fright, horror, grief, shame, humiliation, worry, and severe emotional distress that is so severe no reasonable person could be expected to endure it.  ***GTE Sw., Inc. v. Bruce***, 998 S.W.2d 605, 618 (Tex. 1999).  Mere worry, anxiety, vexation, embarrassment, or anger are not enough, and there must be a high degree of mental pain and distress.  ***Parkway Co. v. Woodruff***, 901 S.W.2d 434, 443-44 (Tex. 1995).  Van Dyke fails to plead facts showing that statements on a blog or in e-mails are "so outrageous in character, and so extreme in degree," as to be "utterly intolerable in a civilized community."

74.     Furthermore, IIED is a "gap-filler" tort that exists for the "limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Hoffmann-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004).   IIED was "never intended to supplant or duplicate existing statutory or common-law remedies." *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 (Tex. 2005).   The tort's clear purpose is to supplement existing forms of recovery by providing a cause of action for egregious conduct that might otherwise go unremedied.   *See Hoffmann-La Roche*, 144 S.W.3d at 447.   IIED has no application when the actor intends to invade some other legally protected interest, even if emotional distress results.   *Id*. Thus, where the gravamen of a complaint is another tort—such as defamation— IIED is not available as a cause of action. *See Creditwatch*, 157 S.W.3d at 816 (citing *Hoffmann-La Roche*, 144 S.W.3d at 447); *see also Draker v. Schreiber*, 271 S.W.3d 318, 322-23 (Tex. App.—San Antonio 2008, no pet.) (applying *Hoffman-La Roche* where the gravamen of plaintiff's complaint was defamation). If a plaintiff "does not allege facts that are independent of her defamation claim and that could support a claim for IIED," the plaintiff's IIED claim "fails as a matter of law." *Tubbs v. Nicol*, 675 Fed.Appx. 437, 440 (5th Cir. 2017).

75.     Van Dyke fails to state a claim for IIED upon which the Court can grant relief.   The Court should dismiss this claim pursuant to FED. R. CIV. P 12(b)(6).

### J. Van Dyke Fails to State a Valid Claim for Malicious Criminal Prosecution

76.     To sufficiently state a claim for malicious criminal prosecution, Van Dyke must plead:

(i)     A criminal prosecution was commenced against Van Dyke;

**(ii)    Retzlaff initiated or procured the prosecution;**

(iii)   The prosecution was terminated in Van Dyke's favor;

**(iv)   Van Dyke was innocent of the charge;**

(v)     Retzlaff did not have probable cause to initiate or procure the prosecution;

(vi)    Retzlaff acted with malice; and

(vii)   Van Dyke suffered damages as aa result of the prosecution.

***Kroger Tex., L.P. v. Suberu***, 216 S.W.3d 788, 792 (Tex. 2006).

77.     A defendant "initiates" a criminal prosecution by making a formal charge to law enforcement authorities.  A defendant does *not* "initiate" criminal proceedings when the complaint was executed by a police officer and the charging instrument was filed by the prosecutor.  ***Gonzalez v. Grimm***, 479 S.W.3d 929, 936-37 (Tex. App.—El Paso 2015, no pet.).   The affidavit initiating Van Dyke's criminal prosecution was signed by Oak Point Chief of Police Michael Shackleford on January 10, 2019.  **Exhibit 15**.

78.     Van Dyke's pleading that he "has no recollection" of committing the crimes alleged is not a pleading of innocence.  (TAC ¶ 6.33.) Dismissal under Rule 12(b)(6) is warranted if the complaint does not contain sufficient factual matter,

accepted as true, to "state a claim to relief that is plausible on its face." ***Walker***, 938 F.3d at 734.  Furthermore, Van Dyke has already *admitted* guilt.  **Exhibit 16**.

79.   The Court should dismiss Van Dyke's claim of malicious prosecution for failure to state a claim on which the Court can grant relief.

### K. Van Dyke's Unclean Hands Disentitle Van Dyke to Injunctive Relief

80.   To be entitled to injunctive relief, Van Dyke must come to court with "clean hands." ***Bank of Saipan v. CNG Fin. Corp***., 380 F.3d 836, 840 (5th Cir. 1984).  The unclean hands doctrine applies when a plaintiff's conduct "has been unconscientious, unjust, marked by a want of good faith, or violates the principles of equity and righteous dealing." ***Bank of Saipan***, 380 F.3d at 840.

81.   Although Van Dyke now claims he has "no recollection" of sending e-mails to Retzlaff threatening to murder him (TAC ¶ 6.33), Van Dyke was arrested and charged with felony obstruction and retaliation against Retzlaff as a witness in violation of TEX. PENAL CODE § 36.06.  **Exhibit 15**.  The probable cause affidavit quotes two December 12, 2018, e-mails from Van Dyke to Retzlaff unambiguously threatening Retzlaff's murder.  *Id*.  Van Dyke *admitted* to the State Bar there was "legally sufficient evidence" that Van Dyke "made threats of violence" to Retzlaff, thereby "committing criminal acts that reflect adversely on [Van Dyke's] honesty, trustworthiness, or fitness as a lawyer."  **Exhibit 16**.

82.   Because Van Dyke comes to Court with unclean hands, the Court should dismiss Van Dyke's claim for injunctive relief pursuant to FED. R. CIV. P 12(b)(6).

## IV. REQUEST FOR ORAL HEARING

82.    Pursuant to Local Rule CV 7(g), Retzlaff respectfully requests an oral hearing on this motion.  The legal issues are complex, and Retzlaff believes oral argument would materially aid the Court's resolution of the issues.

## V. CONCLUSION

83.    Various issues of law are dispositive against Van Dyke on his claims.  Van Dyke's third amended complaint does not contain sufficient factual matter, accepted as true, to plausibly allege each element of his claims.  *Walker*, 938 F.3d at 734, citing *Iqbal*, 556 U.S. at 678.  Van Dyke's scant and conclusory factual allegations do not "'raise a right to relief above the speculative level.'" *Twombly*, 550 U.S. at 555-56; *see also Walker*, 938 F.3d at 734-35.  Van Dyke's allegations are "merely consistent with [Retzlaff's] liability." *Twombly*, 550 U.S. at 555.  They "stop short of the line between possibility and plausibility of entitlement to relief," and thus are inadequate.  *Id*.

## VI. PRAYER

84.    For these reasons, Retzlaff prays the Court dismiss with prejudice Van Dyke's claims for libel per se, business disparagement, intrusion on seclusion, tortious interference with existing contract, tortious interference with prospective relations, malicious prosecution, intentional infliction of emotional distress, and injunctive relief.  Van Dyke has failed to state any claim upon which relief can be granted.  FED. R. CIV. P 12(b)(6).  Retzlaff prays the Court grant such other and further relief, at law or in equity, as to which he shall show himself justly entitled.

Respectfully submitted,

**HANSZEN ✦ LAPORTE**

By: _____/s/ Jeffrey L. Dorrell_____

**JEFFREY L. DORRELL**
State Bar No. 00787386
Federal ID # 18465
jdorrell@hanszenlaporte.com
**ANTHONY L. LAPORTE**
State Bar No. 00787876
alaporte@hanszenlaporte.com
14201 Memorial Drive
Houston, Texas 77079
Telephone 713-522-9444
FAX: 713-524-2580
**ATTORNEYS FOR DEFENDANT TOM RETZLAFF**

## CERTIFICATE OF SERVICE

I certify that on _____3-1_____, 2020, the foregoing was electronically filed using the Court's CM/ECF filing system, which will provide notice and a copy of this document to the following if a registered ECF filer in the United States District Court for the Eastern District of Texas, Sherman Division.

Mr. Jason Lee Van Dyke
Plaintiff, Pro Se
108 Durango Drive
Crossroads, Texas 76227
Telephone: 469-964-5346
FAX: 972-421-1830
jasonleevandyke@protonmail.com


_____/s/ Jeffrey L. Dorrell_____
**JEFFREY L. DORRELL**