**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| JASON LEE VAN DYKE | § | |
|     Plaintiff | § | |
| | § | |
| v. | § | Case No. 4:18cv247 |
| | § | |
| THOMAS CHRISTOPHER RETZLAFF | § | |
| a/k/a Dean Anderson d/b/a BV Files, Via | § | |
| View Files L.L.C., and ViaView Files | § | |
|     Defendant | § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS PLAINTIFF'S THIRD AMDENDED COMPLAINT UNDER RULE 12(b)(6)**

## I.    INTRODUCTION

1.1    In this case, Plaintiff seeks to hold Thomas Christopher Retzlaff ("Retzlaff")

accountable for repeatedly defaming him and interfering with his legal career on an

ongoing manner since March 2017. Retzlaff and his counsel artfully claim that the kind

of stalking behavior Retzlaff has engaged in is protected by the First Amendment and is

otherwise not legally actionable. Retzlaff's speech is not constitutionally protected and

is legally actionable.

## II.    FACTS

2.1    Plaintiff incorporates by reference herein all of the facts alleged in his third amended

complaint. ECF 113. Both parties have – on numerous occasions – recited the facts

relevant to this case *ad nauseaum* in prior motions before this Court.

## III.    ARGUMENT

### A.    Standard for Dismissal Under Rule 12(b)(6)

3.1    If there was ever a case to be made for defamation in a civil case, it exists here. A

dismissal of this case would be tantamount to a finding by this Court that defamation no

longer exists as a valid cause of action in the United States. A motion to dismiss under Rule 12(b)(6) admits the facts alleged in the complaint but challenges the plaintiff's right to any relief based upon those facts. *Crowe v. Henry*, 43 F.3d 198, 203 (5th Cir. 1995).

3.2     A motion to dismiss under Rule 12(b)(6) should be granted only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. Fed. R. Civ. P. 12(b)(6); *Bell Atlantic Corp v. Twombly*, 550 U.S. 540, 570 (2007). A motion under Rule 12(b)(6) merely tests the legal sufficiency of a complaint, requiring a court to construe the complaint liberally, assume all facts as true, and draw all reasonable inferences in favor of the plaintiff. *Twombly*, 550 U.S. at 556-57. A complaint should never be dismissed because the court is doubtful that the plaintiff will be able to prove all the factual allegations contained therein. *Id*.

**B.     Plaintiff Is Not A Public Figure, Limited Purpose Or Otherwise**

3.3     The question of whether Plaintiff is a limited purpose public figure or a private figure is a question of law for this Court to decide. *Rosenblatt v. Baer*, 383 U.S. 75, 88 n. 15 (1966); *Trotter v. Jack Anderson Enters.,* 818 F.2d 431, 433 (5th Cir. 1987).

3.4     The Fifth Circuit has established a three part test to determine whether Plaintiff is a limited purpose public figure: (a) the controversy must be public – that is, people other than the immediate participants in the controversy must discuss it and must be likely to feel the impact of its resolution; (b) the plaintiff must have more than a trivial or tangential role in the controversy; and (c) the defamation must be related to plaintiff's participation in the controversy. *Trotter,* 818 F.2d at 433-34.

3.5     A controversy is not a public controversy simply because the public is interested in it.

*Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976). Similarly, a matter is not a public controversy simply because it is being litigated a public forum (such as a state court). *Levine v. CMP Publications, Inc.,* 738 F.2d 660, 672 (5th Cir. 1984). To determine whether there is a public controversy, the Court "must examine whether persons actually were discussing some specific question," looking to "see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment." *Waldbaum v. Fairchild Publications Inc.,* 627 F.2d 1287, 1297 (D.C. Cir. 1980).

3.6    Defendant's motion identifies four reasons it claims that Plaintiff was a limited purpose public figure: (a) representation of and leadership in The Proud Boys; (b) employment as a felony prosecutor; (c) twenty years of "racially charged public comments. These paragraphs eight through seventeen of his motion essentially do nothing more than argue Plaintiff is a "bad guy" who has represented controversial clients and advocated controversial causes. But what is the public controversy? Who, other than the participants in the controversy, were likely to feel the impacts of its resolution? How were Retzlaff's statements related to Plaintiff's role in the controversy?  These are essential questions which Retzlaff has completely failed to answer.

### 1.    Plaintiff's Representation and Leadership of the Proud Boys

3.7    In support of his assertion that The Proud Boys is a "violent hate group", Retzlaff cites articles written by highly partisan publications such as *The Huffington Post* and disreputable partisan smear organizations such as the *Southern Poverty Law Center* (which has repeatedly been sued for its 'hate group' designations). He also provides a copy of a press release concerning Plaintiff's temporary leadership of the group during

a transitional period (which occurred over six months after Retzlaff was sued), examples of business formation documents filed by Plaintiff in his capacity as an attorney for the organization, and legal pleading where Plaintiff is not named as a defendant and did not represent the organization in any capacity. In fact, Retzlaff is unable to point to a single instance where Plaintiff represented the group in any type of civil litigation filed in any court. This is because Plaintiff's representation of the group consisted primarily of sending demand letters to media organizations which had libelously characterized the fraternity as a white supremacist organization, a hate group, or a part of the so-called 'alt-right.' See e.g. ECF 129-3.

3.8    The nature of Plaintiff's representation of the group is insufficient to place Plaintiff into the "forefront of a very public issue." It is telling that Retzlaff rarely referred to Plaintiff as a "Proud Boy", a "western chauvinist" (Proud Boys declare themselves to be "western chauvinists who refuse to apologize for creating the modern world), or even as an "extremist": he elected to repeatedly refer to Plaintiff as a Nazi and a white supremacist *despite* the fact that the Proud Boys was and remains a multi-racial fraternity that allows welcomes both straight and gay men as brothers.

3.9    Whatever Plaintiff's association with the Proud Boys is or was, it ultimately has nothing to do with this case. Retzlaff is being sued for procuring the termination of Plaintiff's employment at Karlseng, LeBlanc & Rich LLC ("KLR") and his subsequent interference with Plaintiff's private law practice. There was absolutely no public controversy over his role as a private attorney employed as an associate at a private law firm primarily engaged in title insurance work. Following his termination from that employment due to Retzlaff's actions, there was also no public controversy concerning

his role as a solo practitioner. To the extent that a public controversy ever arose, it was created entirely by Retzlaff.

3.10    To the extent that the Proud Boys was a controversial organization, the controversy was not public in a manner that materially impacted anyone who was not either involved in the organizations or who played an active role in opposing it. Plaintiff's role in any controversy involving the organization was tangential; although he occupied a minor leadership role in a local chapter, his primary role in the organization consisted of practicing law. For this Court to accept Retzlaff's argument concerning Plaintiff's role in The Proud Boys would be akin to a holding that all members and attorneys representing the Freemasons are limited purpose public figures simply because Alex Jones believes that the Freemasons worship Satan and control the government.

## 2.    Plaintiff's Was Never Employed as A Felony Prosecutor

3.11    No thanks to false and defamatory statements made to then-District Attorney Steve Tyler by Retzlaff, there is no dispute Plaintiff was never employed as a felony prosecutor. Although Plaintiff was offered the job and had accepted it, the job offer was rescinded by e-mail approximately twelve days before it was scheduled to begin. An accepted job offer which never began – solely because of Retzlaff's behavior – is insufficient to transform Plaintiff from a private person into a public figure. In any case, his job offer to become a felony prosecutor was in no way related to the false and defamatory material conveyed by Retzlaff to his employers at KLR, his clients, or on his "BV Files" blog.

## 3.    Plaintiff's Supposed History of Commentary Does Not Make Him A Public Figure

3.12    Retzlaff lists the following events as the basis for Plaintiff's supposed status as a public

figure (a) conservative activism while a college student at Michigan State University;

(b) emcee of a speech by Chris Simcox at Michigan State University; (c) representation

of victims of revenge pornography; and (d) authoring of an appellate brief with another

attorney. Once again, none of these activities (some of which were eighteen years old at

the time the defamation in this case occurred) were part of a public controversy where

Plaintiff was practicing law. It had nothing to do with Plaintiff's role as a private

attorney working for a private law firm primarily engaged in real estate title work. Each

of these controversies had taken place years earlier, most of them occurred in Michigan

rather than Texas, and they were not the subject of any significant public discussion or

debate at the time Retzlaff made his false and defamatory statements.

#### 4.    *Gertz* and its Progeny

3.13    The most analogous case to most of Plaintiff's activities referenced in the motion to

dismiss is *Gertz v. Robert Welch*. 418 U.S. 323 (1974).  In *Gertz*, an attorney

representing a victim of police brutality hired Gertz to represent them in civil litigation

against the office. *Id*. at 325. As a result of his representation of the victim's family in a

highly-public case, the Respondent published that Gertz was a "Leninist", a

"Communist-fronter", and a leader of the National Lawyers Guild (which is categorized

as a communist organization). *Id*. at 326. Just as in this case, the defendant asserted that

Gertz could not show falsity or demonstrate actual malice. *Id*. at 327 – 328. Despite his

participation in a public and controversial case, the U.S. Supreme Court decidedly

found that Gertz was not a public figure. *Id.* at 351. It held that "absent clear evidence

of general fame or notoriety in the community, and pervasive involvement in the affairs

of society, an individual should not be deemed a public [figure]." *Id*. at 352.

3.14   In the case at bar, Retzlaff is attempting to do to Plaintiff the exact same thing that the Birchers attempted with Elmer Gertz; to take Plaintiff's representation of politically controversial clients, coupled with random partisan articles spread out over a twenty year period, and use them as a conduit to turn an otherwise private individual into a limited purpose public figure – without even arguing that the public controversy was and how *all* of his many varied false and defamatory statements had any relationship to it. The Supreme Court could have found that, in accepting a controversial civil case involving police brutality, Gertz thrust himself to the forefront of a public controversy in order to influence the resolution of issues involved; it declined to do so. *Id*. Yet, by replacing the words "Leninist" and "Communist" with "Nazi" and "white supremacist," Retzlaff is asking this Court to reach a different conclusion in the case at bar. It should decline to do so.

3.15   Following its holding in *Gertz*, the U.S Supreme Court further narrowed the margin for individuals who could be considered public figures. In *Wolston v. Readers Digest Association*, Wolston was subpoenaed to appear before a grand jury concerning a Soviet espionage investigation but failed to appear. 443 U.S. 157, 161-62 (1979). After being cited for contempt and given a suspended sentence, the Reader's Digest Association published a book identifying him as a Soviet agent operating in the United States. *Id*. at 188. While the lower courts found that his plea of guilty to the contempt citation made him a limited purpose public figure for the purpose of the controversy surrounding Soviet espionage in the United States, the U.S. Supreme Court held that he was not a public figure. *Id*. at 165 – 69.

3.16   A similar question was considered by the U.S. Supreme Court the same year in

*Hutchinson v. Proxmire*; except that this time the plaintiff had, in fact, "thrust" himself

into the center of a public controversy. 443 U.S. 111, 135-136 (1979). In that case, a

scientists who had studied why certain animals clench their jaws received a facetious

"Golden Fleece of the Month" award from a Wisconsin senator and subsequently sued

for defamation. *Id*. at 117. The district court found that the plaintiff was a public figure

by virtue of his having participated in publicly funded research and the fact that his

research had received press coverage and the Seventh Circuit affirmed. *Hutchinson v.

Proxmire*, 431 F. Supp. 1311, 1327 (W.D.Wisc. 1977), *aff'd* 579 F.2d 1027 (7th Cir.

1978). However, the U.S. Supreme Court reversed the Seventh Circuit, finding that the

plaintiff's notoriety and access to the media came about only as a result of the

defendant's libelous remarks. 443 U.S. at 135-136. It also determined that his published

writings did not make him a public figure because they were only read by a relatively

small group of scientists. *Id*. at 135.

3.17    Once again, both *Wolston* and *Hutchinson* are both analogous to this case. Retzlaff is

seeking a proclamation by this Court that Plaintiff is a limited purpose public figure

who, on a whim, can be referred to practically anything other than a gentleman. The

libelous blog post by Ken White draws a perfect analogy to Hutchinson: The "Popehat"

article by Ken White came into existence in the controversy surrounding the rescission

of Plaintiff's job offer with the Victoria County District Attorney. Retzlaff has admitted

to procuring that rescission – and thus allegedly creating the public controversy – in the

same way to outside influencers procured public controversy in *Wolston* and *Hutchison*.

A copy of this admission is attached as Exhibit "1" and incorporated by reference

herein. If Retzlaff had left Plaintiff alone and not elected to interfere with his career,

there would have been no litigation against the Victoria County District Attorney and no public controversy. Now, three years after Retzlaff began stalking him, Plaintiff is before this Court and *still* trying to obtain a legal remedy that will compel Retzlaff to leave him alone.

3.18    This case also differs from a typical defamation case because the typical case involves a plaintiff suing a defendant for making a single publication containing a single false statement of material fact. This makes it relatively easy for a court to look at what was published, determine the existence of a public controversy, determine the plaintiff's role in that controversy, and decide whether the defamatory statement was somehow related to the controversy.

3.19    In this case, Retzlaff made numerous false and defamatory statements, all of which were highly varied in nature, and did so for a period of several years. Retzlaff's argument concerning Plaintiff's status as a public figure reads as though he *only* stated that Plaintiff was a "Nazi" or a "white supremacist". While Retzlaff is astute in realizing that Plaintiff will not continue to tolerate such characterizations, the argument ignores the multiple other instances of libel which Retzlaff has demonstrably committed: Retzlaff has repeatedly referred to Plaintiff as a pedophile and a drug addict. He has claimed that Plaintiff is involved with revenge pornography, that he has a criminal record for abusing women, that he has sent unwanted pictures of his penis to third parties, and that he tampered with a witness in a criminal case by having a homosexual relationship with him. Retzlaff has failed to identify any public controversy with respect to these additional false allegations, and furthermore, has failed to tie those statements to a public controversy as required by *Trotter*.

**B.**      **Plaintiff Has Stated A Valid Claim for Libel Per Se**

**1.**      **Retzlaff Made His False Statements With Actual Malice**

3.20    "Actual malice" is "the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true." *Duffy v. Leading Edge Products, Inc.,* 44 F.3d 308, 313 (5th Cir.1995) (quoting *Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex. 1989)(citations omitted)). "Reckless disregard" has been defined as "a high degree of awareness of probable falsity" that the plaintiff shows by presenting "'sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' An error in judgment is not enough." *Carr*, 776 S.W.2d at 571 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

3.21    The following evidence has previously been shown to constitute actual malice with regard to the truth of a statement: (1) circumstantial evidence establishing that the defendant entertained serious doubts about the truth of the statement; See e.g. *Harte-Hanks Comms. v. Connaughton*, 491 U.S. 657, 688 (1998); (2) obvious reasons to doubt the veracity of a statement; *St. Amant*, 390 U.S. at 732; (story based wholly on unverified anonymous informant may establish recklessness); (3) the publisher's purposeful avoidance of the truth. *Bentley v. Bunton*, 94 S.W.3d 561, 599 (Tex. 2002) (purposeful avoidance of the truth enough to establish actual malice); and (4) denial of the allegations by a plaintiff combined with circumstances where the defendant admitted that he "really couldn't get anything" on a plaintiff. *Id.* at 600-601.

3.22    When the U.S. Supreme Court decided *Twombly*, it interpreted Federal Rule of Civil Procedure 8(a)(2) to require the plaintiffs in an antitrust action to state a "plausible" claim of conspiracy. 550 U.S 554 (2007). Rule 8(a)(2) reads as follows: "A pleading

that states a claim for relief must contain: . . . a short and plain statement of the claim

showing that the pleader is entitled to relief . . . ." Prior to *Twombly*, the standard for

determining whether a complaint was sufficient under Rule 8(a) had been articulated in

*Conley v. Gibson*: "[A] complaint should not be dismissed for failure to state a claim

unless it appears beyond doubt that the plaintiff can prove no set of facts in support of

his claim which would entitle him to relief." 355 U.S. 41 (1957). The Court in *Twombly*

"retire[d]" the Conley standard, substituting a test that requires plaintiffs to plead

"enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 563.

However, the Supreme Court specifically stated that the plausibility requirement "does

not impose a probability requirement at the pleading stage," nor does it "apply any

'heightened' pleading standard." *Id*. at 556, 569 n. 14. A subsequent holding in *Iqabl*

would apply the *Twombly* standard to all cases. 556 U.S. 662 (2009). As the *Iqbal* court

specifically addressed Rule 9(b), it was at this point that a plaintiff must do more than

generally assert a state of mind. *Id*.

3.23    Unfortunately, the actual malice element of a defamation case has always been

understood as an evidentiary matter to be proved at trial or disposed of on summary

judgment. 2 *Rodney A. Smolla, Law of Defamation* § 12:75 (2d ed. 2015). This is

because, when the defendant's state of mind is an element of a cause of action, that

state of mind must generally be inferred from objective evidence (in the absence of an

admission by the defendant). On the question of actual malice, Plaintiff goes further as

he pleads as follows verbatim:

> "With regard to making these statements, Retzlaff was acting with actual malice
> because Retzlaff not only knew they were false at the time they were made, but
> he has made and is continuing to make these statements as factual assertions
> concerning Plaintiff while purposefully avoiding the truth. Retzlaff knew, and

> continues to know, that all of these allegations concerning Plaintiff are false. Despite actual knowledge of their falsity, he originally posted many of these statements – without regard to their truth – for the sole purpose of causing the termination of Plaintiff's employment and destroying Plaintiff's legal career. Once Plaintiff's legal career had undisputedly ended, he continued posting similar materials for the sole purpose of mentally tormenting Plaintiff and ensuring that, in addition to never practicing law again, he could never get a job outside the practice of law either" ECF 113, ¶ 6.9

Retzlaff believes that it is a fatal omission that it was not plead *how* Retzlaff knew that the statements were false. However, Plaintiff has not plead that Retzlaff is just a dopey member of the media who acted recklessly with his use of informants: Plaintiff's Third Amendment Complaint demonstrates that Retzlaff is a dangerous and vindictive sociopath who has repeatedly told outrageous lies about Plaintiff for the purpose of accomplishing a specific goal: the destruction of Plaintiff's law practice and ability to earn an income. While ill will is not dispositive of the question of actual malice, it remains relevant to the issue and is clearly plead. See *Bentley*, 94 S.W.3d at 596; *Belo Corp. v. Publicaciones Paso Del Norte, S.A. de C.V.,* 243 S.W.3d 152, 159 (Tex. App. – El Paso 2007, pet. denied

3.24    In *Palin v. New York Times*, the 2nd Circuit Court of Appeals reversed a district court that had granted dismissal of a plaintiff's defamation claim under similar circumstances. 940 F.3d 804 (2d Cir. 2019). The Court found that Palin's legal theory – that defendant had a pre-determined argument that he wanted to make in the editorial which led him to publish a statement he knew to be false – was sufficient to plead actual malice. *Id*. at 813. This almost exactly what Plaintiff has plead: that Retzlaff published these statements with full knowledge of their falsity and that he was motivated to do so by his goal of destroying Plaintiff's career and tormenting Plaintiff. See also ECF 113, ¶ 5.38, 6.3, and 6.9.

3.25   Actual malice is sufficiently plead in this case for the same reason that the 2nd Circuit

accepted it in the *Palin* case: Plaintiff's pleadings demonstrate that Retzlaff had a very

specific goal, and that goal led him to publish numerous statements that he knew to be

false.

### 4.   Retzlaff's Libelous Statements Are Not Opinion or Hyperbole

3.26   A defamatory statement, under Texas law, is one that injures a person's reputation. See

*Bedford v. Spassoff*, 520 S.W.3d 901, 905 (Tex. 2017); *Hancock v. Variyam*, 400

S.W.3d 59, 62 (Tex. 2013). See also *Nunnally & Franklin, 1 Tex. Prac. Guide Torts* §

1:33 (Dec. 2018 update) (discussing defamation under Texas law). Texas law also

provides for liability if the "gist" of a collection of statements conveys a false and

defamatory impression, even if each statement is literally correct. See *Turner v. KTRK*

*Television, Inc.,* 38 S.W.3d 103, 116-17 (Tex. 2000).

3.27   A statement is defamatory *per se* if, on its face, the statement falls within the statutory

definition of libel. *Gartman v. Hedgpeth*, 157 S.W.2d 139, 140-41 (Tex. 1941). To fall

within the statutory definition, a statement must: (a) injure a living person's reputation

and thus expose the person to public hatred, contempt, or ridicule; (b) impeach a

person's honesty, integrity, virtue, or reputation; or (c) publish a person's natural

defects and thus expose the person to public hatred, ridicule, or financial injury. Tex.

Civ. Prac. & Rem. Code § 73.001.

3.28   A statement is also considered defamatory *per se* in Texas if it falls into one of the

following categories: (a) A statement that injures a person in his office, profession, or

occupation; *Hancock*, 400 S.W.3d at 64. (b) A statement that falsely charges a person

with the commission of a crime; *KTRK TV*, 409 S.W.3d at 690. (c) A statement that

imputes that a person presently has a loathsome disease; *Memon v. Shaikh*, 401 S.W.3d

407, 421 (Tex. App. – Houston [14th Dist.] 2013). and (d) A statement that imputes

sexual misconduct. *Id*. A statement that is not obviously hurtful on its face and requires

extrinsic facts or circumstances to explain its defamatory nature is defamation *per*

*quod. Id*.

3.29     The Texas Supreme Court has adopted the test used by the *Milkovich* court in

determining whether a statement is actionable in defamation. *Bentley*, 94 S.W.3d at

579. In his motion to dismiss, Retzlaff argues that the statements on his blog are either

pure opinion or rhetorical hyperbole. However, the *Milkovich* court held that the First

Amendment does not demand an inquiry into whether a statement is opinion or fact,

because existing constitutional doctrine adequately secures freedom of expression

without the need to create an artificial dichotomy between the two. *Milkovich*, 497 U.S.

at 19. Under the test set out in *Milkovich* and adopted by *Bentley*, an opinion (like any

other statement) can be actionable in defamation if it expressly or impliedly asserts

facts that can be objectively verified. See e.g. *Milkovich*, 497 U.S. at 18-19; *Bentley*, 94

S.W.3d at 580.

3.30     When Retzlaff states that "In my opinion, Van Dyke is a Nazi", "In my opinion, Van

Dyke is a Nazi drug addict", or "[w]e will post more later about Denton attorney Jason

Van Dyke and our efforts at identifying ALL of his clients, as well as the court records

regarding him being a pedophile", he has implied knowledge of facts which lead to the

conclusion the Plaintiff is, in fact, a Nazi, a drug addict, or a pedophile respectively.

Retzlaff cannot escape this implication by couching his statements in terms of opinion

or rhetorical hyperbole, using ridiculous graphics near where these statements are

published, publishing them in conjunction with taunts, or claiming that the entire blog is meant to be silly and fun. Plaintiff's employers certainly did not see it this way. See Exhibit "2".

**5.** **Referring to Plaintiff As a "Nazi" or "White Supremacist" Is Defamatory *Per Se***

3.31 Courts around the country have recognized that whether a statement is "defamatory" must be measured by current social norms. It was once defamatory to falsely identify a white person as African American. In *Flood v. News & Courier Co.*, the court held that "to call a white man a negro affects the social status of the white man so referred to." 50 S.E. 637, 639 (S.C. 1905). While a holding of this nature is outrageous by twenty first century standards, it was not until forty years ago that courts began rejecting claims for defamation based upon racial misidentification. The courts held "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Thomason v. Times-Journal, Inc.*, 379 S.E.2d 551, 553, *quoting Palmore v. Sidoti*, 466 U.S. 429, 422 (1984). See also: *Albright v. Morton*, 321 F.Supp. 2d 130, 138 (D. Mass. 2004) (discussing defamation law and stating that "statements falsely linking a plaintiff to racial, ethnic, or religious groups, which plainly would not qualify as defamation today) *Polygram Records Inc. v. Super. Ct.,* 170 Cal. App. 3d 543, 557 (Cal. 1985) (rejecting claim based on supposed association of Plaintiff's brand of wine with African Americans).

3.32 Similarly, courts have increasingly rejected previous rulings that allegations of homosexuality are defamatory *per se*. In *Amrack Prods. Inc. v. Morton*, the First Circuit rejected a defamation claim based upon an allegedly false claim of homosexuality. 410 F.3d 69 (1st Cir. 2005). Many other courts have rejected defamation claims based upon

homosexual conduct finding, for example, that "the fact of [prejudice] on the part of

some does not warrant a judicial holding that gays and lesbians, merely because of their

sexual orientation, belong in the same class of criminals." *Hayes v. Smith*, 832 P.2d

1022, 1025 (Colo. App. 1991). See also: *Donovan v. Fiumara*, 442 S.E.2d 572, 580

(N.C. Ct. App. 1994) (finding that allegations of homosexuality are defamation *per

quod* rather than defamation *per se*); *Albright*, 321 F. Supp. 2d at 138 (rejecting

homosexuality as the basis of a claim for defamation per se); *Yonaty v. Mincolla*, 97

A.D.3d 141, 145-46 (N.Y.App. Div. 2012) (rejecting a defamation claim concerning

homosexuality based upon the "prevailing attitudes of the community" and the

"tremendous evolution in social attitudes regarding homosexuality").

3.33   Shortly after World War II and during the Cold War, courts held that misidentifying

someone as a communist was defamatory per se. *Utah State Farm Bureau Fed'n v.

Nat'l Farmers Union Serv. Corp.*, 198 F.2d 20, 23 (10th Cir. 1952) (noting the "temper

of the times" in holding that identifying someone as "communist" or a "communist

sympathizer" is defamatory per se). When considering that openly socialist individuals,

such as Bernie Sanders, are serving in the United States Congress and making credible

runs for the presidency of the United States, it is highly probable that prevailing

attitudes towards communism in the twenty-first century, and evolving social norms

concerning communist ideas, would doom a defamation claim by a person claiming to

have been defamed as a "communist" or "communist sympathizer". Referring to

someone as a Nazi or a white supremacist, in modern society, is certainly the type of

statement that meets the criteria for defamation *per se* under the Texas statute. See

*supra* ¶  3.27 – 3.28.  Such claims are certainly as independently verifiable today (if not

more so) as claims concerning communism were in 1954.

3.34    Retzlaff references a lawsuit filed in response to the "Unite the Right" rally in

Charlottesville, Virginia. ECF 129-5. Plaintiff would show this Court that the white

supremacist violence in Charlottesville, Virginia in August of 2017 was an event which

changed the national conversation on issues of race and white supremacy especially. He

also expects this Court to take judicial notice of facts concerning the Proud Boys. That

being the case, this Court can also take judicial notice of mainstream news reports of

individuals being discharged from the U.S. military, losing civilian jobs, being forced

off social media, being harassed in public places, or having their homes or businesses

vandalized following allegations – true or untrue - of Nazism or white supremacy by

individuals like Retzlaff who are objectively lack any credibility. For example, on

December 26, 2019, there was a report of two members of the national guard receiving

a general discharge (rather than an honorable discharge) following reports from an

Atlanta based "antifascist" group that the two were involved in white supremacist

activity. A copy of that article is attached hereto as Exhibit "3" and incorporated by

reference herein.

3.35    When a court categorizes statements as defamatory per se, it reinforces general societal

disapproval of people described in the manner of the offending speech. This was a

problem for courts when they are asked to uphold such implications of societal scorn

for homosexuals and people of color. While white supremacy and anti-Semitism may

have been acceptable when *Flood* was decided in 1905, such views have reached a

level of scorn in the 21st century similar to that reserved for murderers and thieves. Just

as evolutions in social attitudes have led to the acceptance of those who used to be

scorned, they have resulted in the condemnation of "Nazis" and other white
supremacists as being akin to criminals. The Court should recognize this societal
change and find that wrongful references to an individual as a "Nazi" or "white
supremacist" as legally actionable as defamation *per se*. Doing so would not buck
judicial trends: it would validate societal disapproval of Nazis and other forms of
racism while holding sociopaths like Retzlaff accountable when they make make such
claims falsely, recklessly, and with malicious intent.

3.36   Court have already recognized, at least implicitly, that similar terms can form the basis
for a defamation claim. In *Armstrong v. Shivrell*, a disbarred attorney was sued for
defaming a student activist at the University of Michigan. 596 Fed.Appx. 433 (6th Cir.
2015). Shivrell made the same arguments concerning opinion and rhetorical hyperbole
that Retzlaff makes in his motion. The 6th Circuit found that "the vast majority of
Shirvell's statements were capable of defamatory meaning because they can reasonably
be interpreted as conveying actual facts. The common usage of Shirvell's words does
not suggest that they are commonly understood as loose, figurative, or
hyperbolic. **Courts have held that words like "liar" and "racist" have clear, well
understood meanings, which are capable of being defamatory**." *Id*. at 442
(emphasis added, quoting *Milkovich* at 1; *Taylor v. Carmouche*, 214 F.3d 788, 793-94
(7th Cir. 2000); and *Connaughton v. Harte Hanks Commc'ns, Inc.*, 842 F.2d 825, 840-
41 (6th Cir. 1988)).

### 6.    All of Retzlaff's Other Statements Are Also Defamatory *Per Se*

3.37   Retzlaff is also being sued for repeatedly making factual assertions that Plaintiff is a
drug addict, a pedophile, has a criminal record for abusing women, is involved in

revenge pornography, has bipolar disorder, has syphillis, and has engaged in sexual

misconduct such as a homosexual relationship with a witness and unwanted sexual

solicitation.

3.38    Each and every one of these assertions of fact imputes that Plaintiff has committed a

felony or a crime of moral turpitude (sexual assault of a child, possession of child

pornography, possession of a controlled substance, witness tampering, and assault

causing bodily injury are just a few of the criminal offenses that can be imputed from

these statements). The mere fact that they falsely impute that Plaintiff has committed

crimes of this nature would be sufficient to bring a claim for defamation per se

*regardless* of Plaintiff's occupation.

3.39    These allegations are more serious in light of that fact that, at the time they were made,

Plaintiff was an attorney. To the extent that each of these statements impute a crime,

they also impute a violation of the rules of professional conduct in each jurisdiction

where Plaintiff was licensed to practice. See e.g. *Tex. Discip. R. Prof. Cond*. §

8.04(a)(2). Furthermore, although allegations of drug addiction and mental illness are

not always prosecuted by state bar authorities as *per se* violations of the rules of

professional conduct in the absence of a criminal conviction, they are often used to strip

attorneys of their licenses on the basis that such addictions make them mentally unfit to

practice law.

3.40    To the extent that pedophilia and drug addiction have been treated as "diseases" by

mental health professions in recent years, imputing this type of conduct to Plaintiff also

carries with it the implication that Plaintiff presently has a loathsome disease, which

meets the criteria for defamation per se..

**8.      Defendant's Remedy Under the *Defamation Mitigation Act* Was Abatement, And It Has Been Waived**

3.41    Retzlaff is not entitled to any sort of dismissal due to lack of compliance with the Texas

Defamation Mitigation Act. The entitlement of a defendant to a demand for correction

or retraction is required by Tex. Civ. Prac. & Rem. Code § 75.055. However, the statute

goes on to state that the proper remedy for the failure of a person to comply with

§75.055 is abatement of suit – not dismissal. Tex. Civ. Prac. & Rem. Code § 73.062.

Defendant would have been entitled to abatement of this lawsuit if it had filed a plea in

abatement within thirty (30) days of his original answer. That time has long expired.

3.42    The appropriate question for this Court to consider is whether the legislature's use of

the word "maintain' in § 73.055(a) of the act demonstrates an intent that a plaintiff's

defamation case should be dismissed due to a failure to request correction, clarification,

or retraction. The term "maintain" is not defined by the act, but the common meaning

of the word is "to keep in an existing state" or "to continue or persevere in." See e.g.

*Big Three Welding Equip. Co. v. Crutcher, et. al*, 229 S.W.2d 600, 604 (Tex. 1950);

*Walters v. Livingston*, 514 S.W.3d 763, 767 - 68 (Tex. App. – Austin 2015) (discussing

the legal meaning of the word "maintain" in the context of civil suits).

3.43    This definition of "maintain" is consistent with the right to abate provided by § 73.062:

a defendant who did not receive a request for correction, clarification, or retraction has

the right under the act to move to abate the lawsuit, and after abatement, a plaintiff may

not continue the lawsuit until the request for correction, clarification, or retraction is

served. There is nothing in the statute supporting the assertion that the Texas

Legislature intended to deprive a plaintiff of a defamation claim solely based on a

failure to request a correction, clarification, or retraction.

3.44    The notion that dismissal is an appropriate remedy is also ludicrous when considering

the statute as a whole. Specifically, the statute affords a defendant the right to challenge

the timeliness, as well as the sufficiency, of a request for a correction, clarification, or

retraction. Tex. Civ. Prac. & Rem. Code § 73.058(c). If a plaintiff's claim were subject

to dismissal solely due to his failure to request correction, clarification, or retraction,

there would be no need for a defendant to challenge such a request; the defendant

would simply move to dismiss the case. See *City of Dallas v. TCI West End, Inc.*, 463

S.W.3d 53, 57 (Tex. 2015) (holding that "as a general principle, we eschew

constructions of a statute that render any statutory language meaningless or

superfluous"). Further, if the statute is to be construed as Retzlaff suggests, there would

be no need for either a limitation on damages or an abatement provision.

3.45    Retzlaff has waived his right to avail himself of the abatement provisions of the

Defamation Mitigation Act due to the passage of time. It's only remaining relevance to

this suit is on the issue of damages.

### 9.    Communications Decency Act

3.46    Retzlaff is only being sued for his own comments on the BV Files blog and not those of

any other used.  47 U.S.C. § 230 does not apply.

### 10.    Immunity for Filing State Bar Grievances

3.47    As Plaintiff previous wrote in his response to Defendant's motion for a stay of

discovery, he alleges no cause of action against Retzlaff based on the filing of

grievances but does request injunctive relief as a remedy in this case to prevent further

harassment and stalking behavior by Retzlaff. See ECF 133, ¶ 7 – 9. Retzlaff is been

adjudicated a vexatious litigant in Texas for his abuse of the civil litigation process and

his use of the same as a weapon against those he has wished to torment. Unfortunately, vexatious litigant orders do not apply to disciplinary matters by regulatory agencies and have not stopped him from weaponizing the attorney discipline process against Plaintiff (and others) in the same way that he previously abused litigation.

3.48    Plaintiff has not requested that Retzlaff be completely stripped of his ability to file grievances with the State Bar of Texas. Retzlaff obviously has a legitimate interest in ensuring that *his own* attorney acts in a professional manner, and the relief requested would permit Retzlaff to file a grievance against any attorney hired to represent him. It would also allow a licensed attorney to file a grievance against another attorney on Retzlaff's behalf. See ECF 113, ¶ 7.2. Thus, Retzlaff would still be permitted to file bar grievances against Plaintiff and others; but purely frivolous grievances would be pre-screened by someone who could face professional discipline himself if it were found that he knowingly filed it for a frivolous or improper purpose.

3.49    At trial, Plaintiff intends to demonstrate that Retzlaff is a public menace who has abused the First Amendment, litigation, and bar discipline processes repeatedly. Plaintiff intends to do this by demonstrating that the crux of this case is that Plaintiff has been a victim of stalking by Retzlaff and, in addition to substantially financial compensation for the damage done to his life and career, that he is entitled to injunctive relief (similar to what is contained in family law anti-stalking orders) to prevent at least some of Retzlaff's behavior from continuing as Plaintiff attempts to rebuild his life.

### 11.    Criminal Stalking by Retzlaff

3.50    The question of the constitutionality of the Texas stalking and harassment statutes – which have been repeatedly violated by Retzlaff – remains an open one. The U.S.

Supreme Court had an opportunity to weigh in on the matter, but denied certiorari in *Ogle v. Texas* in October of 2019. Although they have only limited relevance to this case, Plaintiff would show that said statutes are, in fact, constitutional restraints on free speech.

3.51    The last time the Texas Court of Criminal Appeals addressed that harassment statute, it as asked to consider whether Tex. Penal Code § 42.07(a)(4) (telephone harassment) ran afoul of speech protected by the First Amendment. *Scott v. State*, 322 S.W.3d 662 (Tex. Crim. App. 2010), *abrogated on other grounds by Wilson v. State*, 448 S.W.3d 418 (Tex. Crim. App. 2014). While the court held that constitutional guarantees on free speech generally protects the freedom to express ideas, opinions and information, the state may lawfully proscribe conduct that invades the substantial privacy interests of another in an essentially intolerable manner. *Id*. at 668-69. The conduct committed by Retzlaff in this case is another perfect example of conduct invading the substantial privacy interests of Plaintiff in an essentially intolerable manner.

3.52    In the *Barton* case cited by Retzlaff, the state court of appeals in Fort Worth interpreted the *Wilson* case as repudiating the entire holding of the *Scott* case (and thus, opening the door to declare the § 42.07(a)(7) – relating to online harassment - unconstitutional). The Texas Court of Criminal Appeals has yet to weigh in on the findings in *Barton* or any other case challenging the constitutionality of the harassment statute or the stalking statute.

## 12.    Libel Proof Plaintiff Doctrine

3.53    A libel-proof plaintiff is one whose reputation on the matter in issue is so diminished that, at the time of an otherwise libelous publication, it could not be further damaged.

*Langston v. Eagle Publishing Co.*, 719 S.W.2d 612, 621 (Tex.App.--Waco 1986, writ

ref'd n.r.e.). The libel-proof doctrine had its genesis in the Second Circuit decision,

*Cardillo v. Doubleday & Co., Inc.* 518 F.2d 638 (2d Cir. 1975). In *Cardillo*, the

plaintiff, an inmate who was then incarcerated in a federal penitentiary, sued the

publishers of a book entitled, *My Life in the Mafia*, claiming the book was libelous. *Id.*

at 639. The district court dismissed Cardillo's complaint and granted the defendants'

motion for summary judgment on the ground that the publication was protected by the

First Amendment. *Id.* On appeal, Cardillo argued that the court erred in granting the

summary judgment motion because there were disputed issues of fact relating to

whether the statements were privileged. *Id.* at 638. Judge Oakes, writing for the panel

in a three page opinion, summarily disposed of this argument, stating, "[W]e consider

as a matter of law that appellant is, for purposes of this case, libel-proof, i.e., so

unlikely to be able to recover anything but nominal damages as to warrant dismissal of

the case, involving as it does First Amendment considerations." *Id.*  The opinion then

went on to note that Cardillo was presently serving a twenty-one year sentence for

"assorted federal felonies" and had previously been convicted of "numerous minor

infractions of the law in Massachusetts where he lived." *Id.* at 640. Judge Oakes

concluded by stating that he could not "envisage any jury awarding, or court sustaining,

an award under any circumstances for more than a few cents' damages, even if Cardillo

were to prevail on the difficult legal issues with which he would be faced." *Id.*

3.54    Shortly after the holding in *Cardillo*, Judge Oakes re-examined his opinion in a libel case

involving William F. Buckley Jr. – a political commentator far more notorious than

Plaintiff ever could be – and rejected a libel proof plaintiff defense (holding that the

Court's opinion in *Cardillo* was limited to a narrow factual context). *Buckley v. Littell*,

539 F.2d 882 (2d Cir. 1976). Since *Cardillo* and *Buckley,* Courts have generally reserved

the libel-proof plaintiff doctrine plaintiffs who are notorious for past criminal behavior

assert that they have been libeled by communications charging them with identical or

similar behavior. *McBride v. New Braunfels Herald-Zeitung*, 894 S.W.2d 6, 9 ( Tex. App.

-- Austin 1994). However, such allegations are noticeably absent from Retzlaff's motion.

3.55    In Texas defamation cases, evidence of a plaintiff's diminished reputation has been

permitted in mitigation of actual damages. Tex. Civ. Prac. & Rem. Code § 73.003. The

Texas Supreme Court, however, has expressly prohibited evidence of a plaintiff's bad

reputation as admissible to justify a libelous publication. *George Knapp & Co. v.*

*Campbell*, 36 S.W. 765, 769 (Tex. 1896); See also *Bell Publishing Co. v. Garrett Eng'g*

*Co.*, 170 S.W.2d 197, 203 (Tex. 1947) (conflicting testimony on plaintiff's reputation

could not bar libel action). The law presumes that one possesses good character and that

even the limited good reputation of a person of bad character could be worse. *Houston*

*Printing Co. v. Moulden*, 41 S.W. 381, 387 (Tex. 1897); see *Liberty Lobby, Inc. v.*

*Anderson*, 746 F.2d 1563, 1568 (D.C. Cir. 1984). Texas courts, therefore, have

vigorously guarded the right of a citizen to defend his reputation, however tarnished,

from libelous publications. *Finklea v. Jackson Daily Progress*, 742 S.W.2d 512, 516

(Tex. App. – Tyler 1987); *Langston v. Eagle Publishing Co*., 719 S.W.2d 612, 622 (Tex.

App. – Waco 1986); *Fitzjarrald v. Panhandle Pub. Co*., 228 S.W.2d 499, 503 (Tex.

1950).

3.56    To justify applying the doctrine, the evidence of record must show not only that the

plaintiff engaged in criminal or anti-social behavior in the past, but also that his activities

were widely reported to the public. *McBride*, 894 S.W.2d at 10. The evidence on the nature of the conduct, the number of offenses, and the degree and range of publicity received must make it clear, as a matter of law, that the plaintiff's reputation could not have suffered from the publication of the false and libelous statement. *Id*.

3.57    In this case, Retzlaff's arguments that Plaintiff is libel proof fail to account for the most basic argument at the heart of Plaintiff's claim: Plaintiff had a legal career before Retzlaff began criminally stalking him. That career is now destroyed. Plaintiff was employed – twice – before Retzlaff intervened. Once Retzlaff spoke to Plaintiff's supervisors, he became unemployed. Now, due to the online footprint created for him by Retzlaff, Plaintiff can no longer be employed by any business, of any type, in any capacity.

**C.      Retzlaff is Liable to Plaintiff for Business Disparagement**

3.58    Business disparagement is a tort similar to defamation because both involve the imposition of liability for an injury sustained through publication to a third person of a false statement of fact concerning the plaintiff. *In re Lipsky*, 460 S.W.3d at 591; *Astoria Industries of Iowa, Inc. v. SNF, Inc*., 223 S.W.3d 616, 624-25 (Tex. App. – Fort Worth 2007, pet. denied). The difference is that an action for defamation is to protect the personal reputation of an injured party while an action for business disparagement is to protect the economic interests of an injured party. *Hurlbut v. Gulf Atlantic Life Ins. Co*., 749 S.W.2d 762, 766 (Tex. 1987).

3.59    The common-law standard for business disparagement required a plaintiff to prove the defendant's malice in making the statement. However, the element of malice can be met in a business disparagement case by demonstrating knowing falsity, reckless

discard for falsity, **or** acting with ill will or intent to interfere with a plaintiff's interests. *Id*. at 766; *Restatement (Second) of Torts* § 623A (1977).

3.60    The U.S. Supreme Court has required a proof of knowing falsity or reckless disregard for truth – actual malice – in business disparagement cases against a media defendant. See *Bose Corp. v. Consumers Union of United States, Inc*., 466 U.S. 485, 511-14 (1984). The Texas Supreme Court has also assumed, without deciding, that a the *New York Times* standard for actual malice applies to a public figures business disparagement suit against a media defendant. *Forbes Inc. v. Granada Biosciences Inc., 124 S.W.3d 167, 171 (Tex. 2003).* However, it remains unclear whether the common law standard or some other standard applies in cases such as this where the party disparaged is not a public figure, the defendant is not a media outlet, and the disparagement does not involve a matter of public concern. If the common law controls, simple proof of ill will qualifies as a basis of liability. *Hurlbut*, 749 S.W.2d at 766; *Forbes*, 124 S.W.3d at 170.

3.61    In this case, the appropriate standard ultimately matters little. Plaintiff is not a public figure or a limited purpose public figure. Retzlaff is not a media defendant and has not spoken with respect to Plaintiff on a matter of public concern.  Plaintiff has sufficiently plead a *New York Times* actual malice standard. Accordingly, Plaintiff's claim cannot be dismissed under Rule 12(b)(6).

**D.    Defendant Intruded on Plaintiff's Seclusion**

3.62    The elements of intrusion on seclusion are (a) the defendant intentionally intruded on the plaintiff's solitiude, seclusion, *or private affairs*; (b) the intrusion would be highly offensive to a reasonable person; and (c) the plaintiff suffered an injury as a result of

the defendant's intrusion. *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993) (emphasis added). Defendant's motion is quite astute in one respect: Plaintiff *is* suing Retzlaff for contacting his private employer for the purpose of having Plaintiff's employment terminated. However, he is also suing Defendant for sending reams of unwanted e-mails and harassing members of his family and illegally disseminating his private personal information (including his social security number). See ECF 113, ¶ 5.22 – 5.24, 5.32.

3.63   While intrusion on seclusion certainly includes activities such as harassing telephone calls or wiretapping, it has also included "following, spying on, and harassing the plaintiff." *Kramer v. Downey*, 680 S.W.2d 524, 525 (Tex. App. – Dallas 1984, writ ref'd n.r.e). While this does not specifically include contacting a person's private employer for the purpose of having them terminated, such conduct would certainly constitute both harassment and an intrusion onto a person's private affairs. It does not, as Retzlaff argues, involve a public place or public matters: Plaintiff's private employment was of no legitimate concern to Retzlaff, or for that matter, anyone other than Plaintiff, his employers, and his clients. Retzlaff also had no write to continue reaching out to Plaintiff in a harassing manner after he had told Retzlaff, using no uncertain terms, to leave him alone. He certainly had no right to possess or disseminate Plaintiff's social security number, which is a state jail felony in Texas. Tex. Penal Code § 32.51.

3.64   The type of injury alleged by Plaintiff in his claim for intrusion on seclusion with respect to his interference with Plaintiff's private employment is not specifically excluded by any case law that Retzlaff is able to cite. Furthermore, the harassment of

Plaintiff and his family is specifically the type of behavior for which the tort of

intrusion on seclusion is designed to provide financial compensation to stalking victims

such as Plaintiff. Therefore, Plaintiff has presented a claim that is plausible on its face

and cannot be dismissed under Rule 12.

**E –   Tortious Interference With Existing Contract, or Alternatively, with Prospective Relations**

3.65    The Texas Supreme Court has recognized that contracts terminable at will or on notice

may be protected from tortious interference. *Sterner v. Marathon Oil Co.*, 767 S.W.2d

686, 689 (Tex. 1989); *Juliette Fowler Homes, Inc. v. Welch Associates, Inc.*, 793

S.W.2d 660, 666 (Tex. 1990). In Sterner, the court recognized the contractual nature of

an at-will employment relationship for the purpose of a tortious interference claim and

intermediate courts have followed. See e.g. *In re: Swift Transportation Co.*, 311 S.W.3d

484, 489 (Tex. App. – El Paso 2009, no pet. ("Texas courts have for many years

considered an employment-at-will agreement to be a contract"); *Whitehead v.*

*University of Texas Health Science Center at San Antonio*, 854 S.W.2d 175, 180 (Tex.

App. – San Antonion 1993, no writ) ("We do not disagree with the argument that all

employment relationships are implicitly contractual"); *Crouch v. Trinque*, 262 S.W.3d

417, 425-26 (Tex.App.-Eastland 2008, no pet.) (cause of action exists " for tortious

interference with a contract of employment terminable at will").

3.66    Retzlaff's arguments in this context are twofold.  He contends that it cannot be tortious

interference to induce a party what it had a right to do. See *ACS Investors, Inc. v.*

*McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1977). Thus, in *Wal Mart Stores, Inc. v.*

*Sturges*, the Texas supreme court clarified that a claim for wrongful interference with a

prospective contract or business relationship requires proof that the defendant's conduct

was independently tortious. 52 S.W.3d 711, 726 (Tex. 2001). Subsequently, an intermediate court held that a tortious interference claim arising out of a contract terminable on notice involves primarily the prospect of continuing business relationship, and therefore, was property characterized as a claim for tortious interference with a prospective business relationship. Faucette v. Chantos, 322 S.W.3d 901, 914-16 (Tex. App. – Houston [14th Dist.] 2010, no pet.). The supreme court recently implied that this is correct. *El Paso Healthcare System, Ltd. v. Murphy*, 518 S.W.3d 412, 421 n. 6 (Tex. 2017).

3.67    Retzlaff also argues that plaintiff has failed to plead Retzlaff's knowledge of the contract between him and his employer. This argument borders on the absurd. Clearly Retzlaff knew of the employment relationship between Plaintiff and his employer, or he would not have known to send them an email messages demanding Plaintiff termination – or to publish false and defamatory information about Plaintiff's supervisors and co-workers on his blog as a means of procuring Plaintiff's termination.

3.68    It doesn't matter whether Plaintiff's contract was terminable at will. Well settled Texas law establishes that he has a claim either for tortious interference with an existing contract or tortious interference with prospective relations. Ultimately, it is a question of law for the Court concerning which of these two claims Plaintiff will be allowed to proceed with.

**F.        Intentional Infliction of Emotional Distress Is A Valid Alternative Theory**

3.69    Plaintiff is the victim of stalking. This stalking by Retzlaff has left him unemployable.

3.70    Retzlaff's motion asks the Court to dismiss *all* of Plaintiff's other claims against Retzlaff under a 12(b)(6) standard and leave no possibility of legal recompense against

his tormentor. Plaintiff's Third Amended Complaint sets forth a detailed chronological litany of how Retzlaff has tormented him over the course of the past three years. Plaintiff believes that this Court is more than capable of making a determination concerning whether Retzlaff's behavior has arisen to a level that cannot be tolerated in a civilized society.

3.71    Retzlaff is also correct that IIED is a gap filler tort and notes that its purpose is to provide a cause of action for egregious conduct that might otherwise go unremedied. ECF 129 ¶ 74. This is a case where Retzlaff has clearly engaged in egregious behavior that, if Plaintiff's other claims are dismissed, will go unremedied. Accordingly, IIED is plead as an alternative theory to all other forms of recovery.

**G.    Retzlaff Clearly Initiated and Procured A Malicious Prosecution of Plaintiff**

3.72    It is well-settled law that a defendant "initiates" a criminal prosecution by making a formal charge to law enforcement authorities. *Browning-Ferris Indus. v. Lieck*, 881 S.W.2d  288, 292 (Tex. 1994). Evidence that the defendant filed formal charges against the plaintiff is sufficient to show that the defendant initiated the criminal prosecution. *Id*. at 293. The four corners of Michael Shackleford's affidavit in support of an arrest warrant clearly  establish that Defendant initiated a wrongful prosecution against Plaintiff. A defendant "procures" a criminal prosecution if its actions are enough to cause the prosecution and if the prosecution would not have occurred but for its actions. *Id*. at 292; *King v. Graham*, 126 S.W.3d 75, 77 (Tex. 2003).  Either way, Plaintiff's claim survives a motion to dismiss.

3.73    For the purposes of a malicious prosecution lawsuit, a no-bill from a grand jury is legally sufficient to show that a prosecution was terminated in a Plaintiff's favor. See

*French v. French*, 385  S.W.3d 61, 71-72 (Tex. App. – Waco 2012, pet. denied);

*Restatement (2d) of Torts* § 659(b). Plaintiff did not commit the crime and has no

recollection of it. In any case, even if the e-mails were sent, they would not arise to the

level of a criminal offense. Hence, the no bill: Plaintiff is innocent because no crime was

committed and there is no probable cause to believe that a crime was committed.

3.74   The state bar judgment attached does not contain an admission of guilt to the offense of

obstruction or retaliation; it merely contains an admission that the evidence was legally

sufficient to permit the State Bar to make a *prima facie* case. ECF 129-16. Not only was

this not an admission of guilt, but on its face, the judgment references threatening

communications on or around March 1, 2018 – not the supposed December 2018 which

formed the predicate a bogus obstruction and retaliation case.

**H.      Plaintiff Is Entitled to Injunctive Relief**

3.75   While it may be true that Plaintiff was arrested for obstruction or retaliation for e-mails

that he did not send to Retzlaff, he was *never* formally charged. The case was sent to a

Collin County grand jury as a misdemeanor with no true bill of indictment returned.

3.76   The unfortunate truth about the State Bar of Texas is that it often allows complaints for

supposed misconduct that does not violate the disciplinary rules, but which they find

was either personally disagreeable or committed by an attorney with whom they

personally disagree. The process is nothing more than a "kangaroo court" in which no

attorney accused of professional misconduct has a realistic likelihood of prevailing on

the merits of their defense. The case cited by Retzlaff is a perfect example of that: not

only was there no criminal act, but even if there was, the threat of violence by a stalking

victim against his stalker who will not leave them alone is not conduct which has any

relation to an attorney's honesty, trustworthiness, or fitness as an attorney in other respects (certainly not at the term "fitness" is defined in the *Texas Disciplinary Rules of Professional Conduct*).

3.76    This is precisely the type of case in which injunctive relief ought to be granted. Laws exist so that disputes of this nature as settled in a courtroom – not on the street with "pistols at dawn." Retzlaff often refers to himself as "a man who simply cannot be intimidated", yet he has done a great deal of wailing about being threatened. With that having been said, there remain truths in this case which cannot be ignored. It was Retzlaff who made the decision to stalk Plaintiff. It was Retzlaff who caused Plaintiff to be fired from two jobs in a one-year period. It was Retzlaff who caused Plaintiff to be arrested for a felony without probable cause. As of the date of filing this response, Retzlaff is still harassing and stalking Plaintiff. There is *zero* doubt that hostilities between these parties will continue until such a time as law enforcement and the courts compel Retzlaff to leave Plaintiff, his family, and his clients alone.

3.77    Retzlaff would be well advised to refrain from interfering with a man's home, family, and job in the future. However, since he is clearly incapable of behaving like a civilized human being, this Court should grant injunctive relief to put his uncivilized behavior to an end. The failure to issue an injunction in this case will only ensure one thing: continued harassment and additional litigation.

## IV.   ORAL ARGUMENT

4.1    Plaintiff joins in Retzlaff's request for oral argument pursuant to Local Rule CV 7(g).

## V.   CONCLUSION AND PRAYER

5.1    Plaintiff's Third Amended Complaint contains more than sufficient factual allegations

to plausibly allege every element of each of his claims against Retzlaff. When combined with the evidence attached thereto, they raise even more than a right to relief above the speculative level: they raise a probable right to relief. Accordingly, Plaintiff prays that Retzlaff's motion to dismiss be denied in all things.

Respectfully submitted,

/s/ Jason Lee Van Dyke
Jason L. Van Dyke
SBN: 24057426
PO Box 2618
Decatur, TX 76234
P – (940) 305-9242
Email:  jasonleevandyke@protonmail.com

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was electronically filed on the CM/ECF System, which will automatically serve a Notice of Electronic Filing on Jeffrey Dorrell, Attorney for Defendant.

/s/ Jason Lee Van Dyke
JASON LEE VAN DYKE