-IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| JASON LEE VAN DYKE<br>    Plaintiff | §<br>§<br>§ | |
| v. | §<br>§ | Case No. 4:18cv247 |
| THOMAS CHRISTOPHER RETZLAFF<br>a/k/a Dean Anderson d/b/a BV Files, Via<br>View Files L.L.C., and ViaView Files<br>    Defendant | §<br>§<br>§<br>§<br>§ | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT

### I.  FACTS

1. Plaintiff declines to further address *ad nauseaum* the delusions which Retzlaff continues to suffer concerning the facts of this case and Plaintiff's reason for filing it. Plaintiff attaches as Exhibit "1" an unsworn declaration to establish facts not otherwise apparent from the record

2. Plaintiff re-transmitted his first interrogatories to Retzlaff (shortly after the opening of discovery) on January 29, 2020. On March 10, 2020, Plaintiff sent his first request for production to Defendant. Ex. 1, ¶ 2 – 3.

3. On March 15, 2020, Retzlaff amended his responses to Rule 26(A) disclosures in this cause in a manner that was so vulgar and outrageous that it caused Plaintiff to believe they were authored by Retzlaff himself – not his counsel Mr. Dorrell. Ex. 1, ¶ 4 – 5. A copy of these disclosures, which have not been amended since, are attached hereto as Exhibit "2" and incorporated by reference herein. Ex. 1, ¶ 5.

4. Beginning on March 20, 2020, Retzlaff began filing a series of frivolous applications for protective orders against Plaintiff. Ex. 1, ¶ 6. On March 22, 2020, Plaintiff received

    the correspondence attached hereto as Exhibit "3" and incorporated by reference herein from Mr. Dorrell. Ex. 1, ¶ 6. The nature of the offer was that Mr. Retzlaff dismiss his protective order lawsuits in exchange for payment by Plaintiff in the amount of $500,000.00 plus dismissal with prejudice of *this* lawsuit. Ex. 3. The offer was rejected by Plaintiff. Ex. 1, ¶ 6. It should be noted that all of Retzlaff's frivolous protective order applications have now been dismissed, and in fact, the latest dismissal order is with prejudice to refiling due to Retzlaff's outrageous litigation misconduct. A copy of that order, entered by the Honorable Jonathan Bailey on August 13, 2020, is attached hereto as Exhibit "4" and incorporated by reference herein. Ex 1, ¶ 7.

5.     Meanwhile, Retzlaff has failed and refused to participate in discovery in any meaningful way. Ex. 1, ¶ 8. This Court granted a motion to compel answers to interrogatories on April 14, 2020. ECF 153. After the entry of this order, Retzlaff responded to all or substantially all of Plaintiff's discovery by invoking privilege under either the First or Fifth Amendment. A copy of Retzlaff's answers to interrogatories, including all amended responses, is attached hereto as Exhibit "5" and incorporated by reference herein. A copy of Retzlaff's answers to requests for production is attached hereto as Exhibit "6" and incorporated by reference herein. Ex 1, ¶ 8 -11.

6.     After Retzlaff's invocation of his Fifth Amendment privilege, Plaintiff filed a motion with this Court for an oral examination of Retzlaff concerning his invocation of the privilege. ECF 164. This Court has not yet made a ruling with respect to whether Mr. Retzlaff's invocation of privilege is valid or what, if any, consequences he should face in this case based upon his invocation of privilege.

7.     Plaintiff made further attempts to investigate his claim for malicious prosecution by

Retzlaff by issuing subpoenas for his communications with the Denton County District Attorney. This court entered an order quashing that subpoena pursuant to the law enforcement privilege. ECF 180.

## II. ARGUMENT

**A.  Retzlaff Cannot Use The 5th Amendment as Both a Shield and a Sword**

8. The Fifth Amendment privilege against self-incrimination may "be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory." *Kastigar v. United States*, 441 U.S. 441, 445 (1972).

9. The privilege protects witnesses from being compelled to provide testimony "which would furnish a link in the chain of evidence needed to prosecute the claimant" for a crime. *United States v. Hubbell*, 504 U.S. 27, 37 (2000) (quoting *Hoffman v. United States,* 341 U.S. 479, 485 (1951)). The privilege may be asserted both in response to written discovery and oral testimony. See e.g. *Davis-Lynch v. Moreno*, 667 F.3d 539, 547 (5th Cir. 2012). If the self-incriminatory impact of the question is not apparent on its face, the trial court must determine why a question would lead the witness to give potentially incriminating information. *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976).

10. Unlike criminal proceedings, if a court upholds a party's invocation of privilege in a civil case, it may instruct the jury that it may draw an adverse inference from the defendant's invocation of the Fifth Amendment: e.g. the jury may presume that, had the defendant testified, the testimony would have been harmful to him. *Baxter v. Palmiginano*, 425 U.S. 308, 318 (1976); *FDIC v. Fidelity & Dep. Co.*, 45 F.3d 969 (5th Cir. 1995). In fact, when a witness's invocation of the Fifth Amendment privilege is of

substantial probative value (as it is in this case), prohibiting evidence of such invocation may be an abuse of discretion. *Hinojosa v. Butler*, 547 F.3d 285, 293 – 95 (5th Cir. 2008).

11. Retzlaff has asserted his rights under the Fifth Amendment to waive himself from any kind of meaningful participation in discovery. Now, based his invocation of privilege and failure to participate in discovery, he has moved for summary judgment – asserting that Plaintiff has no evidence in support of his claims. Instead of using the Fifth Amendment as a shield to protect himself from revealing potentially incriminating information, Retzlaff is now using it as a sword on summary judgment. This Court should resolve this issue by giving Retzlaff the choice of either: (a) waiving his Fifth Amendment privilege and providing meaningful answers to Plaintiff's discovery; or (b) continuing to invoke the privilege, and permitting a jury to make what it will of such invocation of privilege.

12. It should not escape this Court's notice that the portion of Retzlaff's motion for summary judgment pertaining to libel relates only to the statements made concerning Plaintiff that were located on Defendant's "BV Files" blog (located at www.viaviewfiles.net). Retzlaff completely fails to address the electronic mail communications sent under his "Dean Anderson" pseudonym to Plaintiff's former employer at Karlseng, LeBlanc & Rich L.L.C. ("KLR"). This correspondence is specifically made a portion of Plaintiff's defamation claim, as well as his claim for tortious interference with prospective relations. Retzlaff has apparently abandoned the most untenable portion of his defense, which is that he never made these publications in the first place.

**B.     Retzlaff's Statements Are Not Mere Opinion or Rhetoric Hyperbole; They Are Defamatory Statements of Fact**

13.  A defamatory statement, under Texas law, is one that injures a person's reputation. See *Bedford v. Spassoff*, 520 S.W.3d 901, 905 (Tex. 2017); *Hancock v. Variyam*, 400 S.W.3d 59, 62 (Tex. 2013). See also *Nunnally & Franklin, 1 Tex. Prac. Guide Torts* § 1:33 (Dec. 2018 update) (discussing defamation under Texas law). Texas law also provides for liability if the "gist" of a collection of statements conveys a false and defamatory impression, even if each statement is literally correct. See *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 116-17 (Tex. 2000).

14.  A statement is defamatory *per se* if, on its face, the statement falls within the statutory definition of libel. *Gartman v. Hedgpeth*, 157 S.W.2d 139, 140-41 (Tex. 1941). To fall within the statutory definition, a statement must: (a) injure a living person's reputation and thus expose the person to public hatred, contempt, or ridicule; (b) impeach a person's honesty, integrity, virtue, or reputation; or (c) publish a person's natural defects and thus expose the person to public hatred, ridicule, or financial injury. Tex. Civ. Prac. & Rem. Code § 73.001.

15.  A statement is also considered defamatory *per se* in Texas if it falls into one of the following categories: (a) A statement that injures a person in his office, profession, or occupation; *Hancock*, 400 S.W.3d at 64. (b) A statement that falsely charges a person with the commission of a crime; *KTRK TV*, 409 S.W.3d at 690. (c) A statement that imputes that a person presently has a loathsome disease; *Memon v. Shaikh*, 401 S.W.3d 407, 421 (Tex. App. – Houston [14th Dist.] 2013). and (d) A statement that imputes sexual misconduct. *Id*. A statement that is not obviously hurtful on its face and requires extrinsic facts or circumstances to explain its defamatory nature is defamation *per*

*quod. Id.*

16. The Texas Supreme Court has adopted the test used by the *Milkovich* court in determining whether a statement is actionable in defamation. *Bentley* v. Button, 94 S.W.3d 561, 579 (Tex. 2002); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 – 23 (1990). In his motion to dismiss, Retzlaff argues that the statements on his blog are either pure opinion or rhetorical hyperbole. However, the *Milkovich* court held that the First Amendment does not demand an inquiry into whether a statement is opinion or fact, because existing constitutional doctrine adequately secures freedom of expression without the need to create an artificial dichotomy between the two. 497 U.S. at 19. Under the test set out in *Milkovich* and adopted by *Bentley*, an opinion (like any other statement) can be actionable in defamation if it expressly or impliedly asserts facts that can be objectively verified. See e.g. *Milkovich*, 497 U.S. at 18-19; *Bentley*, 94 S.W.3d at 580.

17. When Retzlaff states that "In my opinion, Van Dyke is a Nazi", "In my opinion, Van Dyke is a Nazi drug addict", or "[w]e will post more later about Denton attorney Jason Van Dyke and our efforts at identifying ALL of his clients, as well as the court records regarding him being a pedophile", he has implied knowledge of facts which lead to the conclusion the Plaintiff is, in fact, a Nazi, a drug addict, or a pedophile respectively. Retzlaff cannot escape this implication by couching his statements in terms of opinion or rhetorical hyperbole, using ridiculous graphics near where these statements are published, publishing them in conjunction with taunts, or claiming that the entire blog is meant to be silly and fun. Plaintiff's employers certainly did not see it this way. See Exhibit "7". See also Ex. 1, ¶ 11.

18. While it may be an oversimplification of the issues in this case, the question of whether summary judgment should be granted boils down to an answer the following questions:

   1. What would a person of normal intelligence believe if they saw the following:

   

   2. Is the following an expression of fact or an expression of opinion/hyperbole?

   

3. Did Retzlaff intend for the contents of this post on the "BV Files" blog to be taken seriously by readers?

> Good day, eh. Well today's topic is all about Nazis and white supremacists and people who have the look of a pedophile – and the corporations that hire them. Edward LaMonica and his ex-wife Ashley Ann (LaMonica) Mitchell are the owners of a so-called "credit repair" company based out of Plano, Texas. Ed and Ashley – along with their good friend, business partner, and brother-in-law Allen Humphris – are HUGE SUPPORTERS of white supremacists & Nazis – 100% VERIFIED!!
>
> Doing business with Nazis is bad for business – and we plan to make sure business goes very, very badly for some folks – 100% VERIFIED!!




Ashley Mitchell    Edward LaMonica

19. There is no way a person of ordinary intelligence could read any of these headlines on the "BV Files" blog and reach the conclusion that the content was "loose figurative language" or that it was "pointed, exaggerated and heavily laden with emotional rhetoric and moral outrage." These posts purport to print hard facts, their motive is crystal, and their purpose is clear: to inflict as much damage as possible on the reputation of Plaintiff and his clients, to harm Plaintiff's law practice, and to serve as a deterrent to others from conducting business with him (lest he libel them in the same manner).

20. Defendant argues that the blog contains what is purportedly a disclaimer. Perhaps the disclaimer cited by Defendant is the only portion of the blog not meant to be taken seriously because the following texts appears prior to it (as of 8/21/2020):

> This blog is all about everything related to James McGibney (who we don't like), the company ViaView, Inc., and their revenge pornography / blackmail websites Bullyville.com & Cheaterville.com. As well as McGibney's white supremacist / Nazi side-kick Jason Lee Van Dyke. We also offer our opinions about the quality of services offered to the public in the marketplace by ViaView, Inc., Klein Investigations & Consulting, and their employees / owners, as well as their attorneys.
>
> If you have any story ideas on whatever McGibney / Klein / Van Dyke related subjects, please do not hesitate to let us know!
>
> **Also, if you feel we made a mistake or just gotten something plain wrong, let us know and give us the specifics so we can make it right.**
>
> If you truly want to be contacted, then give us legit contact info. If you don't want to be contacted, but just offer only anonymous feedback, that's okay. Just use obviously fake contact info so we don't waste anytime trying to contact you. thanks!
>
> Name:

Thus, notwithstanding Retzlaff's arguments to the contrary, the blog clearly purports to offer truthful information about Plaintiff and others. It even makes a (laughable) offer to "make it right" in the event of a "mistake" or getting something "plain wrong".

C. **Referring to Plaintiff As a "Nazi" or "White Supremacist" Is Defamatory *Per Se***

21. Courts around the country have recognized that whether a statement is "defamatory" must be measured by current social norms. It was once defamatory to falsely identify a white person as African American. In *Flood v. News & Courier Co.*, the court held that "to call a white man a negro affects the social status of the white man so referred to." 50 S.E. 637, 639 (S.C. 1905). While a holding of this nature is outrageous by twenty first century standards, it was not until forty years ago that courts began rejecting claims for defamation based upon racial misidentification. The courts held "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Thomason v. Times-Journal, Inc.*, 379 S.E.2d 551, 553, *quoting*

*Palmore v. Sidoti*, 466 U.S. 429, 422 (1984). See also: *Albright v. Morton*, 321 F.Supp. 2d 130, 138 (D. Mass. 2004) (discussing defamation law and stating that "statements falsely linking a plaintiff to racial, ethnic, or religious groups, which plainly would not qualify as defamation today) *Polygram Records Inc. v. Super. Ct.,* 170 Cal. App. 3d 543, 557 (Cal. 1985) (rejecting claim based on supposed association of Plaintiff's brand of wine with African Americans).

22. Similarly, courts have increasingly rejected previous rulings that allegations of homosexuality are defamatory *per se*. In *Amrack Prods. Inc. v. Morton*, the First Circuit rejected a defamation claim based upon an allegedly false claim of homosexuality. 410 F.3d 69 (1st Cir. 2005). Many other courts have rejected defamation claims based upon homosexual conduct finding, for example, that "the fact of [prejudice] on the part of some does not warrant a judicial holding that gays and lesbians, merely because of their sexual orientation, belong in the same class of criminals." *Hayes v. Smith*, 832 P.2d 1022, 1025 (Colo. App. 1991). See also: *Donovan v. Fiumara*, 442 S.E.2d 572, 580 (N.C. Ct. App. 1994) (finding that allegations of homosexuality are defamation *per quod* rather than defamation *per se*); *Albright*, 321 F. Supp. 2d at 138 (rejecting homosexuality as the basis of a claim for defamation per se); *Yonaty v. Mincolla*, 97 A.D.3d 141, 145-46 (N.Y.App. Div. 2012) (rejecting a defamation claim concerning homosexuality based upon the "prevailing attitudes of the community" and the "tremendous evolution in social attitudes regarding homosexuality").

23. Shortly after World War II and during the Cold War, courts held that misidentifying someone as a communist was defamatory per se. *Utah State Farm Bureau Fed'n v. Nat'l Farmers Union Serv. Corp.*, 198 F.2d 20, 23 (10th Cir. 1952) (noting the "temper

of the times" in holding that identifying someone as "communist" or a "communist sympathizer" is defamatory per se). When considering that openly socialist individuals are serving as mayors of cities like New York, as U.S. senators in Vermont, and in some cases, making credible runs for the presidency of the United States, it is highly probable that prevailing attitudes towards communism in the twenty-first century, and evolving social norms concerning communist ideas, would doom a defamation claim by a person claiming to have been defamed as a "communist" or "communist sympathizer". However, referring to someone as a Nazi or a white supremacist in modern society is certainly the type of statement that meets the criteria for defamation *per se* under the Texas statute. Such claims are certainly as independently verifiable today (if not more so) as claims concerning communism were in 1954.

24. When a court categorizes statements as defamatory per se, it reinforces general societal disapproval of people described in the manner of the offending speech. This was a problem for courts when they are asked to uphold such implications of societal scorn for homosexuals and people of color. While white supremacy and anti-Semitism may have been acceptable when *Flood* was decided in 1905, such views have reached a level of scorn in the 21st century similar to that reserved for murderers and thieves. Just as evolutions in social attitudes have led to the acceptance of those previously scorned, those same attitudes condemn "Nazis" and other white supremacists as being akin to felons. The Court should recognize this societal change and find that wrongful references to an individual as a "Nazi" or "white supremacist" as legally actionable as defamation *per se*. Doing so would not buck judicial trends: it would validate societal disapproval of Nazis and other forms of racism while holding sociopaths like Retzlaff

accountable when they make such claims falsely, recklessly, and with malicious intent.

25. Court have already recognized, at least implicitly, that similar terms can form the basis for a defamation claim. In *Armstrong v. Shivrell*, a disbarred attorney was sued for defaming a student activist at the University of Michigan. 596 Fed.Appx. 433 (6th Cir. 2015). Shivrell made the same arguments concerning opinion and rhetorical hyperbole that Retzlaff makes in his motion. The 6th Circuit found that "the vast majority of Shirvell's statements were capable of defamatory meaning because they can reasonably be interpreted as conveying actual facts. The common usage of Shirvell's words does not suggest that they are commonly understood as loose, figurative, or hyperbolic. **Courts have held that words like "liar" and "racist" have clear, well understood meanings, which are capable of being defamatory**." *Id*. at 442 (emphasis added, quoting *Milkovich* at 1; *Taylor v. Carmouche*, 214 F.3d 788, 793-94 (7th Cir. 2000); and *Connaughton v. Harte Hanks Commc'ns, Inc.*, 842 F.2d 825, 840-41 (6th Cir. 1988)).

26. Between the "Unite the Right" rally in Charlottesville, Virginia in 2017 and the killing of George Floyd in Minneapolis, MN earlier this year, there is a large segment of the population which believes that we are going through what has been referred to as a "national reckoning" on issues of race and white supremacy. Both events have charged the national conversation concerning such issues and created what has colloquially been referred to as a "cancel culture", in which those who refuse to tow the politically correct line on racial issues quickly find themselves unemployable and homeless. The sad truth is that, whenever trumped up charges of racism, Nazism, and white supremacy are conjured out of thin air by the Thomas Retzlaffs of this world, they almost

inevitably result in ruined careers, broken families, and worse. The victims of "cancel culture" are no less deserving of justice than victims of hate crimes or police brutality.

### D. All of Retzlaff's Other Statements Are Also Defamatory *Per Se*

27. Retzlaff is also being sued for repeatedly making factual assertions that Plaintiff is a drug addict, a pedophile, has a criminal record for abusing women, is involved in revenge pornography, has bipolar disorder, has syphilis, and has engaged in criminal sexual misconduct such as a homosexual relationship with a witness and unwanted sexual solicitation.

28. Each and every one of these assertions of fact imputes that Plaintiff has committed a felony or a crime of moral turpitude (sexual assault of a child, possession of child pornography, possession of a controlled substance, witness tampering, and assault causing bodily injury are just a few of the criminal offenses that can be imputed from these statements). The mere fact that they falsely impute that Plaintiff has committed crimes of this nature would be sufficient to bring a claim for defamation per se *regardless* of Plaintiff's occupation.

29. These allegations are more serious in light of that fact that, at the time they were made, Plaintiff was an attorney. To the extent that each of these statements impute a crime, they also impute a violation of the rules of professional conduct in each jurisdiction where Plaintiff was licensed to practice. See e.g. *Tex. Discip. R. Prof. Cond*. § 8.04(a)(2). Furthermore, although allegations of drug addiction and mental illness are not always prosecuted by state bar authorities as *per se* violations of the rules of professional conduct in the absence of a criminal conviction, they are often used to strip attorneys of their licenses on the basis that such addictions make them mentally unfit to

        practice law.

30.     To the extent that pedophilia and drug addiction have been treated as "diseases" by mental health professions in recent years, imputing this type of conduct to Plaintiff also carries with it the implication that Plaintiff presently has a loathsome disease, which meets the criteria for defamation per se.

### E. Retzlaff Has Mischaracterized Plaintiff's Claim for Tortious Interference, As Well As The Law Pertaining to Harassment and Stalking

31.     To prove that a defendant's conduct was independently tortious or unlawful, a plaintiff must demonstrate that a defendants conduct would be actionable under a recognized tort. *Wal-Mart Stores v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001); *Astoria Indus. v. SNF, Inc.*, 223 S.W.3d 616, 634 (Tex. App. – Fort Worth 2007, pet. denied). It is *not* the plaintiff's burden to prove that defendant's conduct was not justified or privileged, and any such claim must be raised as an affirmative defense. *Sturges*, 52 S.W.3d at 727.

32.     The only claim of privilege relied upon by Retzlaff is his completely unmeritorious claim that this entire lawsuit was filed in retaliation for a state bar grievance – rather than in retaliation for Retzlaff proximately causing the termination of Plaintiff's employment. ECF 126, ¶ 98. Is there any evidence of tortious or unlawful conduct by Retzlaff? The answer to that question is a clear and unequivocal "YES".

33.     In addition to libel, Retzlaff has criminally stalked and harassed Plaintiff in violation of both Tex. Penal Code § 42.07(a)(7) and § 42.072, as well as 18 U.S.C. § 2261A. Although the Second Court of Appeals in Fort Worth appeared to make a holding in the *Fernandez* case cited by defense counsel that "stalking" can only occur with respect to conduct between persons in some sort of dating relationship, this holding is clearly contrary to the plain wording of the statute. See Tex. Penal Code § 42.072(a).

34. The question of the constitutionality of the Texas stalking and harassment statutes – which have been repeatedly violated by Retzlaff – remains an open one. The U.S. Supreme Court had an opportunity to weigh in on the matter, but denied certiorari in *Ogle v. Texas* in October of 2019. Despite the U.S. Supreme Court declining to address the issue in *Ogle*, both the harassment and stalking statute are reasonable restrictions on speech and have been held as such by many intermediate Texas appellate courts.

35. The last time the Texas Court of Criminal Appeals addressed that harassment statute, it as asked to consider whether Tex. Penal Code § 42.07(a)(4) (telephone harassment) ran afoul of speech protected by the First Amendment. *Scott v. State*, 322 S.W.3d 662 (Tex. Crim. App. 2010), *abrogated on other grounds by Wilson v. State*, 448 S.W.3d 418 (Tex. Crim. App. 2014). While the court held that constitutional guarantees on free speech generally protects the freedom to express ideas, opinions and information, the state may lawfully proscribe conduct that invades the substantial privacy interests of another in an essentially intolerable manner. *Id.* at 668-69. The conduct committed by Retzlaff in this case is another perfect example of conduct invading the substantial privacy interests of Plaintiff in an essentially intolerable manner.

36. In the *Barton* case cited by Retzlaff, the state court of appeals in Fort Worth interpreted the *Wilson* case as repudiating the entire holding of the *Scott* case (and thus, opening the door to declare the § 42.07(a)(7) – relating to online harassment - unconstitutional). *Barton* demonstrates little more than a split among Texas intermediate appellate courts concerning the constitutionality of Tex. Penal Code § 42.07(a)(7), which has yet to be resolved by the Texas Court of Criminal Appeals.

37. At least four intermediate appellate courts have disagreed with the *Barton* court and

upheld the constitutionality of the harassment statute based upon the reasoning of the Court of Criminal Appeals in *Scott*. *Lebo v. State*, 474 S.W.3d 402, 408 (Tex. App. -- San Antonio 2015, pet. ref'd); *Ex Parte Hinojos*, Cause No. 08-17-00077-CR (Tex. App. -- El Paso, Dec. 19, 2018, pet. ref'd); *Ex Parte Reece*, Cause No. 11-16-00196-CR (Tex. App.-Eastland Nov. 30, 2016, pet. ref'd); *Blanchard v. State*, No. 03-16-00014-CR (Tex. App.-- Austin, June 2, 2016, pet. ref'd); Other courts have upheld the constitutionality of the Tex. Penal Code § 42.07(a)(7) since *Barton.* See e.g. *Tarkington v. State*, Cause No. 12-19-00078-CR (Tex. App. – Tyler Mar. 18, 2020). The Texas Court of Criminal Appeals has yet to weigh in on the holding in *Barton*.

38. Regardless of whether the Texas stalking or harassment statutes are constitutional, Retzlaff has also violated 18 U.S.C. § 2261A (the federal stalking statute) with respect to Plaintiff and has libeled Plaintiff. His conduct clearly meets the criteria for that which is "independently tortious or unlawful".

**F.     Plaintiff Is Not Required to Prove The *New York Times* Standard of Actual Malice Because He Is Not A Public Figure**

39. Despite Retzlaff's claims to the contrary, Plaintiff is not a public figure in any respect. This question was litigated at length on Defendant's motion to dismiss under FRCP 12(b)(6) and Plaintiff's response to the same. Furthermore, the electronic communications by Retzlaff to KLR, as well as the statements on his website, clearly pertained to the business Plaintiff was conducting as an attorney.

40. Business disparagement is a tort similar to defamation because both involve the imposition of liability for an injury sustained through publication to a third person of a false statement of fact concerning the plaintiff. *Astoria Industries*, 223 S.W.3d at 624-25. The difference is that an action for defamation is to protect the personal reputation

of an injured party while an action for business disparagement is to protect the economic interests of an injured party. *Hurlbut v. Gulf Atlantic Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987).

41. The common-law standard for business disparagement required a plaintiff to prove the defendant's malice in making the statement. However, the element of malice can be met in a business disparagement case by demonstrating knowing falsity, reckless discard for falsity, **or** acting with ill will or intent to interfere with a plaintiff's interests. *Id*. at 766; *Restatement (Second) of Torts* § 623A (1977).

42. The U.S. Supreme Court has required a proof of knowing falsity or reckless disregard for truth – actual malice – in business disparagement cases against a media defendant. See *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 511-14 (1984). The Texas Supreme Court has also assumed, *without deciding*, that the *New York Times* standard for actual malice applies to a public figures business disparagement suit against a media defendant. *Forbes Inc. v. Granada Biosciences Inc.*, 124 S.W.3d 167, 171 (Tex. 2003). However, it remains unclear whether the common law standard or some other standard applies in cases such as this where the party disparaged is not a public figure, the defendant is not a media outlet, and the disparagement does not involve a matter of public concern.

43. If the common law controls, simple proof of ill will qualifies as a basis of liability. *Hurlbut*, 749 S.W.2d at 766; *Forbes*, 124 S.W.3d at 170. It does control in this case. Especially in light of his arguments concerning the nature of the BV Files blog, Retzlaff cannot credibly claim to be a media defendant. Furthermore, Retzlaff's summary judgment motion provides neither evidence nor argument on the question of whether

        Plaintiff is a public figure (a question that was already addressed at length in his 12(b)(6) motion and Plaintiff's response).

44. There is no legitimate question that the parties to this case have harbored, and continue to harbor, extreme amounts of hostility and ill-will towards each other (as this Court has noted on several occasions). There can also be no question that Retzlaff's behavior was specifically designed to cause to cause the termination of Plaintiff's employment as an attorney and that it was intended to harm his career.

45. Finally, even if Plaintiff were a public figure, Retzlaff's conduct on his face goes beyond reckless disregard for the truth: this is a sociopathic defendant who has no regard for the truth whatsoever and who, since March of 2017, has routinely made claims about Plaintiff that any reasonable investigation would conclusively establish as lies. The plainly obvious fact that Retzlaff himself fails to qualify as a "reasonable person" is neither justification nor excuse for his behavior.

**G.     Retzlaff Clearly Initiated and Procured A Malicious Prosecution of Plaintiff**

46. It is well-settled law that a defendant "initiates" a criminal prosecution by making a formal charge to law enforcement authorities. *Browning-Ferris Indus. v. Lieck*, 881 S.W.2d 288, 292 (Tex. 1994). Evidence that the defendant filed formal charges against the plaintiff is sufficient to show that the defendant initiated the criminal prosecution. *Id*. at 293. A defendant "procures" a prosecution if its actions were enough to cause the prosecution and if the prosecution would not have occurred but for its actions. *Id*. at 292.

47. Plaintiff attaches as Exhibit "8" the electronic communications between himself and Oak Point Police Chief Michael Shackleford ("Shackleford") in support of his

        contention that Retzlaff procured a prosecution against him. He attaches as Exhibit "9" a copy of the affidavit executed by Shackleford in support of an arrest warrant. He attaches as Exhibit "10" the (perjured) affidavit submitted by Retzlaff to Shackleford, which was referenced in Shackleford's arrest warrant affidavit. He also attaches as Exhibit "11" additional e-mails communications to the Oak Point Police Department from Retzlaff concerning Plaintiff. These documents conclusively prove that Plaintiff would not have been wrongfully arrested by the Oak Point Department of Public Safety but for the false report made by Retzlaff. See also Ex. 1, ¶ 12 – 15.

48. For the purposes of a malicious prosecution lawsuit, a no-bill from a grand jury is legally sufficient to show that a prosecution was terminated in a Plaintiff's favor. See *French v. French*, 385 S.W.3d 61, 71-72 (Tex. App. – Waco 2012, pet. denied); *Restatement (2d) of Torts* § 659(b). A copy of the no bill (for a lesser included offense of harassment) is attached hereto as Exhibit "12".

49. Plaintiff was also innocent of the charge because he did not send the e-mail referenced in the arrest warrant affidavit, and hence, did not commit the offense. Ex 1, ¶ 16 – 17. Shortly prior to the no-bill, Plaintiff's prior roommate invoked his Fifth Amendment privilege against self-incrimination as to his relationship and contacts with Retzlaff. A copy of that affidavit is attached hereto as Exhibit "13". See also Ex. 1, ¶ 18 – 19.

50. Defendant is correct with respect to one of the points made in his motion: Plaintiff has no way of knowing what Retzlaff honestly and reasonably believed the facts to be with respect to the false report he filed against Plaintiff. Once again, the reason for this is because Retzlaff has refused to answer discovery that is specifically related to this element of the tort. The communications between Retzlaff and police, prosecutors, and

other individuals (including, potentially, Isaac Lee Marquardt and Jason Ryan De Keresforth Armitage) would likely have shed significant light on Retzlaff's malicious intentions. Once again, Plaintiff would show that the Retzlaff cannot use his Fifth Amendment privilege as both a shield and a sword. See *supra* ¶ 11 – 15.

### III. PRAYER

51.   Plaintiff prays that Defendant's motion for summary judgment be denied.

Respectfully submitted,

/s/ Jason Lee Van Dyke
Jason L. Van Dyke
PO Box 2618
Decatur, TX 76234
P – (940) 305-9242
Email: jasonleevandyke@protonmail.com

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was electronically filed on the CM/ECF System, which will automatically serve a Notice of Electronic Filing on Jeffrey Dorrell, Attorney for Defendant.

/s/ Jason Lee Van Dyke
JASON LEE VAN DYKE