## AFFIDAVIT OF ISAAC LEE MARQUARDT

| | |
|---|---|
| **COUNTY OF DENTON** | ) |
| | ) |
| **STATE OF TEXAS** | ) |

Before me, the undersigned Notary Public, on this day personally appeared Isaac Lee Marquardt, known to me, who being by me duly sworn, upon his oath deposed and said:

1. My name is Isaac Lee Marquardt. This is my affidavit. I have not been paid or coerced by any person to write or sign it, and it is being notarized at a place of my choosing. I am nineteen years of age. I have personal knowledge of the facts stated in this affidavit, and they are all true and correct. The headings contained in this affidavit are for reference purposes only.

2. The purpose of this affidavit is to correct or clarify certain statements I have previously made concerning these matters and to clarify certain conceptions once and for all.

### A. Background

3. I have known Jason Lee Van Dyke ("Van Dyke") for slightly more than one year. During that time, I have become acquainted with his legal problems concerning a supposed false report to the Oak Point Police Department, an ongoing lawsuit involving Thomas Christopher Retzlaff ("Retzlaff"), and multiple attorney discipline actions against him in Texas, Colorado, Georgia, and Washington D.C.

4. I resided with Van Dyke at 108 Durango Drive, Crossroads, Texas 76227 for one month between the approximate dates of August 20, 2018 and September 20, 2018. During this time, I had access to the entirety of his residence and had permission to drive his motor vehicles, to wit, a 2014 Ford F250 King Ranch pickup truck and a Ford Mustang GT convertible.

5. During the time I have known Van Dyke, I came to be aware of a situation involving him and Retzlaff. I personally observed that Van Dyke regularly suffered from significant emotional distress due to Retzlaff attacking him. Several individuals, who had known Van Dyke longer than I had, commented that Van Dyke had never been quite the same person as he was before Retzlaff began attacking him.

6. Despite the ongoing emotional distress that he was clearly suffering from, I have found Van Dyke to be a good and decent person. I believe that he is trustworthy and honest almost to a fault. He is extremely loyal to his family and to his friends.

INITIALS: _ILM_           Page 1 of 6

For him to lie, cheat, or steal would be completely contrary to the character traits that I have observed in him for as long as I have known him.

7. I have read the accusations that have been made against him by Retzlaff and which have been repeated by certain media outlets. Van Dyke is politically conservative, but is certainly not a Nazi, a white nationalist, or a white supremacist. The allegations made by Retzlaff that he is a "drug addict" are similarly false as I have never observed him using illegal drugs. In fact, I have witnessed him actively discouraging others from the use of drugs. I believe that he is mentally stable, and the allegations made against him by Retzlaff that he is a "pedophile" are completely untrue.

8. I am also aware of allegations made by Retzlaff and others that Van Dyke and I were romantically involved. I am heterosexual and have never been romantically involved or interested in Van Dyke or any other man. I can also state, with certainty and without elaborating, that Van Dyke is heterosexual.

### B. False Police Report Incident (September 13 – 14, 2018)

9. I was not present at 108 Durango Drive, Crossroads, Texas 76227 on the evening of September 13, 2018 when the burglary of Van Dyke's Ford F250 pickup truck occurred. I was visiting a friend in the City of Denton and did not return to the house until after midnight.

10. Upon returning to the house, and by telephone before returning, I talked to a police officer from the Oak Point Police Department concerning the burglary of Van Dyke's Ford F250 pickup truck. The truck was not parked at the house when I got home, and I assumed that Van Dyke had gone somewhere. I was not told that he had been arrested until after they had spoken to me.

11. With respect to all statements made to the Oak Point Police Department on the evening of September 13, 2018, the morning of September 14, 2018, or anytime thereafter, I hereby invoke my rights under the 5th Amendment to the United States Constitution. Pursuant to that right, I will not answer any questions concerning any verbal or written statement I made to the Oak Point Police Department during this time period.

### C. Subsequent Contact with the Oak Point Police Department and the Court

12. I moved out of Van Dyke's home on approximately September 20, 2018. After I moved out, I was still permitted to access Van Dyke's property. I still saw Van

INITIALS: *ILM*  Page 2 of 6

Dyke socially on occasion. I also took care of Van Dyke's dogs during times when he was out of town or otherwise unable to do so.

13. On or around January 8, 2019, Van Dyke advised me that he was going to turn himself in on a warrant that had been issued for his arrest while he was out of town. He asked me to take care of his dogs while he was in jail. I agreed to do so.

14. Prior to Van Dyke turning himself in, he warned me that only I was permitted to enter his house. He cautioned me against speaking with the media and directed me not to admit any members of the media onto his property. He also cautioned me against speaking about him, or about his case, on the Internet and specifically directed me not to admit unknown persons into his home.

15. While Van Dyke was in jail, on or around January 11, 2019, officers from the Oak Point Police Department appeared at Van Dyke's home while I was present for the purpose of questioning me a second time and searching the house with a search warrant. I observed the officers search the entire house, except the attic, and observed them take Van Dyke's laptop computer and several other items. To the best of my recollection, the officers did not leave a copy of the search warrant or any list of the items taken from the house.

16. I did speak to Van Dyke's father, Daniel Van Dyke, during the time that Van Dyke was in jail. We did not discuss the cases involving Van Dyke at all and I was never instructed to "not answer the door" or to "make myself scarce" by Daniel Van Dyke. We did not discuss the possibility of me being a character witness in any of the trials involving Van Dyke. The sole extent of our conversations concerned whether Van Dyke was safe and in good health at the jail, and the care of Van Dyke's dogs.

17. Neither Van Dyke, nor any person acting on his behalf (including his father), made any attempt to dissuade me from testifying in his criminal case.

18. Neither Van Dyke, nor any person acting on his behalf (including his father), offered me anything of value to dissuade me from testifying in his criminal case.

19. Neither Van Dyke, nor any person acting on his behalf (including his father), made any kind of threat against me, or any other person that I am aware of, to dissuade me from testifying in his criminal case.

20. Neither Van Dyke, nor any person acting on his behalf (including his father), gave me any advice or instructions on how to evade process servers or detection from law enforcement.

INITIALS: JLM

21. The only time I discussed the false report case with Van Dyke after he was released from jail was to inquire as to whether he could act as my attorney if I was located and served with a subpoena. Van Dyke stated that he could not do so and that he did not want to talk to me at all until the case was over.

22. After being interviewed by officers from the Oak Point Police Department for the second time, I was determined to have no further involvement of any kind in Van Dyke's case. I moved in with a friend in Tarrant County. I did not answer or return telephone calls from police or investigators. The only people I did speak to about the case were Van Dyke's attorneys. They also asked me to appear for Van Dyke's case, and I told them that I would not appear unless I received a subpoena. I was never served with a subpoena.

23. Van Dyke had nothing to do with my decision to have no further involvement in the case. My decision was based upon the following factors:

    a. I believe that, if I had testified truthfully at Van Dyke's trial, that I would have been required to invoke my 5th Amendment rights and hire my own attorney to protect those rights.

    b. In addition to the facts surrounding the false report case, I believe that I may have also been required to answer questions under oath at trial as to whether I had been contacted, coerced, or influenced by Retzlaff into doing any particular thing or making any particular statement. I would have been required to invoke my 5th Amendment privilege concerning those activities as well.

    c. I did not want to have any contact with the local or national media organizations which had taken an interest in Van Dyke's case. I did not want to be reported on in the newspaper, on television, or online.

    d. In the likely event that my truthful testimony had resulted in or contributed to Van Dyke winning the false report case, I believe that I would have become a target for threats, harassment, and stalking by Retzlaff.

    e. After being interviewed by offices from the Oak Point Police Department for a second time, it was clear to me that they were not serving the interests of justice and were simply trying to pin as many criminal charges as they could onto Van Dyke. I feared retaliation against me by the Oak Point

Police Department if my testimony harmed them in this effort and would not have been able to afford an attorney to defend myself against them.

24. I did not begin seeing Van Dyke socially again until after the false report case was over. On the occasions where I did see him socially after the case was over, he did not wish to discuss his case with me. This did not change until May of 2019, which is when I offered to make him an affidavit to help clarify what had really happened while still protecting my own rights.

### D. Miscellaneous Matters

25. Van Dyke has not, at any time, directed me to lie to law enforcement officers, investigators, prosecutors, or the people who work for state bar organizations. To the contrary, he has repeatedly told me that I must tell the truth if I am ever questioned by such people.

26. I am terrified of Retzlaff. I have observed Retzlaff systematically destroy Van Dyke's life in every way I could imagine for as long as I have known Van Dyke. Although my rights under the 5th Amendment were my primary motivation in declining to make myself available for service of a subpoena, my fear of Retzlaff was a strong secondary factor. Contributing to my fear of Retzlaff is what has come to be my personal belief that certain law enforcement officers, prosecutors, and courts are quietly encouraging Retzlaff to continue his attacks against Van Dyke for their own ends. For these reasons, I do not wish to have any involvement in any legal proceedings concerning Van Dyke.

27. At a time of my choosing, I will be mailing this original affidavit to Dominick Marsala, who is currently listed as Van Dyke's attorney, to him at 1417 E. McKinney Street, Denton, Texas 76209. At that same time, I will also be mailing true and correct ~~photocopies~~ originals [ILM 8/22/19] of this affidavit to the following:

   a. Denton County District Attorney, Attn: Kristin Kidd, 1450 E. McKinney Street, Denton, TX 76209.

   b. Office of the Chief Disciplinary Counsel, State Bar of Texas, Attn. Kristin Brady, 14651 Dallas Parkway, Suite 925, Dallas, TX 75254.

   c. Office of the Disciplinary Counsel, District of Columbia, Attn: Bill Ross, 515 5th Street NW, Building A, Room 117, Washington D.C. 20001.

INITIALS: ILM

d. Office of Attorney Regulation Counsel, Colorado Supreme Court, Attn: Matthew Gill, 1300 Broadway, Suite 500, Denver, CO 80203.

e. Office of General Counsel, State Bar of Georgia, Attn: William Hearnburg, 104 Marietta Street NW, Suite 100, Atlanta, GA 30303.

If Retzlaff obtains a copy of this affidavit, it will further confirm my fears and suspicions of collusion between these persons and Retzlaff.

28. Further affiant sayeth not.

*Isaac Lee Marquardt*
ISAAC LEE MARQUARDT

SWORN AND SUBSCRIBED to before me, the undersigned authority, this 22nd day of August, 2019 to certify which witness my hand and official seal of office.

Notary Public
State of Texas

EMILY PACE
NOTARY PUBLIC STATE OF TEXAS
MY COMM. EXP. 9/12/2020
NOTARY ID 13081832-9

INITIALS: ILM